UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROSS SCHUCKER, EDWARD FRYAR, VIRGILIO VALDEZ, TOM SHAFFER, STEVEN HEINRICH and SHANE BOWER on behalf of themselves and all other employees similarly situated, <br><br> PLAINTIFFS, <br><br> v. <br><br> FLOWERS FOODS, INC., LEPAGE BAKERIES PARK STREET, LLC, C.K. SALES CO., LLC and JOHN DOE 1-10, <br><br> DEFENDANTS. | Case No. 16-cv-3439 (KMK) (PED) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND COMPLAINT**

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................ iii

Background ......................................................................................................... 4

I.     Flowers Foods, Inc., Lepage Bakeries Park St., LLC, and CK Sales, Co ........................ 4

II.    Plaintiffs' Independent Distributor Agreements .................................................. 4

III.   The Plaintiffs' Distributorship Businesses ........................................................ 5

IV.   Procedural History .......................................................................................... 8

Argument ........................................................................................................... 9

I.     The Court Should Grant Summary Judgment to Defendants ............................... 9

    A.    Plaintiffs' Overtime Claims (Counts I and II) .......................................... 9

        1.    Plaintiffs Were Properly Treated as Independent Contractors Under the FLSA (Count I) ........................................................... 9

            a.    Defendants Did Not Exercise Control Over Plaintiffs ................. 10

            b.    Plaintiffs Made Investments in Their Businesses and Had Opportunities for Profit and Loss ................................................ 13

            c.    Plaintiffs' Work Required Skill and Independent Initiative ........ 16

            d.    Plaintiffs' Relationship Was Not Permanent ............................... 17

            e.    Plaintiffs' Work Was Not Integral to Defendants' Business ....... 18

        2.    Plaintiffs Were Properly Treated as Independent Contractors Under the NYLL (Count II) ................................................................... 18

            a.    Plaintiffs Worked at Their Own Convenience and Were Not on a Fixed Schedule ............................................................. 18

            b.    Plaintiffs Were Free to Engage in Other Work ........................... 19

            c.    Plaintiffs Did Not Receive Benefits and Were Not on Payroll ..................................................................................... 20

    B.    Plaintiffs' Overtime Claims (Counts I and II) Fail Because They Were Exempt from Overtime Requirements ................................................. 20

        1.    Plaintiffs Were Exempt Under the Motor Carrier Exemption ................. 20

            a.    Lepage is a Motor Private Carrier .............................................. 21

            b.    Plaintiffs Engage in Activities that Affect the Safety of Operation of Motor Vehicles in Interstate Commerce ................. 21

            c.    The Technical Corrections Act Does Not Apply to Plaintiffs ..................................................................................... 23

# TABLE OF CONTENTS
### (continued)

**Page**

2. Plaintiff Valdez Met the Requirements of the Outside Sales Exemption from June 2015 to January 2016 ............................................. 24

C. Plaintiffs' NYLL Unlawful Deductions (Count III) Claims Fail as a Matter of Law ...................................................................................................... 25

D. Plaintiffs' ERISA Claims (Counts IV through VII) Fail ..................................... 26

E. Plaintiffs' Unjust Enrichment Claims (Count VIII) Fail Because Their Relationship With Defendants is Governed by Contract .................................... 27

F. Plaintiff Schucker, Shafer, Fryar and Heinrich's NYLL, ERISA and Unjust Enrichment Claims (Counts II-VIII) are also Barred by Release ............ 28

II. The Court Should Deny Plaintiffs' Motion to Amend ...................................................... 29

A. Plaintiffs' Claims Fail as a Matter of Law ............................................................ 29

C. There is No Good Cause for Plaintiffs' Amendment ............................................. 30

B. Plaintiffs' Request to Amend Should Also Be Denied as Unduly Delayed and Prejudicial ........................................................................................................ 32

Conclusion ................................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbatiello v. Monsanto Co.*,
  571 F. Supp 2d 548 (S.D.N.Y 2008)......................................................................35

*Avery v. Chariots For Hire*,
  748 F. Supp. 2d 492 (D. Md. 2010)......................................................................24

*Bertrand v. Sava*,
  535 F. Supp. 1020 (S.D.N.Y. 1982), rev'd, 684 F.2d 204 (2d Cir. 1982) ............ 35

*Bilyou v. Dutchess Beer Distributors, Inc.*,
  300 F.3d 217 (2d Cir. 2002).................................................................................22

*Brock v. Superior Care, Inc.*,
  840 F.2d 1054 (2d Cir. 1988)...............................................................................10

*Browning v. Ceva Freight*,
  LLC, 885 F. Supp. 2d 590 (E.D.N.Y. 2012)................................................ passim

*Cannon v. Douglas Elliman*,
  LLC, 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007)............................................27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...............................................................................................9

*Chaohui Tang v. Wing Keung Enterprises, Inc.*,
  210 F. Supp. 3d 376 (E.D.N.Y. 2016) .................................................................21

*Chenensky v. New York Life Ins. Co.*,
  2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009) .....................................................24

*Chenensky v. New York Life Ins. Co.*,
  2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011).......................................................26

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
  70 N.Y.2d 382, 516 N.E.2d 190 (1987)...............................................................28

*Commander Oil Corp. v. Barlo Equip. Corp.*,
  215 F.3d 321 (2d Cir. 2000)..................................................................................35

*Cruz v. AAA Carting & Rubbish Removal, Inc.*,
116 F. Supp. 3d 232 (S.D.N.Y. 2015)....................................................................21

*DiFilippo v. Barclays Capital, Inc.*,
552 F. Supp. 2d 417 (S.D.N.Y. 2008)....................................................................28

*Downes v. J.P. Morgan Chase & Co.*,
2006 WL 1233939 (S.D.N.Y. May 8, 2006) .........................................................27

*Downes v. J.P. Morgan Chase & Co.*,
2006 WL 785278 (S.D.N.Y. Mar. 21, 2006) .........................................................27

*Downey v. Coal. Against Rape & Abuse, Inc.*,
143 F. Supp. 2d 423 (D.N.J. 2001) ........................................................................35

*Flood v. Just Energy Marketing Corp.*,
2017 WL 280820 (S.D.N.Y. Jan. 20, 2017) ..........................................................26

*Freund v. Hi-Tech Satellite, Inc.*,
185 F. App'x 782 (11th Cir. 2006) .........................................................................18

*Garcia v. W. Waste Servs., Inc.*,
969 F. Supp. 2d 1252 (D. Idaho 2013) ..................................................................24

*Hernandez v. Fresh Diet, Inc.*,
2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014)........................................................34

*Hummel v. AstraZeneca LP*,
575 F. Supp. 2d 568 (S.D.N.Y. 2008)....................................................................28

*In re Gen. Elec. Co. Sec. Litig.*,
2012 WL 2892376 (S.D.N.Y. July 12, 2012) ........................................................31

*Jeffreys v. City of New York*,
426 F.3d 549 (2nd Cir. 2005).................................................................................9

*Knoll, Inc. v. Moderno, Inc.*,
2012 WL 3613896 (S.D.N.Y. Aug. 22, 2012).................................................30, 32

*Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*,
935 F.2d 1360 (2d Cir.1991)..................................................................................27

*McCartt v. Kellogg USA, Inc.*,
139 F. Supp. 3d 843 (E.D. Ky. 2015) ....................................................................35

*McGuiggan v. CPC Int'l, Inc.*,
84 F. Supp. 2d 470 (S.D.N.Y. 2000)................................................................22, 23

*Meyer v. U.S. Tennis Ass'n*,
607 F. App'x 121 (2d Cir. 2015) .............................................................................18

*Meza v. Intelligent Mexican Mktg., Inc.*,
720 F.3d 577 (2013).................................................................................................25

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010).....................................................................................35

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
46 F. 3d 230 (2d Cir. 1995)......................................................................................35

*Rambarran v. Mount Sinai Hosp.*,
2008 WL 850478 (S.D.N.Y. Mar. 28, 2008) ..........................................................32

*Reyes v. Goya Foods, Inc.*,
549 F. App'x 876 (11th Cir. 2013) ..........................................................................25

*Saleem v. Corp. Transp. Grp., Ltd.*,
52 F. Supp. 3d 526 (S.D.N.Y. 2014) *aff'd* 854 F. 3d 131 (2d Cir. 2017) ...............18

*Saleem v. Corp. Transp. Grp., Ltd.*,
854 F. 3d 131 (2d Cir. 2017)........................................................................... passim

*Schwind v. EW & Assocs., Inc.*,
357 F. Supp. 2d 691 (S.D.N.Y. 2005)......................................................................10

*Shah v. Micro Connections, Inc.*,
286 A.D.2d 433 (N.Y. App. Div. 2001) ..................................................................29

*Spiteri v. Russo*,
2013 WL 4806960 (E.D.N.Y. Sept. 7, 2013) ..........................................................28

*Traver v. Lowe's Home Ctrs., Inc.*,
2014 U.S. Dist. LEXIS 185314 (E.D.N.Y. June 27, 2014) .....................................30

*Truelove v. Northeast Capital & Advisory, Inc.*,
95 N.Y.2d 220, 223-34 (N.Y. 2000) ........................................................................26

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
2015 WL 1650767 (S.D.N.Y. Apr. 10, 2015)....................................................32, 33

*Velu v. Velocity Express, Inc.*,
   666 F. Supp. 2d 300 (E.D.N.Y. 2009) .......................................................10, 11, 19

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...........................................................................................33

*Wiegele v. FedEx Ground Package Sys.*,
   2007 WL 628041 (S.D. Cal. Feb. 8, 2007) .........................................................35

*Wilson v. Corelogic Saferent, LLC*,
   2016 WL 482985 (S.D.N.Y. Feb. 8, 2016) .........................................................30

*Yablon v. Stroock & Stroock & Lavan Ret. Plan and Trust*,
   98 F. App'x 55 (2d Cir. 2004) ............................................................................28

**STATUTES**

49 U.S.C. § 13102(15) ...............................................................................................21

49 U.S.C. § 13501 .....................................................................................................23

29 U.S.C. § 213(b)(1) ................................................................................................21

N.Y. Lab. Law § 193(1) ............................................................................................ 26

N.Y. Lab. Law § 195 ................................................................................................. 26

N.Y. Lab. Law § 198 ................................................................................................. 26

Pub. L. No. 110-244, § 306(c) ...............................................................................23, 24

**OTHER AUTHORITIES**

29 C.F.R. § 541.500 ...................................................................................................25

29 C.F.R. § 541.700 ...................................................................................................25

29 C.F.R. § 541.701 ...................................................................................................25

29 C.F.R. § 782.2 .......................................................................................................21

Fed. R. Civ. P. 15 ......................................................................................................32

Fed. R. Civ. P. 16 ...................................................................................................30, 31

Fed. R. Civ. P. 23 .................................................................................................... passim

N.Y. Comp. Codes R. & Regs. Title 12, § 142-2.2 .................................................................21

Defendant Flowers Foods, Inc. ("Flowers"), through its subsidiaries, including Defendant Lepage Bakeries Park St., LLC ("Lepage"), manufactures bread and snack products under brands such as Wonder Bread, Nature's Own, and Tastykake.  Defendant C.K. Sales Co., LLC ("CK Sales"), a subsidiary of Lepage, contracts with independent distributors who purchase the exclusive rights to sell and distribute certain products to supermarkets, groceries, and other accounts within defined geographic territories.  Plaintiffs Ross Schucker, Edward Fryar, Virgilio Valdez, Tom Shafer, Steven Heinrich, and Shane Bower ("Plaintiffs") are current or former independent distributors affiliated with CK Sales.  Plaintiffs allege that they were misclassified as independent contractors in violation of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  They also bring claims for unlawful deductions under the NYLL, unpaid benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), and unjust enrichment.  These claims all fail as a matter of law and Plaintiffs' claims should be dismissed.

Plaintiffs' FLSA and NYLL overtime claims (Counts I and II) fail because Plaintiffs qualify as independent contractors under the "economic realities" test.  Each Plaintiff, often through their own businesses, purchased bakery products from CK Sales, took title to the products, and then resold the products to customers in their territories – earning profit on the difference between their purchase price and the sale price.  The more they sold, the more equity they built in their businesses, as the value of their distribution rights is dependent upon sales. They could later resell their distribution rights – in whole or in part – at any price they were able to negotiate with third-party buyers, and some Plaintiffs did just that.  Plaintiffs were free to hire – and some did hire – their own workers and set the terms of their compensation.  Plaintiffs could carry and distribute non-competing products.  And Plaintiffs solicited sales from customers – seeking both new customers as well as additional sales from existing customers.

Plaintiffs decided for themselves how to best run their businesses.  For example, Valdez made "business decision[s]" to purchase a second territory, hire workers to service both of his territories, and dedicate his own time to seeking out new customers.  (Valdez Dep. 73:10-74:15, 78:5-80:16, 87:24-89:21, 90:22-92:11).  Schucker, an entrepreneur who previously owned his own grocery business, tried to increase his profit margin (and reduce business expenses) by paying cash for his distribution rights and buying rather than leasing a large box truck. (Schucker Dep. 20:4-24, 33:8-10, 161:22-162:24, 186:18-188:7).  Heinrich, who was a Wonder Bread salesman for over 15 years, leveraged his experience and industry relationships to win new business, increasing his sales by $1,500 a week.  (Heinrich Dep. 35:17-25, 100:23-101:20, 128:9-13).  Fryar, for his part, chose to step away from his business entirely, having an employee manage his distributorship while he stayed at home.  (Fryar Dep. 289:20-292:13, 298:4-22). Bower focused on building "rapport" with existing customers, which in turn increased his sales and "benefit[ted] [him] financially."  (Bower Dep. 108:21-113:14, 122:3-9).  And Shafer, as a former Hostess driver-salesman, increased profits by "aggressive[ly]" ordering the "best selling items."  (Shafer Dep. 17:19-18:5, 22:16-19, 26:2-23).

Plaintiffs' FLSA and NYLL overtime claims fail for the independent reason that they meet the requirements of the motor carrier exemption.  Lepage is a private motor carrier and Plaintiffs transported bakery products in interstate commerce in vehicles weighing over 10,000 lbs.  In addition, Plaintiff Valdez's overtime claims are partially barred by the outside sales exemption.   From June 2015 until January 2016, Valdez focused his time exclusively on soliciting customers for sales, delegating delivery of product to two workers he hired.

Plaintiffs' remaining claims fare no better.  *First*, Plaintiffs' NYLL unlawful deduction claims (Count III) fail because only employees may assert such claims, and Plaintiffs were

independent contractors.  In any event, the claims fail because no deductions were taken from

"wages" as defined by the NYLL.  *Second*, Plaintiffs' ERISA claims (Counts IV and VII) fail

because, in their Distributor Agreements, Plaintiffs waived any right to participate in company

benefits.  In addition, the claims fail because, under the terms of the relevant plans, individuals

classified as independent contractors are expressly excluded from coverage even if a court later

determines that they are common law employees.  And the ERISA claims are barred on yet

another ground: Plaintiffs failed to exhaust administrative remedies before bringing suit.  *Third*,

Plaintiffs' unjust enrichment claims (Count VIII) fail both because they are preempted by federal

law (Dkt. 51) and because unjust enrichment claims are barred where, as here, there is a contract

that governs the very same subject matter.  *Finally*, the NYLL, unjust enrichment, and ERISA

claims (Counts II-VIII) of Plaintiffs Schucker, Shafer, Fryar and Heinrich fail because each has

released these claims.

Defendants herein also oppose Plaintiffs' Motion to Amend Complaint (Dkt. 93 ("Motion

to Amend")).  Plaintiffs seek to add Rule 23 class action allegations to their individual NYLL

overtime and improper deductions claims.  Plaintiffs also seek to add a new NYLL

recordkeeping class claim as well as an individual claim under the New York State Commercial

Goods Transportation Industry Fair Play Act ("Fair Play Act").  First, Plaintiffs should not be

permitted to amend because these claims all fail as a matter of law.  Second, as to both the Rule

23 allegations, and the recordkeeping and Fair Play Act claims, Plaintiffs have been aware of the

facts necessary to assert these allegations and claims since the inception of the case.  Indeed,

Plaintiffs' original complaint contains the very alleged facts needed to plead these claims.  And

Plaintiffs have offered no reasonable excuse for delaying to seek the proposed amendment,

particularly given that they seek a dramatic expansion of the case that would lead to months of

burdensome class discovery.  Given Plaintiffs' undue delay and the inevitable prejudice to Defendants that would result from amendment, the Motion to Amend should be denied.

## BACKGROUND

**I.      FLOWERS FOODS, INC., LEPAGE BAKERIES PARK ST., LLC, AND CK SALES, CO.**

Lepage and other bakery subsidiaries of Flowers produce various products, such as fresh bread, buns, rolls and snack cakes under brands such as Nature's Own, Wonder, and Tastykake. (Dkt. 79, Linthicum 4/7/17 Dec. ¶ 2).  These products are distributed in New York State (north of New York City) through distributors contracted by CK Sales, a Lepage subsidiary. (Linthicum 4/7/17 Dec. ¶ 3).

**II.     PLAINTIFFS' INDEPENDENT DISTRIBUTOR AGREEMENTS**

Distributors contract with CK Sales for the exclusive rights to sell and distribute certain products within defined geographic areas.  (Linthicum 4/7/17 Dec. ¶ 4).[1]  Plaintiffs are current and formers distributors who contracted with CK Sales either individually or through an incorporated entity.  (56.1 ¶ 2).[2]  Prior to entering into their Distributor Agreements, Plaintiffs attended presentations detailing the benefits (and potential risks) of being an independent contractor distributor.  (56.1 ¶¶ 14, 21, 50, 83, 112, 149, 186).  Plaintiffs also received a Franchise Disclosure Document detailing the relationship.  *Id.*

Under the terms of the Distributor Agreements, each Plaintiff purchased products from CK Sales at a specified discount percentage from the suggested wholesale price, and resold those products to customers within their territory at a higher price for a profit.  (Linthicum 4/7/17 Dec.

---

[1] Neither Flowers nor Lepage contracts with any independent distributors.  (Linthicum 4/7/17 Dec. ¶ 4).

[2] References to "56.1" refer to Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment, filed contemporaneously herewith.

-4-

¶ 6).  Moreover, in the Distributor Agreement, each Plaintiff acknowledges that he is an independent contractor, that he "shall not be controlled by Company as to the specific details or manner of [his] business," that "Distributor's business is separate and apart from that of Company and it is of the essence of this Agreement that Distributor is an independent business," and that "[n]either Distributor nor any of Distributor's employees, agents, or servants shall be considered or deemed in any way to be employees, agents or servants of Company."  (56.1 ¶ 6).

Under the Agreements, the "risk of loss shall pass to Distributor upon delivery" of product, and distributors must use their "commercially reasonable best efforts to develop and maximize the sale" of products in the territory, must "actively solicit[] all [customers] not being serviced," "maintain[] an adequate and fresh supply" for customers, "maintain[] proper service and delivery to all [customers] requesting service in accordance with [the customer's] requirements, " and run their distributorships consistent with "good industry practice."  *Id*.  The Agreement permits distributors to "carry noncompetitive products," makes them responsible for obtaining their own delivery vehicles and applicable insurance policies, provides that distribution rights can be sold, in whole or in part, at any time, and permits distributors to engage any persons they deem appropriate to carry out the contractual obligations.  *Id*.  The Agreement also provides that Plaintiffs are not eligible for benefits and waive any right to such benefits.  (56.1 ¶ 251).

## III.    THE PLAINTIFFS' DISTRIBUTORSHIP BUSINESSES

Plaintiff Valdez runs a distributorship called G&T Corporation, through which he made the "business decision" to purchase a second full territory in March 2015 and later a partial territory from another distributor to "make more money."  (Valdez Dep. 73:10-74:15).  G&T hired two workers to handle customer deliveries, which allowed Valdez to focus exclusively on soliciting sales from new and existing customers.  (Valdez Dep. 73:10-74:15, 78:5-79:17, 87:24-

89:21, 90:22-92:11).[3]  Valdez treated his workers as independent contractors, and chose to compensate them by splitting the net profit of each territory with them on a 70/30 basis.  (Valdez Dep. 86:15-87:7, 172:17-22, 227:22-230:9).  In October 2016, Valdez decided to sell one of G&T's territories to an independent buyer.  (Valdez Dep. 77:22-78:4, 95:8-16).  Since then, he has grown his business substantially, resulting in G&T earning $147,768 in income in 2015.  (Valdez Dep. 289:12-15, 293:16-294:2).

Plaintiff Schucker came to his distributorship, Starring Rolls, Inc., with years of business experience.  He previously started his own grocery business, which he ran for nine years, and was a chain restaurant manager before that.  (Schucker Dep. 20:4-24, 33:8-10, 42:8-13, 46:16-47:2, 48:2-5).  To avoid the expense of borrowing money, Schucker paid cash both for his territory rights as well as his delivery vehicle; he bought the vehicle from a car dealership and negotiated over the price.  (Schucker Dep. 144:11-145:19, 161:22-162:24, 186:18-188:2 (were "financially responsible" decisions).)  Schucker operated his distributorship for nine months, and then sold his distribution rights back to CK Sales.  (Schucker Dep. 381:18-382:5, 389:4-20).  Shortly after ending his relationship with CK Sales, Schucker, through Starring Rolls, Inc., entered into an independent contractor distributor relationship with a different manufacturer, Mission Foods, to sell and distribute that company's Mexican food products.  (Schucker Dep. 175:10-15, 336:5-15).

Plaintiff Heinrich came to CK Sales with more than 15 years experience as a Wonder Bread salesman.  (Heinrich Dep. 35:17-20).  He purchased one territory through his business, SAGN Corp., in March 2014.  (Heinrich Dep. 30:16-18, 71:19-23, 80:21-24, 94:19-95:3, 110:9-

---

[3] References to "___ Dep. and Ex." are to excerpts from transcripts of deposition testimony and exhibits, all of which are attached to the Declaration of Matthew W. Lampe submitted herewith.

13).  Heinrich has increased sales in his territory, including by adding four new customers.

(Heinrich Dep. 100:10-101:20).  Heinrich sets his own schedule so that he is home 30-60

minutes before his children get home from school, and he decides how often to service customers

based on "what sells."  (Heinrich Dep. 84:18-21, 85:9-86:17, 102:3-15, 207:6-15, 201:11-23,

210:2-8, 211:7-212:13, 214:3-10, 301:21-302:19).  In about October 2014, Heinrich purchased a

partial territory, but later sold it because, in his view, the operating costs were too high.

(Heinrich Dep. 69:9-70:4, 132:5-21).

Plaintiff Bower operated his distributorship, Bowers Bread and Cakes, Inc., from

February 2015 to October 2016.  (Bower Dep. 44:10-24, 74:10-25, 75:25-76:7).  Bower grew his

company's sales by building a "rapport" with existing customers and by persuading stores to buy

additional product from him, which Bower acknowledged "benefit[ted] [him] financially."

(Bower Dep. 108:21-113:14, 122:3-9).  He worked to minimize expenses, including by

"work[ing] it out with the store" management of certain of his customers to deliver additional

product earlier in the week and thus avoid incurring the costs of an extra delivery day.  (Bower

Dep. 207:2-208:9).

Plaintiff Shafer purchased his territory in March 2014, and purchased additional

territorial rights in October 2014.  (Shafer Dep. 34:6-9, 229:7-25).  Shafer hired his son and

another student part-time to service customers.  (Shafer Dep. 151:23-152:15).  As a former

driver-salesman for Hostess with 14 years of experience, no manager from Defendants told him

how to run his business.  (Shafer Dep. 17:19-18:5, 22:16-19, 141:2-8 ("I had three times the

amount of experience these guys had.  There was nothing they could tell me as far as service

patterns, customer treatment")).  He leaned on his experience to "aggressive[ly]" order the "best

selling items."  (Shafer Dep. 26:2-23).  He sold a portion of his territory to Plaintiff Valdez, and

sold the remainder in early 2016.  (Shafer Dep. 236:15-19, 238:7-18, 248:21-23).

Plaintiff Fryar purchased his territory in March 2014 through his business, Ryan F. Baby, Inc.  (Fryar Dep. 80:2-25, 206:8-13).  Ryan F. Baby employed Fryar's nephew and son to service customers while Fryar generally stayed "home," away from his business.  (Fryar Dep. 289:20-292:13, 298:4-22).  During the period that he was actively managing his business, to increase sales Fryar persuaded store managers to give him "massive displays" and extra shelf space, and he obtained help from clients in getting special signage made.  (Fryar Dep. 179:3-186:21).  These efforts resulted in "more money in [Fryar's] pocket."  (Fryar Dep. 202:15-203:3, 203:20-204:8).

## IV.   PROCEDURAL HISTORY

On May 10, 2016, Plaintiffs brought the instant action, alleging under the FLSA that they were misclassified as independent contractors and, as a result, are owed unpaid overtime.  (Dkt. 1 ("Complaint").)[4]  Plaintiffs seek to assert the FLSA claim on behalf of all New York distributors pursuant to the FLSA's opt-in collective action mechanism.  (Dkt. 1).  Plaintiffs also bring individual claims for (i) overtime and improper deductions under the NYLL, (ii) benefits under ERISA, and (iii) unjust enrichment.  (Dkt. 1.)  In the Complaint, Plaintiffs alleged that they and other distributors in the State of New York were subject to common unlawful policy of misclassification.  (Dkt. 1 at ¶¶ 32, 37, 49).  The Complaint also alleges that all New York distributors were subject to improper deductions.  (Dkt. 1).

On October 11, 2016, the Court entered a scheduling order, which set a period of First-Phase Discovery relating to Plaintiffs' individual claims as well as Plaintiffs' FLSA conditional certification motion.  (Dkt. 43).  On November 23, 2016, Plaintiffs moved for conditional

---

[4] On June 9, 2016, Plaintiffs filed a First Amended Complaint.  (Dkt. 23).  This is identical to the Complaint in all respects except to correct a typographical error in the case caption.

certification of an FLSA opt-in class of New York distributors.  (Dkt. 44).  On April 7, 2017, Defendants timely filed their opposition, showing that conditional certification should be denied because, among other reasons, all New York distributors (save one) recently received notice of their right to join an FLSA collective action in at least one, if not two, other actions against Flowers and/or Lepage.  (Dkt. 78 at 2).  The conditional certification motion is pending.

In the interim, on December 9, 2016, Defendants moved for judgment on the pleadings as to Plaintiffs' ERISA and unjust enrichment claims.  (Dkt. 51).  On May 24, 2017, the Court denied the motion without prejudice, permitting Defendants to incorporate such arguments in the instant summary judgment motion.  (Dkt. 91).

## ARGUMENT

## I.      THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS

A nonmoving party may escape summary judgment only by demonstrating the existence of some factual issue requiring trial, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), but "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2nd Cir. 2005).  Rather, the plaintiff must adduce "evidence on which the jury could reasonably find for the plaintiff."  *Id.* Plaintiffs' claims fail under this standard.

### A.      PLAINTIFFS' OVERTIME CLAIMS (COUNTS I AND II) FAIL

#### 1.      Plaintiffs Were Properly Treated as Independent Contractors Under the FLSA (Count I)

Under the FLSA, independent contractor status is governed by an "economic realities" test, which considers factors such as "(1) the degree of the control exercised by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the

permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988). "[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts… determined by reference not to isolated factors but rather upon the circumstances of the whole activity." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F. 3d 131, 140 (2d Cir. 2017) (internal citations and quotation marks omitted). Although the "existence and degree of each factor is a question of fact," the "legal conclusion to be drawn from those facts – whether workers are employees or independent contractors – is a question of law." *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005). Here, Plaintiffs cannot show a triable issue of fact disputing their proper classification as independent contractors.

### a.   Defendants Did Not Exercise Control Over Plaintiffs

The first factor is the degree of control the putative employer exercised over the worker. Even if a defendant "arguably exercised some control over [p]laintiff," this factor favors independent contractor status if the plaintiff "primarily acted independently." *Spiteri v. Russo*, 2013 WL 4806960, at *58 (E.D.N.Y. Sept. 7, 2013). Courts consider facts such as whether the individual "chose…to enter into a franchise agreement…instead of seeking more conventional employment," *Saleem*, 854 F. 3d at 140, "has a great deal of control over his work and work schedule, subject to the demands of clients," *Velu v. Velocity Express, Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009), and whether the individual could hire workers, *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 610 (E.D.N.Y. 2012).

Here, this factor weighs in favor of independent contractor status. As in *Saleem*, each Plaintiff decided to enter into a Distributor Agreement after listening to a presentation, and receiving and reviewing a lengthy Franchise Disclosure Document, detailing the particulars of

-10-

the proposed franchise relationship.  (*See* 56.1 ¶¶ 14, 21, 50, 83, 112, 149, 186).  *See Saleem*, 854 F.3d at 140.  The Distributor Agreement provides that each Plaintiff "shall not be controlled by Company as to the specific details or manner of Distributor's business" and that "Distributor's business is separate and apart from that of Company and it is of the essence of this Agreement that Distributor is an independent business."  (56.1 ¶ 6.d.).  The Distributor Agreement also permits Plaintiffs to "carry noncompetitive products," allows distribution rights to be sold, in whole or in part, at any time, and permits the distributor to engage any persons the distributor deems appropriate to carry out the contractual obligations.  (*Id.* at ¶¶ 6.b., i., j.)

Given the broad leeway granted to Plaintiffs by the Agreement, it is no surprise that the Plaintiffs, while operating their respective businesses differently, each exercised a "great deal of control over his work and work schedule," *Velu*, 666 F. Supp. 2d at 307, and whether and how to use workers, *Browning*, 885 F. Supp. 2d at 601.  For instance, Valdez chose to devote his time to making sales to customers, and hired two full-time workers to deliver his product.  (Valdez Dep. 73:10-74:15, 78:5-80:16, 87:24-89:21, 90:22-92:11).  Valdez gave his workers "a 1099 at the end of the year" and determined their compensation.  (Valdez Dep. 78:5-79:17, 86:15-87:7, 172:17-22, 227:22-230:9).  Valdez "ma[de] [his] own schedule" so that his workday was complete in time for him to pick his daughter up from school.  (Valdez Dep. 101:7-16, 118:20-119:6).  He had to use his own "judgment" to decide how much product to order for his customers, since there is "no mathematic[al] tool to do it."  (Valdez Dep. 215:24-216:14).  In contrast, Fryar hired a full-time worker to manage every aspect of his distributorship business while he stepped away from it entirely for a period of time.  (Fryar Dep. 119:14-25, 290:11-291:24, 292:7-22).  Fryar later retained Plaintiff Bower to work for his distributorship.  (Fryar Dep. 119:22-25, 376:8-22).  No Defendant ever set Fryar's schedule, and he decided the order in

-11-

which to make customer deliveries.  (Fryar Dep. 262:4-7, 272:15-274:14).  Fryar made his own

ordering decisions, which varied "[d]epending on the customer and the product."  (Fryar Dep.

98:4-99:23).  Shafer, too, hired workers, but only intermittently and part-time.  (Shafer Dep.

151:23-153:11).  He chose to pay them $80 a day on average.  (Shafer Dep. 153:12-154:4).  He

determined the optimum sequence in which to deliver product to customers based on his "years

of experience" and his analysis of the most "cost-effective" route.  (Shafer Dep. 170:9-21).

Defendants' managers did not give him advice because he had "three times the amount of

experience that these guys had.  There was nothing they could tell [him] as patterns, customer

treatment."  (Shafer Dep. 141:2-8).

Plaintiff Schucker made business decisions to maximize his profits, such as "decid[ing]

to [rotate all of his product at one customer] on Friday," which allowed him to maximize

weekend sales.  (Schucker Dep. 224:12-225:23, 227:9-15).  Schucker also set his own schedule

to "maximize sales" by servicing customers as early in the day as possible.  (Schucker Dep.

208:7-13, 269:14-270:5).  Schucker took the initiative to reduce the amount of stale, "unsalable"

product by cutting certain products from his orders.  (Schucker Dep. 296:10-16, 301:7-12).  He

chose to hire a worker to fill in for him on certain days when he went on vacation, and chose to

pay her $50 a day.  (Schucker Dep. 167:2-18).  And Defendants' managers provided "[n]ot a

shot" of guidance because Schucker was "better than both of them, if not all three."  (Schucker

Dep. 328:7-14).  Heinrich took a different approach, deciding how often and on what days to

service customers based on "what sells" and chose a route that "minimize[s] [] expenses on gas."

(Heinrich Dep. 199:17-20, 206:20-207:15, 211:7-213:22).  He also set his schedule so that he

could pick up his children after school.  (Heinrich Dep. 14:6-17).  He decided to order product

based upon a "monthly average" of what sells and then takes into account other factors such as

"snowstorm[s], sales" and holidays.  (Heinrich Dep. 45:6-12, 157:8-20, 238:13-239:20, 240:17-241:8) (orders suggested by Defendants' computer system were "[w]ay out of whack").  Plaintiff Bower took another approach, deciding to purchase and sell product from other distributors in order to maximize his profits.  (Bower Dep. 179:4-11, 180:7-21, 182:9-183:11).  He also exercised "freedom in regards to how much…product…[he] could bring in" for his customers.  (Bower Dep. 199:4-200:2).   Bower worked out an arrangement with his customers that allowed him to deliver additional product to stores earlier in the week, and thus avoid incurring the costs of an extra delivery day.  (Bower Dep. 207:2-208:9).

### b.    Plaintiffs Made Investments in Their Businesses and Had Opportunities for Profit and Loss

The second factor is the opportunity for profit or loss and investment in the business.  If Plaintiffs "invest[] heavily in their driving businesses…[it is an] indication that they were 'in business for themselves.'"  *Saleem*, 854 F.3d at 144 (quoting *Superior Care*, 840 F.2d at 1059).  Similarly, where individuals "decid[e] how best to obtain business from [Defendant's] clients, [and their] profits increased through their initiative, judgment, or foresight…[those are also] attributes of the typical independent contractor."  *Id.* at 144.  Where individuals are "responsible for the costs and expenses associated with the vehicle, including maintenance and repair…this factor weighs in favor of independent contractor status."  *Browning*, 885 F. Supp. 2d at 608.

Here, this factor weighs in favor of independent contractor status.  Under the Distributor Agreement, the "risk of loss shall pass to Distributor upon delivery" of product.  (56.1 ¶ 6.c.)  Plaintiffs purchased product and took title to it; if they could not resell those, they bore the loss.  (Linthicum 7/21/17 Dec. ¶ 11).  If Plaintiffs sold their territories to third-party buyers, they could sell at a profit or a loss.  (56.1 ¶ 8).  In addition, Plaintiffs incurred the cost of obtaining their own delivery vehicles and insurance policies.  (56.1 ¶ 6.m., n.).

Each Plaintiff also invested heavily in his business and "decid[ed] how best to obtain business" such that his "profits increased through [his] initiative, judgment or foresight." *Saleem*, 854 F.3d at 144 (internal quotation marks and citation omitted). In addition to purchasing his original distribution rights for $50,290, Valdez purchased distribution rights in a second territory for $63,090 as well as a third partial territory because he wanted to "make more money." (Valdez Dep. 62:10-12, 73:13-74:15, Valdez Exs. 1, 2). He also invested in business cards and car stickers. (Valdez Dep. 249:25-250:25, 263:7-264:6, Valdez Exs. 20, 21). After he decided to sell one of his territories, Valdez' investment continued to grow, with his corporation G&T earning $147,768 in operating income in 2015. (Valdez Dep. 289:12-15, 293:16-294:2).

Schucker purchased his territory for $52,900 and he negotiated with a dealership over the price of his delivery truck. (Schucker Dep. 161:23-162:24, 186:18-188:7). He implemented strategies to increase his profit, including by rotating his product on Fridays to maximize weekend sales, cutting his orders of certain products to reduce stale product losses, and developing "good relationship[s]" with store managers. (Schucker Dep. 224:12-225:23, 227:9-15, 250:4-19, 301:7-12). Ultimately, Schucker sold his territory (Schucker Dep. 381:17-382:5) and subsequently contracted, through Starring Roles, Inc., to become an independent contractor distributor for another manufacturer, Mission Foods. (Schucker Dep. 134:7-10, 136:10-13, 175:5-15, 188:14-13, 390:24-391:3).

Heinrich purchased his original territory for $31,470 (Heinrich Dep. 110:9-22), and purchased a second partial territory about 6 months later for $20,340. (Heinrich Dep. 67:22-68:9, 69:6-12, 131:10-21, 137:25-138:8, Heinrich Ex. 6). He sold his second territory for a $2,000 profit after he "built equity" in it by increasing sales. (Heinrich Dep. 141:24-142:14, 143:13-23, 145:8-16, Heinrich Ex. 8). Heinrich grew his business by successfully soliciting new

-14-

customers and developing relationships with store managers who could "increase [his] business" by providing Heinrich with additional shelf space for his products.  (Heinrich Dep. 100:23-101:20, 219:9-23).  As a result of his efforts, sales "went up" in Heinrich's first territory by about $1,500 a week.  (Heinrich Dep. 128:2-13).

Fryar paid $62,960 for his territory in order to "make money" and "grow a business." (Fryar Dep. 63:10-17, 125:4-126:7).   He focused on growing sales at his existing customer accounts by "reconstruct[ing] [his] route," persuading store managers to give him "massive displays" and extra shelf space, and getting special signage made.  (Fryar Dep. 169:2-24, 179:3-186:21, 199:6-19, 201:7-202:23).  He also analyzed sales data to find ways to "reduce the stales" so that he could "[m]ake more money."  (Fryar Dep. 94:4-95:6).  Ultimately, the value of Fryar's territory increased, resulting in "more money in [his] pocket."  (Fryar Dep. 202:19-23).

Bower invested $29,260 in purchasing his territory (Bower Dep. 73:3-13, 103:1-19, Bower Ex. 3), which he believed would give him "more control over [his work] and the opportunity to expand."  (Bower Dep. 53:6-54:17, 67:21-24).  He did expand by building "rapport" with his existing customers, persuading two customers to purchase Tastykake products for the first time.  (Bower Dep. 111:16-112:13, 113:7-14).  This ultimately "increased the value of [his] territory" which "benefit[ted] [Bower] financially."  (Bower Dep. 108:21-109:6, 109:17-113:14, 117:14-25, 122:3-9).

Plaintiff Shafer invested $35,290 in his original territory (Shafer Dep. 227:18-25) and decided to purchase distribution rights in an additional partial territory for $12,410 because he "wanted to make more money."  (Shafer Dep. 75:22-76:24, 229:7-25).  He later sold his second territory to Plaintiff Valdez.   (Shafer Dep. 236:15-19, 243:17-24).  In the meantime, Shafer used relationships he developed while a driver-salesman at Hostess to sign up three new customers,

-15-

which were all profitable accounts.  (Shafer Dep. 83:4-25).  Shafer also increased his profits by "order[ing] the right products."  (Shafer Dep. 102:5-13).

      **c.**      **Plaintiffs' Work Required Skill and Independent Initiative**

The third factor is the degree of skill and independent initiative required to perform the work.  If plaintiffs have "professional driving skills, business management skills, knowledge of Department of Transportation regulations, and freight-handling skills," this factor favors independent contractor status.  *Browning*, 885 F. Supp. 2d at 609.  Past experience in the industry also supports independent contractor status.  *Id.*   Here, as in *Browning*, Plaintiffs have professional driving skills necessary to operate trucks weighing over 10,000 pounds.  (*See* Section II.A).  Similarly, Plaintiffs had "knowledge of Department of Transportation regulations" and obtained DOT licenses to comply with with DOT regulations.  (*See* 56.1 ¶ 218).

Each Plaintiff brought to bear unique skills and experience in running their respective distributorships.  Plaintiff Valdez, who studied mechanical engineering in college and had retail management experience (Valdez Dep. 14:19-15:14, 20:25-21:15, 22:7-24:18, 26:22-27:10), used that experience to, among other things, devise a compensation scheme for his workers, "separate the money and my expenses" by paying himself a salary, and deduct business expenses from his taxes.  (Valdez Dep. 164:9-21, 166:15-167:6, 271:18-272:8, 277:23-278:2, 291:20-298:13, Valdez Exs. 26, 29; *see also* 56.1 ¶¶ 40-43).  Plaintiff Schucker came to his distributorship, Starring Rolls, Inc., after owning his own grocery business for a decade.  (Schucker Dep. 20:4-24, 33:8-10).  He used his entrepreneurial skills in many ways, including by taking the initiative to reduce orders of certain products that did not sell well.  (Schucker Dep. 301:7-12).  Heinrich worked as a driver salesman for Wonder Bread for 17-18 years. (Heinrich Dep. 35:17-25).  He used relationships developed during his Wonder Bread tenure obtain new customers.  (Heinrich Dep. 100:4-101:20).  He also used his past experience in determining orders.  (Heinrich Dep.

-16-

37:22-25, 44:22-45:21, 157:8-20, 240:17-241:8).  Plaintiff Shafer was a driver-salesman for

Hostess for 14 years.  (Shafer Dep. 17:19-18:5, 22:16-22).  At Hostess, "start[ed] to learn

[product] trends."  (Shafer Dep. 22:16-24:9).  Based on this experience, as a distributor, he

quickly learned what products were the "best selling items," and he was "aggressive [in

ordering] those items."  (Shafer Dep. 26:2-23).

     Plaintiff Fryar did not have industry experience, but made up for it with initiative.  In

addition to "asking for displays" and "shelf space" from customers, and "reconstruct[ing] his

route" to better serve customers, he decided to purchase "certain [individual products] from

certain distributors" for particular customers – products which had to be ordered by the whole

tray otherwise – to better tailor his order to customer needs and to minimize unsold product.

(Fryar Dep. 187:6-188:17).  Plaintiff Bower worked in the bread industry for several years prior

to purchasing his distributorship, and he used knowledge gained from that experience in his

distributorship to "order[] every day based on what I felt would sell."  (Bower Dep. 90:7-24).

### d.  Plaintiffs' Relationship Was Not Permanent

     The fourth factor is the permanence or duration of the working relationship.  Where

"Plaintiffs [can] reassess their choice to affiliate with [Defendants]...and terminate the [franchise]

agreements as they please[s]...[yet] the terms of the agreements committed the Franchisor

Defendants to maintaining them for substantial durations, or even indefinitely, absent Plaintiffs'

breach of those terms," it weighs in favor of independent contractor status.  *Saleem*, 854 F.3d at

141 (internal citations and quotation marks omitted).

     Here, just as in *Saleem*, while Plaintiffs could sell their distribution rights to third-parties

at any time, CK Sales could only terminate Plaintiffs' Distributor Agreements if Plaintiffs

breached the Agreement and failed to cure the breach within certain defined periods.   (56.1 ¶

6.o.).  Certain Plaintiffs also in fact chose to sell either all or a portion of their distribution rights

after only a short period of time.  *See, e.g.*, Schucker Dep. 381:17-382:5 (sold distribution rights after 9 months); Valdez Dep. 77:22-78:4 (sold portion of distribution rights to third party buyer after less than a year).  Thus, this factor weighs in favor of independent contractor status.

### e.      Plaintiffs' Work Was Not Integral to Defendants' Business

The fifth and final factor is the extent to which the work is integral to the putative employer's business.  Even assuming that Plaintiffs' work was integral to Defendants' business, this factor does not preclude a ruling that Plaintiffs were independent contractors as a matter of law.  *See Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 544 (S.D.N.Y. 2014) ("Notwithstanding that the final factor favors employment status, the Court ultimately concludes that, as a matter of law, Plaintiffs are properly classified as independent contractors rather than employees for purposes of the FLSA.") *aff'd*  854 F. 3d 131 (2d Cir. 2017); *see also Meyer v. U.S. Tennis Ass'n*, 607 F. App'x 121, 123 (2d Cir. 2015); *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784 (11th Cir. 2006).

### 2.      Plaintiffs Were Properly Treated as Independent Contractors Under the NYLL (Count II)

Under the NYLL, "a person's status as an employee or an independent contractor is a fact-intensive inquiry that depends upon factors such as whether the person: (1) worked at his [or her] own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll, and (5) was on a fixed schedule."  *Browning*, 885 F. Supp. 2d at 598-99 (test "substantially similar" to FLSA economic realities test).  "[M]inimal or incidental control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship."  *Id.* (citation omitted).  Plaintiffs meet the independent contractor test.

### a.      Plaintiffs Worked at Their Own Convenience and Were Not on a Fixed Schedule

The first and fifth factors are whether the worker worked at his own convenience and whether he worked on a fixed schedule.  Whether "Plaintiffs could hire their own additional workers to assist with their operations," is a significant factor in determining whether they could work at their own convenience.  *Browning*, 885 F.2d at 601.   And if "there [are] no set hours mandated by [Defendant]," Plaintiffs are not on a fixed schedule.  *Id.* at 602.

Here, these factors weigh in favor of independent contractor status.  Plaintiffs could hire additional workers to assist with their operations.  Several plaintiffs, including Valdez, Fryar, and Shafer did so.  (Valdez Dep. 73:10-74:15, 78:5-80:16, 87:24-89:21, 90:22-92:11, Fryar Dep. 119:14-25, 290:11-291:24, 292:7-22, 376:8-22, Shafer Dep. 151:23-152:5, 152:9-153:11). Similarly, Plaintiffs had significant control over their own schedules and the ability to change them as they pleased.  For example, Valdez "ma[de] [his] own schedule" so that he could pick up his daughter from school.  (Valdez Dep. 101:7-16, 118:15-119:6).  Heinrich also sets his own schedule to pick up his children after school.  (Heinrich Dep. 14:6-17, 236:3-9).  Schucker decided when to start his day, and knew he could have changed his route if he wanted. (Schucker Dep. 208:7-13, 271:14-19).  Shafer testified that no Defendant manager ever gave him a schedule (Shafer Dep. 170:22-171:8), and he changed his schedule without consulting the Defendants.  (Shafer Dep. 171:9-24).  Fryar understood that no one from Defendants set his schedule.  (Fryar Dep. 61:17-22).  And Bower testified that it was "entirely up to [him] which stores to" service each day on certain days.  (Bower Dep. 233:6-15, 235:8-236:17).

### b.     Plaintiffs Were Free to Engage in Other Work

The second factor is whether the worker was free to engage in other work.  This factor weighs in favor of independent contractor status even where plaintiffs have "chosen not to avail [themselves] of the opportunity to work for other…companies…"  *Velu*, 666 F. Supp. 2d at 307. In *Browning*, the court rejected plaintiffs' argument that they could not work for other companies

"because they were told by supervisors that their vehicle could only be used for CEVA purposes," concluding that plaintiffs "could perform work for other companies, even if it was practically difficult to do so." *Browning*, 885 F. 2d at 603.  Here, Plaintiffs could work for other companies as long as the other companies were not directly competitive to Defendants.  (*See, e.g.,* 56.1 ¶ 6.i.; Schucker Dep. 185:6-22; Bower Dep. 78:16-19).  Thus, this factor weighs in favor of independent contractor status.

### c. Plaintiffs Did Not Receive Benefits and Were Not on Payroll

The third and fourth factors are whether the worker received fringe benefits and was on the payroll.  Courts consider whether "Plaintiffs…sought…tax benefits associated with their independent contractor status…[which] weighs heavily in favor of independent contractor status." *Browning*, 885 F.2d at 605.  Here,  Plaintiffs were not on Defendants' payroll and not eligible for benefits plans offered by Defendants.  (56.1 ¶¶ 13, 249).  Significantly, Plaintiffs also represented on tax returns that they were independent businesspeople, filing corporate tax returns, taking deductions from business income for expenses ranging from legal and professional services to gas and car repair.  (Valdez Dep. 271:18-272:8, 277:23-278:24, 283:22-287:15, 292:23-293:3, 294:5-298:13) (took deductions for business expenses); Heinrich Dep. 23:7-13, 26:13-26:23 (filed S Corporation tax returns and deducted business expenses); Schucker Dep. 401:20-405:23, 418:24-419:3) (filed S Corporation tax returns and deducted business-related expenses); Stipulation ¶ 2; 56.1 ¶¶ 42, 78, 106, 142, 181, 215).  In light of these facts, this factor "weighs heavily in favor of independent contractor status." *Browning*, 885 F. 2d at 605.

### B. PLAINTIFFS' OVERTIME CLAIMS (COUNTS I AND II) FAIL BECAUSE THEY WERE EXEMPT FROM OVERTIME REQUIREMENTS

#### 1. Plaintiffs Were Exempt Under the Motor Carrier Exemption

Even if the Court finds that there are issues of material fact as to Plaintiffs' independent

contractor status, the Court should still grant summary judgment to Defendants because Plaintiffs' overtime claims are barred by the motor carrier exemption.  The FLSA and NYLL[5] overtime requirements do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" pursuant to the Motor Carrier Act.  29 U.S.C. § 213(b)(1).  An employee meets the requirements of the motor carrier exemption where: (1) his employer is a motor private carrier; and (2) he engages in activities that affect the safety of operations of motor vehicles in interstate commerce.  29 C.F.R. § 782.2(a).  Here, Plaintiffs meet all requirements for exemption.

### a.        Lepage is a Motor Private Carrier

A "Motor private carrier" is an entity that owns, leases, or has product on bailment that it transports in interstate commerce for sale, lease, rent, bailment or to further a commercial enterprise.  49 U.S.C. § 13102(15).  Where an employer or its employees transport property "[a]cross [a] state line," the interstate commerce requirement is satisfied.  29 C.F.R. § 782.7(b)(1).   Here, Lepage is a motor private carrier: it bakes bread products, transports those products across state lines, and the products are owned by Lepage during the transport process. (Linthicum 7/21/17 Dec. ¶¶ 6, 7, 8, 9).

### b.        Plaintiffs Engage in Activities that Affect the Safety of Operation of Motor Vehicles in Interstate Commerce

Individual drivers satisfy the motor carrier exemption where they participate in "transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(b)(2); *Cruz v. AAA Carting & Rubbish Removal, Inc.*, 116 F. Supp. 3d 232,

---

[5] The NYLL incorporates the FLSA's overtime exemptions, including the motor carrier exemption.  *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (employees "subject to the exemptions of sections 7 and 13 [of the FLSA]."); *Chaohui Tang v. Wing Keung Enterprises, Inc.*, 210 F. Supp. 3d  376, 389 (E.D.N.Y. 2016) ("The same [motor carrier] exemption applicable under the FLSA also applies under the NYLL.")

247 (S.D.N.Y. 2015) (being a driver inherently "affects safety").  Drivers participate in interstate commerce under the Motor Carrier Act where they transport, even within a single state, products "involved in a practical continuity of movement in the flow of interstate commerce."  *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 223 (2d Cir. 2002).

For example, in *McGuiggan v. CPC Int'l, Inc.*, 84 F. Supp. 2d 470, 482 (S.D.N.Y. 2000), the court found that drivers satisfied the requirements of the motor carrier exemption where the employer "produced ... English muffins in New Jersey and then transported them across the state line to a depot in New York, [and] [i]n New York, the Plaintiffs picked up the products, loaded them into their trucks, and delivered them to the stores on their routes," which were entirely within New York.  The court held that the shipment of these muffins was part of a "practical continuity of movement across state lines" since the employer had "a 'fixed and persisting transportation intent'-i.e., an intention to move its muffins across state lines-when it took orders at [its facility] in ... New Jersey."  *Id*. at 482-83 (quoting *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997)).

Just as in *McGuiggan*, Plaintiffs[6] here transported bakery products that were "inten[ded] to move…across state lines" when ordered and therefore were in interstate commerce.  *Id.* at 482-83.  Plaintiffs ordered products for specific customers.  (*See* 56.1 ¶¶ 38, 62, 95, 123, 170, 203).  Those products were produced at out-of-state bakeries, and then transported across state lines to a New York warehouse.  (Linthicum 7/21/17 Dec. ¶¶ 6, 7, 8, 9).  Plaintiffs picked up the

---

[6] Plaintiffs met these requirements during their entire tenures as distributors with the exception of Valdez (June 2015 to January 2016) and Fryar (April 2015 until November 2015).  (Fryar Dep. 209:11-292:13).  From June 2015 to January 2016, Valdez did not deliver any product, but spent his time soliciting customers for sales.  (Valdez Dep. 87:24-88:16).  Nonetheless, Valdez's claims still fail during that period of time because he was exempt under the outside sales exemption.  *Supra* § 24-25.  From April 2015 until November 2015, Fryar stepped away from his distributorship and remained at home.  (Fryar Dep. 289:20-292:13, 298:4-22).  Likewise, Fryar's claims still fail during this period of time because he was at "home" rather than working and therefore not working overtime.  *Id.*

products at the New York warehouse, and delivered them to their customers in New York.

(Linthicum 7/21/17 Dec. ¶ 11).  Thus, Plaintiffs transported goods in interstate commerce.

*McGuiggan*, 84 F. Supp. 2d at 482 (plaintiffs exempt where "they picked up goods at New York

depots and made customer deliveries entirely within New York State").[7]

        **c.**        **The Technical Corrections Act Does Not Apply to Plaintiffs**

Plaintiffs argue (Dkt. 89) that they do not meet the requirements for the motor carrier

exemption because they drove personal vehicles instead of delivery trucks on certain limited

occasions and therefore fell within an exception to the motor carrier exemption contained in the

Technical Corrections Act ("TCA").  Under the TCA, employees "whose work, in whole or in

part, is defined…as affecting the safety of operation of motor vehicles weighing 10,000 pounds

or less in transportation on public highways in interstate or foreign commerce…and who

perform[] duties on motor vehicles weighing 10,000 pounds or less" cannot be subject to the

motor carrier exemption.  No. 110-244, § 306(c).  Plaintiffs do not fall within the exception.

*First*, the TCA does not apply to Plaintiffs because their work was not "defined," either

"in whole or in part," as "affecting the safety of operation of motor vehicles weighing 10,000

pounds or less in transportation on public highways in interstate or foreign commerce."  *Id.*  Each

Plaintiff was required to obtain an appropriate delivery vehicle, and in fact each obtained a

delivery truck that weighed over 10,000 lbs.  (56.1 ¶¶ 6.l., 228)

*Second*, the only activity Plaintiffs claim to have performed using their personal vehicles

was driving to customers on Wednesdays and Sundays in order to replenish the shelves with

previously delivered product.  (Dkt. 89).  But the TCA only applies when an employee uses

---

[7] Bower also meets the requirements of the motor carrier exemption for an independent reason: he transported bakery products from New York to Connecticut.  (Bower Dep. 150:6-9, 206:18-208:9); 49 U.S.C. § 13501 (drivers transport products in interstate commerce where they actually transport property across state lines).

vehicles weighing under 10,000 pounds "*in transportation…in interstate or foreign commerce.*"
No. 110-244, § 306(c)(2)(B); *Garcia v. W. Waste Servs., Inc.*, 969 F. Supp. 2d 1252, 1261 (D.
Idaho 2013) (TCA inapplicable where plaintiff only used vehicles weighing less than 10,000
pounds outside of interstate commerce).  On these days, Plaintiffs did not transport property "in
interstate commerce"; they merely took product, which was previously delivered to customers,
and moved it within the same building from the customer's storeroom to the shelves.  (56.1
¶¶ 60, 91, 120, 169, 198, 229, 230, 232, 234, 236, 238, 240).  Thus, the TCA does not apply.

*Third*, in any event, Plaintiffs are not subject to the exception because their use of
personal vehicle was so infrequent.  Where the plaintiff drives vehicles both over and under
10,000 pounds, the "prevailing view . . . [is that] the motor vehicle exemption should apply so
long as the time an employee spends operating commercial motor vehicles [vehicles over 10,000
pounds] is more than de minimus."  *Avery v. Chariots For Hire*, 748 F. Supp. 2d 492, 500 (D.
Md. 2010).  Here, Plaintiffs spent the vast majority of their working time operating vehicles
weighing *over* 10,000 pounds, using personal vehicles only sparingly, and, as noted, not to
transport property in interstate commerce.  *See* 56.1 ¶¶ 229-241.

## 2.   Plaintiff Valdez Met the Requirements of the Outside Sales Exemption from June 2015 to January 2016

Plaintiff Valdez's overtime claims are barred, for the period from June 2015 to January
2016, for the independent reason that he satisfied the FLSA and NYLL[8] outside sales exemption.
To satisfy the exemption, an employee must: (1) have a "primary duty" of "making sales within
the meaning of section 3(k) of the Act;" and "customarily and regularly [be] engaged away from

---

[8] The NYLL incorporates the FLSA's outside sales exemption.  *Chenensky v. New York Life Ins. Co.*, 2009 WL
4975237, at *5 -6  (S.D.N.Y. Dec. 22, 2009) ("New York law governing overtime pay is defined and applied in the
same manner as the FLSA and includes an exemption for outside salespersons").

the employer's place or places of business in performing such primary duty." 29 C.F.R. §

541.500(a)(1). "Primary duty' means the principal, main, major or most important duty that the

employee performs." 29 C.F.R. § 541.700. "Sales" includes efforts to increase sales from

existing customers. *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577 (2013) (driver-

salesman who tried to upsell existing stores and could solicit new accounts was exempt); *Reyes

v. Goya Foods, Inc.*, 549 F. App'x 876, 878 (11th Cir. 2013) (sales broker who "promote[d] new

Goya products, request[ed] better product placement, and [] reorder[ed] inventory" was exempt);

*McCartt v. Kellogg USA, Inc.*, 139 F. Supp. 3d 843, 858-59 (E.D. Ky. 2015) (route salesman

who made "incremental sales" at "large retail chain customers" was exempt).

Valdez meets both requirements of the outside sales exemption. His "primary duty"

during this period of time was making sales, as Valdez devoted his time to soliciting sales from

customers while delegating responsibility for delivering product to his workers. (Valdez Dep.

87:24-88:16, 256:5-257:4). Indeed, Valdez characterized himself as a "salesman" for this period.

(Valdez Dep. 87:24-88:16). *See Flood v. Just Energy Marketing Corp.*, 2017 WL 280820, at *4

(S.D.N.Y. Jan. 20, 2017) ("In plaintiff's own words, he was a 'salesperson,'" which weighed

towards court's finding that his primary duty was sales). Valdez also satisfies the requirement of

being "customarily and regularly engaged away from the employer's place…of business."

"Customarily and regularly" means "normally and recurrently performed every workweek." 29

C.F.R. § 541.701. Valdez spent no more than one hour at the warehouse each workday,

spending the rest of his time away from the warehouse meeting customers. (Valdez Dep.

102:24-103:5) Thus, Valdez met the requirements of the outside sales exemption for the period

from June 2015 to January 2016.

### C.   PLAINTIFFS' NYLL UNLAWFUL DEDUCTIONS (COUNT III) CLAIMS FAIL AS A MATTER OF LAW

Independent contractors have no viable claims for unlawful deductions.  N.Y. Lab. Law § 193(1) ("No employer shall make any deduction from the wages of an *employee*") (emphasis added); *Chenensky v. New York Life Ins. Co.*, 2011 WL 1795305, at *4 (S.D.N.Y. Apr. 27, 2011) ("Independent contractors are immune from the protections of § 193.").  Therefore, because Plaintiffs were properly treated as independent contractors, *supra*, at 9-20, their unlawful deduction claims fail as a matter of law.

Plaintiffs' Section 193 claims also fail for the independent reason that no deductions were taken from "wages" as that term is defined in the NYLL.  *See* N.Y. Lab. Law § 193(1) ("No employer shall make any deduction from the *wages* of an employee…") (emphasis added).  Plaintiffs received only *profit* in the form of the difference between the price they paid for product and the price they sold it less expenses (Linthicum 4/7/17 Dec. ¶ 6), which does not constitute wages under the NYLL.  *See Truelove v. Northeast Capital & Advisory, Inc.*, 95 N.Y.2d 220, 223-24 (N.Y. 2000) ("certain forms of incentive compensation that are more in the nature of a profit-sharing arrangement and are both contingent and dependent…on the financial success of the business enterprise" are not considered wages) (internal quotation marks omitted).

### D.    PLAINTIFFS' ERISA CLAIMS (COUNTS IV THROUGH VII) FAIL[9]

Plaintiffs' ERISA claims for benefits also fail as a matter of law for several independent reasons.[10]  *First*, Plaintiffs' claims fail because Plaintiffs did not satisfy the relevant plans' eligibility requirements.  To establish a claim for benefits, a plaintiff must prove both that he

---

[9] Defendants also incorporate by reference the arguments in support of their Motion for Judgment on the Pleadings as to Plaintiffs' ERISA claims (Dkt. 51).

[10] Plaintiffs attached to their Motion to Amend a proposed Second Amended Complaint in which they drop their ERISA claims for interference with benefits (Count V) and breach of fiduciary duty (Count VI).  In light of the apparent voluntary dismissal of these claims, the instant motion focuses only on Plaintiffs' ERISA claims for benefits (Counts IV and VII).  Regardless, Defendants are entitled to summary judgment as to those claims for the reasons set forth in Defendants' Motion for Judgment on the Pleadings (Dkt. 51).

"was an employee of the sponsor of the plan during the relevant period" and that he "met the eligibility criteria defined by the plans that provided benefits to employees." *Downes v. J.P. Morgan Chase & Co.*, 2006 WL 785278, at \*11 (S.D.N.Y. Mar. 21, 2006) report and recommendation adopted, *Downes v. J.P. Morgan Chase & Co.*, 2006 WL 1233939, at \*2 (S.D.N.Y. May 8, 2006).  Here, summary judgment should be granted because Plaintiffs not did meet the applicable plan eligibility criteria.  Under the plain terms of the ERISA plans, Plaintiffs' independent contractor status rendered them ineligible to participate, *even if* a court subsequently determines that they are common law employees and not independent contractors.  (Dkt. 52, Hickey Dec. ¶ 5, Ex. A, Sect. 1.31; ¶ 6, Ex. B, Sect. 1.31; ¶ 7, Ex. C, Sect. 2.8; ¶ 8, Ex. D, Sect. 1.07).).  Moreover, under the Distributor Agreement, Plaintiffs were not eligible for Defendants' benefits.  (56.1 ¶ 6.p., 251 ("none of the benefits provided by Company to its employees are available from Company to Distributor…").  Thus, Plaintiffs' claims for benefits are barred.

*Second*, Plaintiffs' ERISA claims are barred for the independent reason that they failed to exhaust their administrative remedies, a fact conceded by Plaintiffs.  *See* 56.1 ¶ 250; *Cannon v. Douglas Elliman*, LLC, 2007 WL 4358456, at \*7 (S.D.N.Y. Dec. 10, 2007) ("a plaintiff must exhaust the administrative remedies provided for by the plan before commencing suit").

*Third*, Plaintiffs' claims fail because they waived their rights to participate in any ERISA plans.  *See* 56.1 ¶ 251 ("In the event Distributor…hereafter become[s] eligible to participate in any…benefits, Distributor…hereby waives any right to participate in such benefits.").  Such prospective waivers of rights to ERISA benefits are enforceable.  *Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1366 (2d Cir.1991) ("an individual generally may waive the right to participate in a pension plan governed by ERISA").

### E.   PLAINTIFFS' UNJUST ENRICHMENT CLAIMS (COUNT VIII) FAIL BECAUSE THEIR RELATIONSHIP WITH DEFENDANTS IS

**GOVERNED BY CONTRACT**

Plaintiffs' unjust enrichment claims fail as a matter of law because they are preempted by federal law, as detailed in Defendants' Motion for Judgment on the Pleadings. (*See* Dkt. 51.) These claims also fail for the additional reason that they arise out of the same subject matter as the Distributor Agreement. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193 (1987); *Shah v. Micro Connections, Inc.*, 286 A.D.2d 433 (N.Y. App. Div. 2001) ("Since the use of the plaintiff's employees as independent contractors was addressed by a written consulting agreement, the plaintiff is precluded from recovering for unjust enrichment."). Here, Plaintiffs' unjust enrichment claims are centered around their alleged misclassification as independent contractors (Am. Compl. ¶ 110), which is governed by the Distributor Agreement (56.1 ¶ 6). Thus, the unjust enrichment claims fail because they "aris[e] out of the same subject matter" as the Distributor Agreement. *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388.

**F.     PLAINTIFF SCHUCKER, SHAFER, FRYAR AND HEINRICH'S NYLL, ERISA AND UNJUST ENRICHMENT CLAIMS (COUNTS II-VIII) ARE ALSO BARRED BY RELEASE**

Plaintiffs' Schucker, Shafer, Fryar and Heinrich's NYLL, ERISA and unjust enrichment claims are barred in whole or in part because they signed general releases. *Yablon v. Stroock & Stroock & Lavan Ret. Plan and Trust*, 98 F. App'x 55, 56 (2d Cir. 2004) (ERISA claims are waiveable); *Hummel v. AstraZeneca LP*, 575 F. Supp. 2d 568, 569-71 (S.D.N.Y. 2008) (NYLL claims barred where plaintiff had released "federal, state or local claims arising from or relating in any way to [plaintiff's] employment relationship"). Releases are enforceable so long as they are "clear and unambiguous on their face and…were knowingly and voluntarily entered into and were not the product of fraud, duress, or undue influence." *DiFilippo v. Barclays Capital, Inc.*,

552 F. Supp. 2d 417, 426 (S.D.N.Y. 2008) (internal citations omitted).

Here, the releases should be enforced. They were "clear and unambiguous," stating that the Distributor releases "any and all claims, actions, cause of actions, rights demands or remedies, whether known or unknown, which Distributor ever had, or may claim to have had, from the beginning of time until as of the moment he/she/it signs this Agreement arising out of, or relating to the Distributor Agreement, including any and all tort and contract claims." (*See* Schucker Ex. 17, Shafer Exs. 9 and 11, Fryar Ex. 6, Heinrich Ex. 8.) They were entered into knowingly given that Plaintiffs received notice both in the Distributor Agreement and FDD that they would sign a general release of all claims in the event that they sold their distribution rights. (56.1 ¶¶ 251-52). Thus, these releases bar Schucker, Shafer, Fryar and Heinrich's New York Labor Law, ERISA and unjust enrichment claims.[11]

Therefore, the Court should grant Defendant's motion for summary judgment, and dismiss Plaintiffs' claims with prejudice.

## II.     THE COURT SHOULD DENY PLAINTIFFS' MOTION TO AMEND

In the Motion to Amend (Dkt. 94), Plaintiffs seek to expand the scope of the case by adding (i) a Rule 23 class action component to their individual NYLL overtime and improper deductions claims, (ii) a new classwide NYLL recordkeeping claim under Rule 23, and (iii) a new individual Fair Play Act claim. The Motion to Amend should be denied.

### A.     PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW

To begin, Plaintiffs' proposed amendment should be denied because the claims that Plaintiffs seek to add, or expand into Rule 23 class claims, fail as a matter of law. As discussed above, summary judgment should be granted on the NYLL overtime and improper deductions

---

[11] Plaintiff Schucker and Shafer's claims are barred in their entirety. Plaintiff Fryar and Heinrich's claims are barred for the period prior to their respective executions of their releases.

claims.  (*supra*, at 9-26).  Likewise, the proposed recordkeeping claim fails.  Only employees can assert the recordkeeping claims Plaintiffs propose to assert pursuant to NYLL Section 195, *see* New York Lab. Law § 195(1) (employers must provide "his or her employees" a wage notice); § 195(3) (similar); § 198 (only employees have cause of action), and there is no genuine dispute that Plaintiffs were properly treated as independent contractors, *supra* at 9-20.  And, the proposed Fair Play Act claim fails because this statute provides no private right of action.  1-2 New York Employment Law § 2.02 (2d ed. 2016) (Fair Play Act "does not provide for a private right of action"); *Traver v. Lowe's Home Ctrs., Inc.*, 2014 U.S. Dist. LEXIS 185314, at *14 (E.D.N.Y. June 27, 2014) (substantially similar statute "does not expressly authorize a private right of action for misclassified employees").  Thus, the Motion to Amend should be denied.

## B.    THERE IS NO GOOD CAUSE FOR PLAINTIFFS' AMENDMENT

Even if Defendants' summary judgment motion is denied, Plaintiffs' Motion to Amend should be denied for the additional reason that they have not shown good cause for the amendment.  "[I]t is settled law that when a responsive pleading has been filed and a party seeks an amendment after the pretrial scheduling order, Rule 16 of the [FRCP] is controlling and the movant must satisfy the more stringent [Rule 16] standard of good cause."  *Knoll, Inc. v. Moderno, Inc.*, 2012 WL 3613896, at *1 (S.D.N.Y. Aug. 22, 2012).  Good cause "depends on the diligence of the moving party."  *Wilson v. Corelogic Saferent, LLC*, 2016 WL 482985, at *2 (S.D.N.Y. Feb. 8, 2016).  There is no "good cause when all the information necessary to support the proposed amendment was in the plaintiff's possession when the action was commenced, and nothing ... learned in discovery or otherwise altered that fact."  *Wilson*, 2016 WL 482985, at *2 (denying motion to amend to add class action claims).

Here, as in *Wilson*, the Complaint allegations confirm that Plaintiffs were on notice of the alleged class-wide improper practices they now seek to challenge under Rule 23.  Indeed, the

Complaint alleges that that *all* New York distributors were denied overtime and subject to common policy of improper deductions.  (Complaint at ¶¶ 73-74 ("Defendants had a *policy and practice* of making charge-backs on independent contractor payments for stale product and other reasons which are wrongful and unlawful.") ¶ 42(vii) ("Defendants maintained . . . the right[] to . . . [w]ithhold pay and *deduct money* from Driver wages"); ¶ 43 ("Drivers cannot refuse the additional product and, if they do, they are billed . . .through *deductions* in their wages.") (emphasis added).)  The original Complaint also alleges recordkeeping violations.  (Complaint at ¶ 66 ("Defendants did not maintain adequate or accurate records of . . . hours worked each day, the total hours worked each workweek, [and] regularly hourly pay rate, . . . among others.").)

Likewise, Plaintiffs have been on notice all along of the facts underpinning their newly-sought Fair Play Act claim.  They concede as much in the Motion to Amend.  (*See* Motion to Amend at 2 ("Plaintiffs also add a cause of action under the … Fair Play Act, which too originates under the same set of operative facts already pleaded.").)  (*See also* Dkt. 95-3 at ¶ 95, 98 (proposed amended complaint relies upon identical facts to support both pre-existing NYLL misclassification and the newly sought Fair Play Act claims).)

For their part, Plaintiffs argue (Motion to Amend at 5, n.2) that the Rule 16 good cause standard does not apply here because "there was no deadline set by the Court for either party to amend pleadings."  But Plaintiffs cite no authority for this contention.  To the contrary, "the absence of a deadline for an amended complaint in [a] Scheduling Order does not permit the [p]laintiff to escape the requirements of Rule 16."  *In re Gen. Elec. Co. Sec. Litig.*, 2012 WL 2892376, at *4 (S.D.N.Y. July 12, 2012).  Although Plaintiffs assert (Motion to Amend at 6) that they only learned during First-Phase Discovery that "a sustainable class action claim under the NYLL could be maintained," this argument is a non-starter because Plaintiffs do not explain

-31-

*what* they learned during discovery or *when* they learned it to reach this conclusion.  *Knoll*, 2012 WL 3613896, at *2 (emphasis added) ("When the movant claims such new information has come to light, the movant must indicate *what* the information is and *when* it came to light" to demonstrate good cause under Rule 16).

Therefore, Plaintiffs' Motion to Amend should be denied for lack of good cause.

### C.   PLAINTIFFS' REQUEST TO AMEND SHOULD ALSO BE DENIED AS UNDULY DELAYED AND PREJUDICIAL

In any event, the Motion to Amend should be denied because Plaintiffs failed to satisfy their burden under Rule 15.  Fed. R. Civ. P. 15 (amendment allowed when "justice so requires").  A Rule 15 motion to amend "should be denied if there is an apparent or declared reason—such as undue delay, bad faith or dilatory motive . . ., undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment."  *Rambarran v. Mount Sinai Hosp.*, 2008 WL 850478, at *4 (S.D.N.Y. Mar. 28, 2008) (internal quotations and citations omitted).  "[A] lengthy delay without a reasonable explanation justifies denying leave to amend."  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 2015 WL 1650767, at *5 (S.D.N.Y. Apr. 10, 2015).

For starters, Plaintiffs' request should be denied because of their "lengthy delay" in seeking the amendment "without a reasonable explanation."  *Kester*, 2015 WL 1650767, at *5.  Despite possessing the alleged pertinent facts to support their new claims from the outset in May 2016 (*supra*, at 30-32.), Plaintiffs did not seek amendment until *after* the completion of (twice-extended) First Phase Discovery, first raising their request for amendment in an April 2017 pre-motion conference letter.  *See Kester*, 2015 WL 1650767, at *5 (denying motion to amend due to delay where plaintiffs possessed operative facts for 9 months before seeking amendment).

Plaintiffs' excuse for their delay is far from reasonable.  Plaintiffs argue (Motion to Amend at 6) that, during First Phase Discovery, "Defendants flooded Plaintiffs with over

150,000 pages of documents" and only then did "Plaintiffs bec[o]me certain that a sustainable

class action claim under the NYLL could be maintained."  But Plaintiffs do not explain *how*

these documents led them to this conclusion or *when* they finally reached this conclusion.  And

Plaintiffs offer no explanation as to *why* they needed documents to make Rule 23 claims when

the Complaint itself alleges that all Distributors in New York were misclassified and subject to

improper deductions and recordkeeping.  Plaintiffs' argument is further belied by the documents

themselves; approximately 148,000 of the 150,000 pages pertain *only* to the six Plaintiffs.

Plaintiffs' request to amend should also be denied for the independent reason that the

proposed amendment would prejudice Defendants.  "Factors relevant to a showing of prejudice

include whether the assertion of new claims would: (i) require the opponent to expend significant

additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the

resolution of the dispute."  *Kester*, 2015 WL 1650767, at *5 (citation omitted).  Here, adding

Rule 23 class action claims would undoubtedly require Defendants to expend significant

additional resources and delay the resolution of the case.  Defendants would need discovery

related to all prongs of the Rule 23 class certification test.  *See* Fed. R. Civ. P. 23(a) (numerosity,

commonality, typicality, and adequacy); Rule 23(b)(3) (predominance and superiority).  Fed. R.

Civ. P. 23.  At the heart of this discovery is the issue of whether "a classwide proceeding [can]

generate common answers," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), to the

question of whether Plaintiffs and their proposed 100-member class were misclassified as

independent contractors.  Plaintiffs concede this is a "fact intensive inquiry" into the day-to-day

experiences of each Distributor.  (Motion at 7).  Thus, to adequately defend against a Rule 23

class certification motion, Defendants would need to explore the day-to-day experiences of

individual Distributors through depositions, document requests, and written discovery, not only

from many of Distributors themselves, but also from company managers.  The need for such discovery is compounded by the fact that New York distributors contracted with one (or both) of two different Flowers subsidiaries, CK Sales and Oxford, and worked out of dozens of different warehouses across the state.  Each subsidiary has a different management structure, and each warehouse is led by different managers with varying practices.  Because of these varying circumstances, Defendants will need fulsome discovery to fully explore these issues.  *See, e.g.*, *Hernandez v. Fresh Diet, Inc.*, 2014 WL 5039431, at *8 (S.D.N.Y. Sept. 29, 2014) (denying class certification of NYLL independent contractor claims; individualized issues as to whether "drivers worked at their own convenience and were sufficiently controlled by defendants").  Not only that, granting the Motion to Amend would require Defendants to re-open the depositions of the Plaintiffs concerning Rule 23(a)'s adequacy and typicality prongs.

By contrast, if the Motion to Amend is denied then any further discovery would be far more limited.  Discovery on the claims of the individual claims of Plaintiffs is complete. Plaintiffs have moved for conditional certification of an FLSA opt-in class of all Distributors in New York.  But notice would be redundant here as each and every member of Plaintiffs' proposed class (except for one) recently received notice and the opportunity to join in one (or two) other pending FLSA collective actions.  Even if notice *is* granted, any opt-in class would be very small because the notice pool includes only (i) New York Distributors who already opted into a prior case (and thus could not join here) and (ii) New York Distributors who received notice in a prior case, but decided *not* to join (and thus would be unlikely to join here).  Thus, further discovery here would involve the claims of, at most, a *very* small number of opt-ins.

Plaintiffs posit (Motion to Amend at 7) that "[i]t will clearly not necessitate much, if any discovery, by virtue of the addition of a New York state class."  But Plaintiffs ignore that *no*

discovery has taken place concerning Rule 23 elements; the significant discovery needed to defend these class claims (*supra*, at 33-34); and the fact that Rule 23 discovery was in no way contemplated by the Court's scheduling order (Dkt. 43). And it would be a due process violation to deprive Defendants of the opportunity to take Rule 23 discovery. *See, e.g.*, *Wiegele v. FedEx Ground Package Sys.*, 2007 WL 628041, at *2 (S.D. Cal. Feb. 8, 2007) ("due process requires an opportunity to conduct discovery on class action issues prior to class certification proceedings"). Moreover, contrary to Plaintiffs' assertion, discovery already completed on FLSA conditional certification issues (Dkt. 43) cannot replace Rule 23 discovery. *Compare Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (FLSA conditional certification requires "modest factual showing" that plaintiffs and putative class members are "similarly situated"), *with Myers*, 624 F.3d at 548 (in Rule 23 class action, plaintiffs have "burden to establish by a preponderance" that prongs are satisfied).[12]

Lastly, Plaintiffs' request to add a Fair Play Act claim should be denied for the additional reason that the amendment sought is futile. (*supra*, at 30).

## CONCLUSION

For the foregoing reasons, the Court should (i) grant Defendants' motion for summary judgment and dismiss the case with prejudice, and (ii) deny Plaintiffs' Motion to Amend.

---

[12] Moreover, Plaintiffs rely upon a series of inapposite cases. Plaintiffs rely heavily on *Abbatiello v. Monsanto Co.*, but, unlike here, in *Abbatiello* plaintiffs did "not seek to add new claims"; plaintiffs sought only to add factual allegations to bolster existing claims. 571 F. Supp. 2d 548 (S.D.N.Y. 2008). Plaintiffs' reliance on *Downey v. Coal. Against Rape & Abuse, Inc.*, is misplaced for the same reason. 143 F. Supp. 2d 423, 436 (D.N.J. 2001) (proposed amendment did "not present new causes of action"). Plaintiffs' reliance on *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, is similarly defective because, in that case, the party opposing amendment "offered no reason, such as prejudice or bad faith" to deny the amendment. 46 F.3d 230, 235 (2d Cir. 1995). Plaintiffs rely upon *Bertrand v. Sava*, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982), rev'd, 684 F.2d 204 (2d Cir. 1982), to argue that addition of class action allegations is not prejudicial. But *Bertrand* was a habeas corpus action, and prior to amendment a "significant amount of evidence [was] already produced" pertaining to each of the 86 proposed class members. *Id.* By contrast, here, no discovery has taken place on the NYLL claims of the proposed class members. And *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) is distinguishable because, in that case, leave to amend was affirmed because there was no "showing of prejudice . . . or bad faith."

Dated: July 24, 2017
New York, New York

Respectfully submitted,


*s/ Matthew W. Lampe*

Matthew W. Lampe
mwlampe@jonesday.com
Karen Rosenfield
krosenfield@jonesday.com
JONES DAY
250 Vesey Street
New York, New York 10281
Tel: 212.326.3939
Fax: 212.755.7306

Deborah A. Sudbury (*pro hac vice*)
dsudbury@jonesday.com
Craig S. Friedman
csfriedman@jonesday.com
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Tel: (404) 521-3939
Fax: (404) 581-8330

*Attorneys for Defendants*