# EXHIBIT "1"

## TO RANDY J. PERLMUTTER DECLARATION IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT

1      JAKE LINTHICUM, having been duly sworn by the Notary

2   Public, was examined and testified as follows:

3                 EXAMINATION BY ATTY. PERLMUTTER:

4      Q    Good morning.  As you may know, I'm the attorney

5   for -- there are six plaintiffs in this case, so I might

6   just refer to them all as plaintiffs.  If individually, I

7   will mention them as individual people.

8            Have you ever been part of a deposition before?

9      A    No.

10     Q    Okay.  Essentially this young lady right next to

11  us is taking down everything that we say.  While they are

12  very good and she's very dexterous, if we talk over each

13  other, she can't type both of us, so I will ask a question,

14  you will answer it.  If you need me to repeat the question

15  at any time, I will repeat it.  If you don't understand it,

16  just say you don't understand it.  And if your lawyer

17  objects, just wait for her to give you permission to

18  answer.  Then at any time if you want to take a break, as

19  long as there's not a question pending on the floor, then

20  you can go and take a break at any particular time.  Those

21  are the essential ground rules.

22           Is there any reason you would not be able to

23  testify truthfully today, are you under the effects of any

24  alcohol or drugs or anything that would affect your ability

25  to answer questions honestly today?

1    Q    And what was your role as a sales manager?

2    A    I was in charge of the Portland, Maine,

3  distribution center and maximizing sales for that area.

4    Q    Okay.  So the distribution center, is that

5  essentially a warehouse where the bread gets delivered

6  before going out to the respective warehouses for delivery

7  at the stores?

8    A    It is one of those end warehouses.

9    Q    It's an end warehouse, so it is actually where the

10  drivers come, pick the product up and deliver it.

11    A    The employees pick up the product and put it in

12  their individual route vehicles there. '

13    Q    And then they went out for delivery?

14    A    Uh-huh.

15    Q    Did you supervise any of the drivers in the depot?

16    A    Yes.

17    Q    Now this is the Portland, Maine, distribution

18  center, correct, you said?

19    A    Yes.

20    Q    Okay.  So what was your role in managing these

21  drivers?  Can I call them drivers?  If there is another

22  word, you can correct me, but just for ease.

23         MS. SUDBURY:  And we are still talking about the

24  spring, 2010 to '13?

25         MR. PERLMUTTER:  Correct, when he was -- when he

1    was a sales manager.

2       A    Route sales associates is how I would refer to

3    them.  And I would review their orders, make sure that they

4    are keeping the customers full of product and that the

5    product is in code, picking up new customers.

6       Q    Picking up new customers, what did that entail?

7            MS. SUDBURY:  During that timeframe?

8            MR. PERLMUTTER:  Yeah, I'm still within that --

9    correct.

10      A    I would visit restaurants, nursing homes, ask if

11   they are happy with their current supplier, provide pricing

12   and product for them to test out, try to get the business.

13      Q    And did the route sales associates do that as

14   well?

15      A    Very limited amount.

16      Q    What do you mean by very limited amount?

17      A    They didn't have much motivation to grow the

18   business as route sales associates.

19      Q    Now at this LePage, the Portland, Maine,

20   distribution center, were all of the route sales

21   associates, were they employees of LePage?

22      A    Yes.

23      Q    Any of them independent contractors?

24      A    No.

25      Q    Okay.  And then around I guess when the spring of

1     A     Probably not weekly, but I e-mail with him every

2   month, I would say.

3     Q     So is it your testimony that your only real job

4   duty associated with the Newburgh warehouse has to do with

5   vehicles?

6     A     No.

7     Q     What else?

8     A     I also deal with the distributor relations in

9   Newburgh.

10    Q     Please describe that.

11    A     That would be any issue he has with independent

12  distributors that he's not sure how to handle, he would

13  bring that to my attention.

14    Q     Why you?

15    A     Because I'm in charge of the distributor agreement

16  with the company, making sure that we treat all the

17  independent distributors as independent business people.

18    Q     Now before this promotion, so before you started

19  in the spring of 2013 position, you never dealt with

20  independent contractors in the context of delivery,

21  correct, the drivers?

22    A     Correct.

23    Q     So how was it explained to you -- well, who

24  explained to you the process of using independent

25  contractors in New York?

1    is motivating sales growth.

2        Q    Okay.  The main reason.  Did they explain to you

3    that it saves the company money to use that model?

4        A    They explained that it also shifts controllable

5    expenses to the distributors, when the distributor has

6    their own delivery vehicle, they take better care of it

7    than driving a truck that they are not responsible for.

8        Q    So I take it the answer to my question was yes, it

9    does save the company money by --

10            MS. SUDBURY:  Objection.  Asked and answered.

11       Q    That's okay.  You can answer.  You didn't really

12   answer it.  Did anybody explain to you that this saves the

13   company money by shifting the controllable expenses to the

14   independent operators?

15       A    I never saw any P&L comparisons on when those

16   expenses shift and the changes.

17       Q    I didn't ask you that.  Did anybody explain to you

18   in any way that it saves the company money by using that

19   model?

20            MS. SUDBURY:  Objection.  Asked and answered.

21       Q    You can answer.

22       A    No.

23       Q    What's -- you were part of the transition to the

24   Newburgh warehouse to independent contractors, correct?

25       A    Yes.

1    Q    You went to meetings there with the drivers?

2    A    The meetings weren't held at the warehouse.  They

3    were held at a hotel.

4    Q    Over about three consecutive Wednesdays, does that

5    sound correct?

6    A    Yes.

7    Q    So are you aware of when the -- well, are you

8    aware -- so prior to the conversion -- commencing the

9    conversion, did you have any contact with the Newburgh

10   distribution center?

11   A    No.

12   Q    And when -- when were you informed or when did you

13   first learn that this transition was going to occur, was it

14   when you got promoted or some other time?

15   A    It was when I got promoted.

16   Q    And there were already people delivering product

17   from that Newburgh warehouse to stores in that Newburgh,

18   Middletown, New York, geographical area, correct?

19   A    Uh-huh.

20   Q    You were saying about eight routes, is that still

21   the same, or more or less?

22   A    More or less.

23   Q    And how many of those were independent contractors

24   when you were promoted?

25   A    Zero.

1     Q    So they were all employees of a company at the

2  time you got promoted?

3     A    Yes.

4     Q    And do they all work for the same company?

5     A    No.

6     Q    I believe there were two companies, one was called

7  Route Relievers and one was called Special Teams; is that

8  correct?

9     A    Yes.

10     Q    So some employees worked for Special Teams and

11  some worked for Route Relievers, correct?

12     A    Yes.

13     Q    And there came a time where the employees for

14  Route Relievers were told that they were going to have to

15  transition to Special Teams in anticipation of becoming

16  independent operators, correct?

17        MS. SUDBURY:  Object to the form.

18     Q    You can answer.

19     A    I know the bakery stopped using Route Relievers at

20  one point.

21     Q    Do you know why?

22     A    I'm not sure.  I wasn't over HR at that point.

23     (Exhibit No. 1, Collective Action Amended Complaint,

24  marked for identification.)

25     Q    Okay.  You are now famous.  I'm going to show you

```
 1      Q    Again, do I have it correct that they took place
 2   on about three consecutive Wednesdays, two being the sales
 3   pitch and the third being sign-up?
 4           MS. SUDBURY:  Object to the form.
 5      A    Yes, it was three Wednesdays.
 6      Q    By the way, have you done that at other places or
 7   has this been the only time you were involved in one of
 8   those presentations?
 9      A    It was not the first.
10      Q    So you have done other ones prior to your time in
11   New York?
12      A    Yes.
13      Q    So is it your understanding that the people who
14   were working either for Route Relievers or for Special
15   Teams were told that either they purchased their routes or
16   they would only be able to run them for a period of time
17   until somebody else wanted to purchase those routes; is
18   that correct?
19      A    They were given the opportunity to purchase their
20   territory.
21      Q    Or lose their job?
22           MS. SUDBURY:  Object to the form.
23      Q    Correct?
24      A    No, that's not the other option.
25      Q    So they could have stayed on as employees of the
```

1    happened to someone's assignment if they chose not to buy.

2        Q    Are there any company owned routes operating

3    within the three-year period -- it's now four years

4    almost -- the spring of '13 to present in the Newburgh

5    distribution center?

6        A    Can you say the timeframes again?

7        Q    From the time you got promoted until present, are

8    there any company operated routes that aren't operated by

9    independent operators?

10       A    Are there any territories in Newburgh that were

11   never owned by a distributor at any point, is that the

12   question?

13       Q    That's one way to answer it -- ask it, right,

14   correct, that were operated -- I'm not talking about for

15   vacation periods.  For periods of time other than

16   short-term coverage, operated by company employees.

17       A    There's been periods where territories have been

18   not owned by distributors and operated by the company in

19   Newburgh.

20       Q    Is that usually when an independent operator

21   either gives back his route or his route is taken away and

22   there is no independent operator to purchase that route, is

23   that usually the reason?

24       A    Yeah, there's periods where no independent

25   operator owns the territory.  I think the example I'm

1    thinking of is we created a territory by purchasing a

2    section from Mr. Heinrich and Mr. Fryar and putting a new

3    territory on, so that territory went a period of time with

4    no owner while we were looking for somebody.

5        Q    What period of time was that?

6        A    That was somewhere -- somewhere in the middle of

7    2014, I believe.

8        Q    Do you remember for how long?

9        A    How long was that new territory open before it was

10   sold, I can't say.

11       Q    So that was an intentional -- a thought-0out

12   intentional -- withdrawn.

13           That was an intentional decision by the company

14   to create a new route?

15       A    We -- it was something we worked with with the

16   distributors there, two of them, I believe, Heinrich and

17   Fryar, they came to us looking to sell portions of their

18   territory because it was more than they could handle.  We

19   agreed to purchase it and put a new territory on.

20       Q    Okay.  And do you remember how long -- is that

21   route still in effect in Newburgh?

22       A    Yes.

23       Q    And who is operating that route now, do you know?

24       A    Right now, it's being operated by the company.

25       Q    And who is that?

1   Exhibit 2.  If you could take a look at that and tell me if

2   you recognize that document.

3        A     I don't know if I have seen this document before.

4        Q     Okay.  By looking at it, can you recognize what it

5   is?

6        A     It's a document tracking DOT compliance.

7        Q     Which is right in your purview of your

8   responsibilities, correct?

9        A     Yes.

10       Q     It's one of your main job functions, right, is

11  dealing with the vehicles and the whole vehicle --

12       A     Yep.

13       Q     Okay.  So do you recognize those route numbers?

14       A     Yes.

15       Q     Okay.  So this is all -- you see the date, the

16  month of February, 2015?

17       A     Uh-huh.

18       Q     And you will see that -- do you know a person by

19  the name of Jon Ward?

20       A     Jon Ward I believe is employed by the bakery

21  directly.  I believe he's a sales rep.

22       Q     And Fred Sheppel?

23       A     Fred is a sales manager currently in Connecticut.

24       Q     Is he an independent operator?

25       A     No.

1    Q    Has he ever been an independent operator?

2    A    No.

3    Q    What about Ray Sanders?

4    A    Ray Sanders works for one of the temp agencies.

5    Q    Was working for one of the temp agencies in

6    February of 2015 because that's when this was generated?

7    A    He was a sales manager at one point.  I don't know

8    when he made the transition to working for a temp agency.

9    Q    Is he still employed with the company?

10   A    Is he?

11   Q    Yes, is he?

12   A    He works for one of the temp agencies right now.

13   He's assigned to the bakery.

14   Q    Is that Special Teams or Route Relievers or some

15   other company?

16   A    Special Teams.

17   Q    Special Teams.  So is it accurate to say that

18   Mr. Ward, Mr. Sanders and Mr. Sheppel did not have to

19   purchase their own vehicles to operate their routes?

20       MS. SUDBURY:  Object to the form.  Vague and

21   ambiguous.

22   A    That's correct, they did not have to purchase

23   their own vehicle.

24   Q    You would know that because that's again within

25   your responsibility, correct?

1       A       Yes.

2       Q       So do you know how long Mr. Sheppel operated a

3    route out of the Newburgh depot?

4       A       No.

5       Q       Did Mr. Sheppel have to purchase product to

6    deliver to the stores?

7       A       No.

8       Q       Did Mr. Sheppel have to assume any of those

9    shifting controllable expenses that you were talking about

10   earlier?

11      A       No.

12      Q       I will ask the same question for Mr. Ward, do you

13   know how long he worked or operated a route out of the

14   Newburgh depot as an employee of the company?

15      A       No.

16      Q       Do you know if he's still operating the route?

17      A       No.

18      Q       He's not?

19      A       No, I do not know.

20      Q       You do not know.  Is that because your only --

21   your scope of responsibility starts and ends with the

22   independent operators, so you don't really worry about

23   the --

24      A       Mr. Ward is a sales rep, so he is neither a temp

25   service person or an independent distributor, so his

1    A    I put together the distributor agreements and the

2    franchise disclosure documents.

3    Q    You say you put them together, you just assembled

4    them?

5    A    Physically printing them, putting their

6    information into the distributor agreement with all the

7    specifics of each territory.

8    Q    Is it accurate to say that the company uses one

9    form agreement for a distribution agreement, plus all the

10   exhibits that are attached thereto, the promissory note,

11   all the other exhibits that are attached, it's one standard

12   form?

13        MS. SUDBURY:  Object to the form.  Speculation.

14   Q    We will talk about these six plaintiffs.  They are

15   all the same, all the agreements are the same, all the

16   exhibits are the same?

17   A    The exhibits are different.  There are different

18   territory descriptions on each territory, different list of

19   authorized products that they have sold in the territory,

20   and different values associated to the bill of sale.

21   Q    Right.  So every IO, independent operator -- I

22   call them IOs because that's what Craig calls them --

23   operated a different route, different volume stores?

24   A    Uh-huh.

25   Q    So there was a different cost of purchasing the

1     Q   Okay.  So, for example, there's a Shop Rite store

2  that one of the IOs will deliver product to, right?

3     A   Uh-huh.

4     Q   Does somebody from the company negotiate the shelf

5  space and the product levels with the store or does the

6  independent operator do that?

7     A   Shelf space and product levels are two different

8  things.  The product level is something each store has

9  their own requirements for.  Some stores might say, you

10  know, we require that it's at least one high of bread

11  during these hours, some stores might require it's always

12  two high on bread, so the product levels, what the store

13  requires is a store by store basis.  And different

14  customers work with either the bakery or the independent

15  distributors when it comes to actual shelf space and

16  displays.  Distributors have the ability to -- you know, at

17  a smaller customer or store, they might have a good

18  relationship, you know, and get extra space in the aisle if

19  it's like a smaller independent store, but a big store like

20  a Shop Rite has set space that's negotiated mixed between

21  the distributors, store and company.

22     Q   Just so I'm perfectly clear on that issue, so the

23  big box stores such as a Walmart, a Hannaford, a Shop Rite,

24  a Price Chopper, stores like that, the independent operator

25  really can't effect the shelf spacing in the store?

1          MS. SUDBURY:  Object to the form.  Asked and

2    answered.

3      Q      Correct?

4      A      The distributor has the ability to pick up extra

5    displays in the store, and depending on the relationship

6    with the local managers, they might have ability to change

7    the shelf space, but there's normally a mapped out area of

8    the aisle for each brand determined by the customer.

9      Q      And a store like -- maybe a smaller store like a

10   Quick Check or a gas station convenience store, their

11   independent operator may have a little more flexibility

12   because the stores can be a little more flexible with what

13   they take in the stores to sell?

14     A      That's accurate.

15     Q      But most product that's sold are sold to the

16   bigger stores such as Price Chopper, Hannafords, Walmart,

17   places like that, correct?

18         MS. SUDBURY:  Object to the form.

19     Q      Not to the Quick Checks of the world, gas stations

20   of the world, right?

21         MS. SUDBURY:  Object to the form.  Asked and

22   answered.

23     A      The larger customers sell more product than

24   smaller customers.

25     Q      Prior to the independent operator model being put

```
 1   in place and actually post that with the company drivers --
 2   well, withdrawn.
 3              Do you know what stale product is?
 4   A    Yes.
 5   Q    What's stale product?
 6   A    Stale product is product that's been pulled from a
 7   customer because it's past the coding on it.
 8   Q    We will come back to that.
 9              Do you know how many hours a week the average
10   independent operator operates his route?
11   A    I wouldn't be able to answer that because there's
12   no average independent operator.  It's all over the place.
13   Q    Well, you understand that stores have requirements
14   for deliveries?
15   A    Yes.
16   Q    That some stores, especially bigger stores don't
17   like deliveries past a certain hour of the day?
18   A    That's true.
19   Q    So would it be fair to say that the independent
20   operators get started early in the morning, some may be
21   earlier than others, but early in the morning?
22   A    Yes.
23   Q    And then they go to the warehouse, they pick up
24   their orders for the day and they go and deliver the
25   product?
```

1    A    Yes.

2    Q    And some customers require deliveries five days a

3  week?

4    A    That's correct.

5    Q    And some less?

6    A    Yes.

7    Q    And then on the days that the independent

8  operators -- actually any of the drivers are not delivering

9  product, they have to work on those other days that they

10  are not delivering, but they have to go to either pull

11  product or take product that was previously delivered in

12  the back room and bring it out to the front of the store,

13  correct?

14          MS. SUDBURY:  Objection.  Calls for speculation.

15    Q    If you know.

16    A    That would depend on each territory.  Some

17  territories have customers that require them going in on

18  nondelivery days and pulling up product and some

19  territories don't at all.

20    Q    Well, territories or stores?

21    A    I'm talking about the mix of customers.

22    Q    So let's talk about the routes in the Newburgh

23  depot.

24    A    Uh-huh.

25    Q    Newburgh depot, do you know if any -- if there are

1    any territories in the Newburgh depot that don't have at

2    least one customer that requires seven-day service?

3                    MS. SUDBURY:  Objection.  Calls for speculation.

4                    MR. PERLMUTTER:  You keep saying that, but he

5    knows the answers to a lot of these questions.  You are

6    just throwing the speculation out there.

7        Q    You can answer.

8        A    I don't know if every territory in New York has a

9    Hannaford which would be the customer I know that requires

10   Wednesday and Sundays.  I'm not sure every single one has

11   one.

12       Q    Okay.  So we would have to take the drivers' words

13   for how often they have to work, correct?

14       A    Yes.

15       Q    Now the days they have -- now if a customer like a

16   Hannafords wants seven-day service and the independent

17   operator doesn't want to give seven-day service, does the

18   independent operator have the option to not give the

19   seven-day service?

20       A    If they could work that out with their store in

21   some way or they could choose to hire a merchandiser on

22   those Wednesdays and Sundays, like some people choose to,

23   that's what some distributors have done to avoid having to

24   personally go in on Wednesday or Sunday.

25       Q    Pay somebody to actually operate their route for

1    them?

2        A      Yes.

3        Q      Which costs the independent operator money,

4    correct?

5        A      True.

6        Q      Does a company operator have to hire somebody to

7    merchandise the store?

8        A      Nobody has to hire anybody.

9        Q      Fair enough.  Would a company operator ever have

10   to be in a position to hire a merchandiser to merchandise

11   the stores on the days they don't deliver?

12       A      No, that would never happen.

13       Q      Because the company would have somebody do that

14   for them, correct?

15       A      I don't think we allow as a company people paying

16   someone else to do their job.

17       Q      So you would either have the company operator work

18   the seven days or you would split up the route between more

19   than one company driver for that particular route?

20       A      It's probably on a case by case basis.

21       Q      What's your experience?

22       A      When I was a sales manager in Portland, they would

23   be responsible for doing their own Wednesday services

24   because we had all Hannafords in Portland.  And then on

25   Sunday, like one out of seven would cover multiple

1    that the percentage that -- why don't you explain to me

2    what the standard discount is.

3       A    Standard discount is the profit margin that a

4    distributor would make purchasing that specific class of

5    product.

6       Q    In other words, they get a 23 to 3 percent

7    discount depending on what the product is from what you

8    sell to them and what they then sell to the stores?

9       A    Correct.

10       Q    And why was there a temporary additional discount?

11       A    Temporary additional discount because each

12    territory is different, different expenses, different net

13    sales and customer makeup.  The temporary additional

14    discount is there to give them a chance to grow the sales

15    to a point where they don't need the temporary additional

16    discount anymore.

17       Q    Was there a definition of temporary when these

18    proformas were rolled out?

19       A    No.

20       Q    It was going to be as -- we will take a look at it

21    as it goes on basis?

22       A    Correct.

23       Q    So some people got longer discounts than other

24    people?

25       A    They were all different.

1    Q    And then he's owning -- he or she would be owning

2    distribution rights, in other words, the right to sell

3    products within the territory the company created; is that

4    accurate?

5    A    Yes.

6    Q    Okay.  So then the next page, did an independent

7    operator have an unfettered right to purchase more than one

8    territory?

9    A    Yes.

10   Q    What was the criteria for being able to purchase a

11   territory, more than one?

12   A    More than one territory, if they were able to come

13   up with a business plan on how they were going to operate

14   it.  Other times distributors purchased a second territory,

15   they have shown the ability to operate one territory for a

16   certain period of time already successfully.

17   Q    Prior to selling any of these routes to the

18   independent operators, did you perform -- did the company

19   perform credit checks on them?

20   A    No.

21   Q    Why not, if you know?

22   A    I'm not sure.

23   Q    But there are multiple ways that if I guess things

24   go bad, that the company can reacquire the route either

25   voluntarily through the independent operator or

1    involuntarily through the company taking it back under

2    certain circumstances, correct?

3         A    Yes.

4         Q    So it's fair to say the company felt protected

5    that they could extend credit to people --

6              MS. SUDBURY:  Object to the form.

7         Q    -- who may not otherwise be able to afford it?

8              MS. SUDBURY:  Calls for speculation.

9         A    I'm not sure I understand the question.

10        Q    Now part of their obligation was to form a

11   corporation, correct?

12        A    Yes.

13        Q    Is there a reason that they had to form a

14   corporation versus a limited liability company or something

15   like that?

16        A    I just know that the distributor agreement our

17   bakery was working with required that they use a

18   corporation.  The limited liability company is a different

19   type of entity.

20        Q    And did the independent operators incorporate

21   privately through -- or did they do that through the

22   company?

23        A    I believe it was a mix.  Some distributors, we

24   referred them to a company they could use to get the

25   corporation set up and I believe some found their own way

1   above what was anticipated in the proforma?

2       A    Yeah, that would be any change in value since they

3   purchased the territory.

4       Q    Who had the biggest -- who has the bigger say in

5   the change of value, the company or the independent

6   operator?

7       A    That could be different on each territory.

8       Q    Well, it's true that the independent operator is

9   sometimes forced to take on new stores and deliver to them,

10  correct, their national accounts?

11      A    If there's a customer in their territory that

12  opens up, as part of their distributor agreement, they are

13  obligated to service that customer.

14      Q    They have no choice, correct?

15      A    As long as it's in their territory, yeah, they are

16  required to service the customer.

17      Q    And part of -- there are two ways that I guess the

18  company feels -- the company realizes value, one is by

19  actually selling product from a store, correct, like a

20  ShopRite, the more product you sell, the more money the

21  company can make, correct?

22      A    Yes.

23      Q    And then the more space you have on the shelves,

24  the less space for competitors to come in there and sell

25  product, correct?

1      A      Yes.

2      Q      Thereby making the Flowers company or the company

3   brand stronger, right?

4      A      Yes.

5      Q      And sometimes the amount of product on the shelves

6   that the company wants may contradict with the interest of

7   the independent operator who may not want as much product

8   on the shelves for other reasons, correct?

9              MS. SUDBURY:   Object to the form.   Calls for

10  speculation.

11     A      I don't know if that's true.

12     Q      So behind you is a long book shelf.   There are

13  five slots of books, right?

14     A      Uh-huh, yes.

15     Q      Those books have probably been here since I

16  graduated law school, you know, 20 years ago, right?

17     A      Uh-huh.

18     Q      Bread perishes, right, as a matter of fact --

19  withdrawn.

20              All company products perish, correct?

21     A      Yes.

22     Q      Some shorter than others, correct?

23     A      Yes.

24     Q      So a company driver doesn't care how much product

25  is on the shelf because when the product goes over date,

1   stale, they just pull it off, bring it back to the

2   warehouse and the company either sells it at a thrift store

3   or disposes of it some other way, correct?

4       A    Yes.

5       Q    But if an independent operator spends, A, a lot of

6   time pulling stale, or B, has to deal with a lot of stale,

7   that can impact his bottom line, right?

8       A    They get credit for selling it back to the thrift

9   store for the same amount they paid for it.

10      Q    So no independent operator loses money on any

11  stale product?

12      A    Not unless they go over a stale cap percentage.

13      Q    Created by the company, correct?

14      A    Yes.

15      Q    And this is one of the big issues that the company

16  has with the independent operators, right, they don't

17  really agree a lot of times with the stale cap, correct?

18      A    I have had distributors dispute the stale cap.

19      Q    There is lots of e-mails on those as a matter of

20  fact, right, where you are going back and forth with the

21  sales manager of the depot trying to resolve issues

22  relating to stale, correct?

23      A    I have had e-mails about stale before.

24      Q    And many of the -- you understand many of the

25  independent operators' positions, right, that we are forced

1    to put product in a store that is not going to sell, but

2    the company is making us put the product on the store

3    shelves for their own reasons, right?

4        A    Any requirements for amount of product in the

5    store is a customer requirement, not the bakery's.

6        Q    Right, but the independent operator -- do you know

7    how often these independent operators even see the store

8    managers?

9        A    No.

10       Q    As a matter of fact, would you be surprised to

11   know that most of the time, at most they meet is a

12   receiving manager?

13       A    That wouldn't surprise me.

14       Q    That the independent operators can't even get

15   meetings with the store managers because they want to meet

16   with company representatives, are you aware of that?

17       A    No.

18       Q    But if I told you that was true, would it make

19   sense to you?

20       A    It would be kind of a case by case thing.  Some

21   distributors have good relationships with their store

22   management and some have no relationship.

23       Q    Well, but it's accurate to say -- you've been in

24   this business awhile now, right, you've been in the

25   business for a long time, seven years?

1    A    Yep.

2    Q    So a Hannafords has their own corporate structure,

3  right?

4    A    Uh-huh.

5    Q    So they want product placed the same in all their

6  stores on a scale basis, correct?

7    A    Yes.

8    Q    So what impact could an independent operator have

9  to affect that planogram, if you want to call it, stock

10  level, they can't, right?

11    A    No, Hannafords' requirement for how in stocked

12  their stores are is the same for all their stores, I

13  believe.

14    Q    And they tell the company that and then the

15  company tells the distributor this is what you have to do?

16    A    I'm sure there are times where we have made

17  distributors clear on what the store requirements are,

18  yeah.

19    Q    Do you know if the independent operators know

20  whether the requirement is coming from the company

21  sometimes or the particular store?

22    A    I'm sure they know who it is coming from if we

23  provide them with an actual communication from the store,

24  whether it's an e-mail or their general guidelines that's

25  made available to distributors.  Walmarts and Hannafords I

1    had a high amount of stale.

2        Q    Right.  Because Hannafords requires the company to

3    put a lot of their private label bread on their store

4    shelves, A, to sell it if they can, and B, to keep other

5    products off the shelves, right?

6        A    Yeah, they require that their shelves are full.

7        Q    It's the business model, right, sell bread, you

8    know, take back what's not sold, right?

9        A    Uh-huh.

10       Q    You are just going to bring another series of

11   product next week, right?

12            MS. SUDBURY:  Object to the form.

13       A    What was the question?

14       Q    Hannafords knows that if they get a delivery

15   today, they are also going to get other deliveries

16   throughout the week, right?

17       A    Yes.

18       Q    So -- and it's the independent operator's job to

19   keep fresh product on the shelves, right?

20       A    Yeah, the distributor, it's in his best interest

21   to keep the customer full and happy.

22       Q    If he doesn't, he gets what's called breach

23   letters, right?

24       A    If the distributor violates the terms of the

25   distributor agreement, we could get a breach letter.

1       Q     We will talk about breaches in a little while.

2       A     Uh-huh.

3       Q     And so Mr. Schucker's complaint was I have got to

4    go to this store and bring all this bread to this store

5    that doesn't sell in essence to keep other products off the

6    shelf and it forces me to go over my stale cap because I

7    can't service these big clients this way without the

8    product going over the stale cap, that was his complaint,

9    right?

10      A     I don't recall if he was charged for going over

11   the stale cap at any point.

12      Q     Well, the stale cap number kept changing, right,

13   it doesn't stay the same?

14      A     Yeah, that's on a territory by territory basis.

15      Q     And who makes that determination?

16      A     That would be something that the bakery

17   determines.

18      Q     So if the stale cap -- if the independent operator

19   goes over the stale cap, he starts getting charged for

20   product that's out of code?

21      A     If a distributor goes over the stale cap, the

22   distributor agreement says bakeries won't repurchase an

23   amount of stale, it's just that we won't repurchase over a

24   certain percentage if someone is over the stale cap and

25   they can choose to do what they want with that stale

1    product instead of selling it back to the bakery.

2        Q    What could they do with it?

3        A    They could sell it to farmers.  They could sell it

4    to a stale account, such as Big Lots, Dollar Tree.  They

5    could give it to charity, write it off on their taxes.

6    They can bring it home and make sandwiches.

7        Q    That was good.  That was a good answer.  But the

8    bottom line here is that the company will only accept a

9    certain amount of stale product before they start making

10   deductions from the independent operator's gross sales for

11   that particular week?

12       A    It's on a territory by territory basis.

13       Q    Once again, every territory has a stale cap,

14   correct, a cap of stale that the company will accept back?

15       A    Not necessarily.

16       Q    Excluding company routes?

17       A    No, there are some distributors -- you know, if

18   there's a customer that has high stale just based off their

19   location and that distributor is ordering, rotating the

20   product, you know, doing everything they can to reduce

21   stale, while still keeping the customer happy, we would

22   work with that distributor.

23       Q    We will come back to that.  We will go for a

24   little while longer and then we will take a quick break.  I

25   just want to finish this exhibit.

1    the sales pitch was, doesn't matter what your credit

2    history was, we don't care about your ability to pay it

3    back, you guys want this opportunity, we are giving you

4    this opportunity, no questions asked?

5              MS. SUDBURY:  Object to the form.

6    A    What it says there is accurate.

7    Q    So is my question accurate, was that answer a yes?

8              MS. SUDBURY:  No.  Object.

9              MR. PERLMUTTER:  That's all right.  You can

10   object.

11             MS. SUDBURY:  Asked and answered.

12   A    I'm not sure exactly how you worded it.

13   Q    In other words, it doesn't matter what your

14   previous payment history is, your credit history or your

15   ability to pay, you can get financing through our company

16   without restriction?

17   A    Yes.

18   Q    Okay.  And all the notes were 10 years at

19   12 percent interest?

20   A    Correct.

21   Q    Do you know how they came up with the 12 percent

22   interest?

23   A    No.

24   Q    Did anybody object to the 12 percent interest?

25   A    Out of these plaintiffs?

1    Q    Yes.

2    A    I don't recall.

3    Q    Was that a negotiable number?

4    A    No.

5    Q    Was the cost of the route negotiable?

6    A    No, but there were times where distributors

7    pointed out that certain customers that were valued might

8    not be open longer and things like that, so there were --

9    that was the only territory value negotiations, this

10   customer closed last week kind of thing.

11   Q    And from your -- when I say your, I mean the

12   company perspective, you feel safe because you are

13   collecting the principal payment plus the interest every

14   week anyway, so there's a security there, correct?

15   A    It comes automatically out of their settlement

16   statements.

17   Q    So they can't miss a payment, in other words, that

18   would be a material breach of the agreement, but they

19   couldn't do it because you take it for them?

20   A    There's some territories that collect so much cash

21   that they do need to send money into the bakery each week

22   to cover the expense of that coming out of their territory,

23   so that's not true 100 percent of the true.

24   Q    That's none of my six guys though, right?

25   A    No.

1  Q  So is it accurate to say that they already knew

2 the order of delivery, the days they had to be there, kind

3 of the whole process for running that particular territory?

4  A  They were all familiar with the territories they

5 purchased.

6  Q  Ross Schucker, for example, had worked there over

7 three years in the same territory, correct?

8  A  I'm not sure.

9  Q  Okay.  But it's accurate to say they were all --

10 they all bought the territory they were operating at the

11 time?

12  A  I'm not sure.

13  Q  Is there any document that would jog your memory

14 on that that could tell you who bought what territory, what

15 they were operating beforehand?

16  A  I know who bought what, but I can't recall who was

17 assigned where.

18  Q  Okay.  But they were all operating routes,

19 correct?

20  A  Yes.

21  Q  And every territory had some of the same players

22 in it such as some of the same stores such as Hannafords,

23 Price Chopper, ShopRite, Walmart, stores like that,

24 correct?

25  A  Yes.

1    Q    So it's accurate to say before they became

2  independent operators, they were reporting to company sales

3  managers, correct?

4    A    Yes.

5    Q    And those sales managers told them basically what

6  they had to do, what time they had to be at the warehouse,

7  what stores you had to go to, when you had to go, right?

8    A    Yep.

9    Q    So are you saying that the day they signed their

10  independent operator agreement, all that now changed and

11  it's your ability to negotiate what stores you want to go

12  to, when, where, how, how much product, that all became

13  shifted to the independent operator?

14    A    The customer requirements didn't change, but once

15  they became an independent operator, they could definitely

16  change the service orders that they serviced the customers,

17  they could change how they serviced the customers, what

18  time they come into the depot in the morning.

19    Q    And the company could change things as well,

20  right, orders, quantity of product, things like that,

21  right?

22    A    For the independent distributors?

23    Q    Yes.

24    A    No, the company shouldn't adjust distributor

25  orders.

1    Q    Shouldn't, but they do, correct?

2    A    There's some occasions where the distributor

3  doesn't have the ability to order something and the company

4  gets the permission and does so.

5    Q    Right.  And then the independent operator has to

6  deliver that product, correct?

7    A    If something has been ordered and it shows up and

8  they accept it as product and sell it to them, to

9  customers, then yes.

10    Q    So are you trying to say that it still depends on

11  the discretion of the independent operator or was the

12  answer to my question just yes?

13    A    Does what depend on the discretion?

14    Q    If the product -- independent operator, Schucker,

15  for example, places an order -- and they have to order

16  several days in advance sometimes?

17    A    Uh-huh.

18    Q    Five days I believe for most stores?

19    A    Uh-huh.

20    Q    But he could show up at a particular day to pick

21  up his product and there is product that the company

22  ordered for him, correct, that he didn't order?

23    A    There would never be a time where it's a surprise

24  to him.

25    Q    So if he testified to that or Mr. Valdez testified

1     A     It's a word I have always heard associated with

2   the independent operators.

3     Q     Nobody ever told you why we use the word

4   distributor?

5     A     No.

6     Q     Okay.  Again, the job function that's being or the

7   opportunity that's being presented is essentially you are

8   going to go to a warehouse, you are going to pick up bread

9   and snacks, you are going to deliver them to the stores,

10  you are going to pull stale product, you are going to

11  rotate product, you are going to come back at the end of

12  the day with whatever is left over in your truck, upload

13  data, go home, and the next day, do a similar thing,

14  correct?

15          MS. SUDBURY:  Objection.  Mischaracterizes prior

16  testimony.

17    A     Those are all functions that a distributor would

18  take part in, yeah.

19    Q     So to ask it maybe a different way, the core job

20  duties didn't change the day they signed the independent

21  operator agreement, the distributor agreement, right, their

22  job didn't change really?

23    A     They didn't have a job anymore.  They had a

24  business to operate, and starting then, how they serviced

25  the customer within the requirements was completely up to

1  them.

2      Q     As long as they did those core duties?

3      A     Those core duties are part of what needs to be

4  done to service the customers.

5      Q     And they needed to be done the day before they

6  signed the independent distributor agreement as well,

7  right?

8      A     Yes.

9      Q     Why are the -- why is there some -- withdraw.

10            Why is there a company representative or employee

11  at the depot in Newburgh?

12     A     Are you asking what the job function of a sales

13  manager is?

14     Q     If you know.

15     A     They are responsible for maintaining the

16  distribution center upkeep, keeping company trucks and

17  territories not owned by distributors operating, and they

18  are to help the distributors grow the business, help them

19  set up new customers and the company's handheld, help them

20  with any questions on promotions customers are having.  The

21  main function is to help grow sales with distributors.

22     Q     Okay.  And Exhibit 3, going back to the equity

23  piece, not all routes that are repurchased or sold to third

24  parties have grown where there is more equity than there

25  was when it started, correct?

1    A    Yeah, sometimes territories lose value.

2    Q    So when this informational presentation is being

3    given to the employees, is that told to them, that what you

4    are buying may decrease?  I see a slide that says it can

5    increase.  Is there one that says it could decrease?

6    A    I would have to look through the whole

7    presentation again.

8    Q    Do you remember anybody in the presentation ever

9    saying that to these people?

10   A    Pointing out that the value could go up or down, I

11   can't recall.

12   Q    It just talks about how you get equity, paid-in

13   equity or appreciated equity, right?

14   A    Yes, I saw that slide earlier.

15   Q    Hiring your own employees, on 356, you may hire

16   your own employees.  Did the company have any say as to if

17   an independent operator wanted to sell a route, would they

18   have input on who the route got sold to?

19   A    There are certain things that would make someone a

20   qualified buyer, buying a territory directly from another

21   distributor.

22   Q    Such as?

23   A    They would need to be -- have a corporation set

24   up, be able to provide a vehicle to deliver product to the

25   customers.

1    A    I think each distributor has their settlement

2  statement go to different types of accounts.  If it goes to

3  an account in their personal name or in an account in their

4  business's name, I don't know who had it set up what way.

5    Q    Well, you would agree that there's a difference in

6  a business being like a Flowers Foods, Inc. and somebody

7  setting up an independent contractor route, that those

8  businesses aren't the same, right, you work for a big

9  company, correct?

10    A    I would say that.

11    Q    These are a whole bunch of little tiny companies,

12  right?

13    A    They could do more than just their bread

14  distributorship with CK Sales with their company, but for

15  the most part, I think they were primarily for that.

16    Q    Well, they were limited on the products they could

17  sell, right?

18    A    They were limited on what brands they had the

19  rights to distribute.

20    Q    They couldn't sell any competing brands, correct?

21    A    That's correct.

22    Q    Back to 359 now, when I asked you about the

23  qualifications of a potential buyer, your buyer must be a

24  bona fide qualified purchaser.  What does that mean?

25    A    As we went over before, the same requirements that

1    were required of the previous owner.

2        Q    On page 361, it talks about the company repurchase

3    guidelines of the territory.  And this particular page is

4    between six months and five years.  Do you see that on page

5    361?

6        A    Yep, I got it.

7        Q    So again, here, there's a formula for the company

8    repurchasing the territory, right?

9        A    Uh-huh.

10       Q    And the company will pay to you any paid-in

11   equity, right?  It says it right there, in essence, pay to

12   you any paid-in equity, right?

13       A    Yes.

14       Q    Anywhere in this slide or anyplace else, does it

15   say what happens if there is no equity in the route?

16       A    I would have to go through all the slides again.

17       Q    So if it's not in there and there was no equity in

18   the route, as a matter of fact, there was negative equity

19   in the route, what is the obligation of the independent

20   operator at that time if they want to give the route back

21   or resell the route, I should say?

22       A    If there is negative appreciated equity, you mean,

23   as in the territory value has gone down, there's no way to

24   have paid-in equity?

25       Q    Right.

1   so that they can -- well, give them tips on how to manage

2   their money; is that accurate?

3       A    Yes.

4       Q    And they actually gave an example of how much

5   money they should put aside to save for vacation and things

6   like that, do you recall that?

7       A    Yeah.

8       Q    As a matter of fact, I think the example you used

9   or the company used -- when I say you, I mean the

10  company -- was if you put away X amount per week, at the

11  end of one year, you would have enough money to pay for a

12  week's vacation, for example?

13      A    I do recall a slide breaking down how much they

14  would have to pay for -- save up per week for time off.

15      Q    Now company operators don't have to pay for

16  anybody's vacation time, right?

17      A    Pay for anybody's?

18      Q    Well, I'm sorry, their own vacation time, do they?

19      A    I'm not sure how the temp service vacation time

20  works.  I believe they accrue some amount of vacation after

21  some period.

22      Q    Is it your testimony that every company operator

23  works for a third-party agency?

24      A    No.

25      Q    So the ones that work for the company directly, do

1    they have to pay people to take vacation?

2        A    No.

3        Q    Do they have to pay the company to take vacation?

4        A    No.

5        Q    For example, you get vacation, you don't pay the

6    company, correct, to take your vacation?

7        A    That's correct.

8        Q    But the independent operators either have to pay a

9    fee to the company or pay somebody to operate their route,

10   correct?

11       A    How they run their business when they have a week

12   they want to take off is up to them.

13       Q    Is there a third option?

14       A    They have -- some people have their wife as a

15   business partner and she operates it on the week off or a

16   son or somebody who is part of the business.

17       Q    So the options are for time off, as I understand

18   them, A, you can pay a fee to the company, I think it's

19   $150 for the first week and $350 for any week after that;

20   is that correct?

21       A    That's an option.

22       Q    That's an option.  The second option is that they

23   hire somebody to run their route for them?

24       A    Yes.

25       Q    Option C is using a family member who they

1    of their temp service fee, if they chose to use that

2    service, you would see on a statement one of those two

3    numbers.

4        Q    The independent operator gets a settlement

5    statement each week, right, and we will talk about it, it

6    encapsulates a lot of information, right?

7        A    Yeah.

8        Q    Are you saying it would be on that statement for a

9    particular week?

10       A    If a distributor chose to use the company's

11   service for a time off week and it was their first week,

12   you would see $150 on that line and you would know they

13   used that week.

14       Q    So it would be on the settlement statement itself?

15       A    Yes.

16       Q    Okay.  Good.  Now there were restrictions on when

17   the independent operators could take vacation, right?

18       A    The bakery needed to be able to have people to

19   cover, so that was something they would work out with their

20   director of sales, scheduling time off weeks.

21       Q    So if I can shorten that answer, the answer is

22   yes, right?

23       A    Yes, the bakery --

24            MS. SUDBURY:  If they are using this service.

25            MR. PERLMUTTER:  Excuse me, please.

```
1     A    The bakery scheduled time off weeks with
2  distributors ahead of time.
3            MR. PERLMUTTER:  Please don't do that again.
4            MS. SUDBURY:  I will do whatever I want.
5            MR. PERLMUTTER:  Whatever you want, really?
6     Q    Okay.  So again, just because your lawyer jumped
7  into my question, there were restrictions on the time the
8  independent operator could utilize the service for
9  vacations, correct?
10    A    They had to be prescheduled with their director of
11 sales.
12    Q    Again, the answer is yes, right?
13           MS. SUDBURY:  Objection.  Asked and answered.
14           MR. PERLMUTTER:  He's not answering it.
15           MS. SUDBURY:  He did answer.  You didn't like the
16 answer, but he answered.
17    Q    It's a yes or no question.  Were there
18 restrictions, yes or no?
19           MS. SUDBURY:  Objection.  Asked and answered.
20    Q    Yes or no?
21    A    It had to be prescheduled.
22    Q    So they couldn't do it on their own volition, they
23 had to work with somebody from the company to make sure
24 that it was available, as a matter of fact, there is a lot
25 of e-mails that go back and forth about people who wanted
```

1   time off in the summer and other times of the year, right?

2          MS. SUDBURY:  Objection.  The question is vague

3   and ambiguous.  You are referring to this service?

4          MR. PERLMUTTER:  If he understands it, he can

5   answer the question.

6     A    My answer still stands that it needed to be

7   scheduled ahead of time.

8     Q    So if I produce e-mails that show that there are a

9   lot of machinations at work to try to get people time off

10  and there is actually responses that they can't get time

11  off, would that refresh your memory as to how the process

12  works?

13         MS. SUDBURY:  Object to the form.

14    A    If the bakery wasn't able to schedule a time off

15  week because we didn't have coverage, then that week

16  wouldn't be one where we could offer that service.

17    Q    On page 383, this is the informational

18  presentation.  Keys to being a successful distributor, the

19  first bullet point, work closely with our sales management

20  team.  They are there to help you be successful, not to

21  tell you what to do or how to do it.  That's how it was

22  presented to the independent -- the potential independent

23  operators, correct?

24    A    Yes.

25    Q    Do you know if that is really how it is in

1    opportunity to speak to the decision-maker of a Hannafords,

2    for example, to change some of the process?

3        A    They have every ability to speak to the management

4    at their store.

5        Q    So are you aware -- you have personal knowledge of

6    any independent operator of my six being able to go to --

7    go into a Hannafords or Shop Rite or some other store and

8    speak to the manager directly about the requirements of the

9    customer?

10       A    Of your six, no, I don't know of any specific

11   negotiations they did with their stores.

12       Q    As a matter of fact, Mr. Valdez was running two

13   routes at one time, correct?

14       A    I know he owned two at one point.

15       Q    Correct, he owned two, I'm sorry.  And do you know

16   why he owned two?

17       A    He was successful in his first one and he wanted

18   to expand.

19       Q    Are you guessing or is that -- do you know that to

20   be true?

21       A    I know that to be true.

22       Q    So did he want the second route, which was

23   Mr. Schucker's old route, right?

24       A    Uh-huh.

25       Q    Because that's where he lived in Middletown,

 1    that's the reason he wanted that route?

 2        A    I think he gave me that as one of the reasons.

 3        Q    But your testimony is because he was successful at

 4    the first, that he wanted the second to build off that,

 5    correct?

 6        A    I know that was one of the reasons as well.

 7        Q    And do you know if there was a period of time that

 8    Mr. Valdez was not actually operating the sales route, he

 9    had two people working for him?

10        A    I wasn't aware of that.

11        Q    And are you aware that Mr. Valdez made numerous

12    attempts to speak to store managers in his territories

13    about various issues relating to his route and they would

14    never speak to him and he was informed that they would only

15    speak to company representatives?

16        A    I can't recall that.

17        Q    Okay.  So you wouldn't know if that's true or not?

18        A    I would not.

19        Q    Okay.  Mr. Valdez was deposed in this case, so he

20    has already testified.  So if Mr. Valdez, for example, had

21    two routes, two territories, and wasn't able to directly

22    interface with the decision-maker in the particular store,

23    would you agree that could impact his ability to either get

24    more sales or make changes to his route that could make him

25    more profitable?

1  for these agreements, correct?

2      A    Prior to the exhibits.

3      Q    Prior to the exhibits.  And the exhibits are more

4  specific towards the purchase of that individual territory,

5  correct?

6      A    That's correct.

7      Q    Okay.  But the distributor agreement itself,

8  pages -- let's say, for example, on Valdez 1 which is

9  Exhibit 6, which starts at Bates stamp 326 and ends on 354,

10 that will be the same for all distributor agreements,

11 correct?

12     A    The exhibits are listed in the page range you gave

13 me.

14     Q    I'm sorry, I'm sorry.  So 326 through 346?

15     A    There's places where the specific date -- the

16 agreement under is referenced and on page three is --

17 territory area is referenced.

18     Q    What else is different?

19     A    I believe that's it.

20     Q    Okay.  So as a matter of fact, there's a CK Sales

21 template that contains all of these documents which

22 includes the exhibits and has the word sample written

23 across them, right?

24     A    I believe I have seen that before.

25     Q    So the forms are the same, it's the individual

1    information regarding each territory that's different and

2    whether or not it was financed and things like that by the

3    operator, correct?

4        A    Yes, the terms of the distributor agreement are

5    the same.

6        Q    And those terms are not negotiable, are they?

7        A    Outside of the exhibits?

8        Q    Well, let's talk about right now -- well, can you

9    negotiate the purchase price?

10       A    Not outside of what I have described earlier,

11   pointing out customers who might not be part of the

12   territory value.

13       Q    So in pages one through 20 at least, before the

14   exhibits start, these terms are not negotiable, correct, in

15   all three models that I have given you, right?

16       A    That's correct.

17       Q    Okay.  Again, right now, what I'm just using is

18   Valdez 1 to make things a little bit easier, so now I'm on

19   page 327 at the bottom right.  It's the body of the main

20   page with all the good lawyer whereas clauses and things

21   like that.  Do you see that?

22       A    Yes.

23       Q    Okay.  And if you look about three quarters of the

24   way down the page, there's a whereas that says the parties

25   desire to create a right and distributor on which

1    distributor will be authorized to sell certain defined

2    products within his specified geographic area.  Do you see

3    that?

4        A    Yes.

5        Q    So essentially this agreement, if I understand it

6    correctly, confers rights on the independent operators to

7    sell a certain amount -- a certain type of product within a

8    certain location, correct, that's what that says?

9        A    That's correct.

10       Q    Okay.  Let's go to the next page which is 328 or

11   page two of this agreement, in the definition section, do

12   you see that?

13       A    Yes.

14       Q    There's a definition of authorized products?

15       A    Yes.

16       Q    And one of those authorized products are attached

17   as a further exhibit, correct?

18       A    That's correct.

19       Q    There's a sentence midway through the paragraph

20   that says company may cease selling such authorized

21   products to distributor upon notice with or without cause,

22   right?

23       A    Yes.

24       Q    So if I understand that sentence correctly in

25   section 2.3, essentially the company reserves the right to

1       A       That sounds correct, yes.

2       Q       That you took the label?

3       A       Yep.

4       Q       Okay.  How about the Tastykake acquisition, was

5    that while you were in your current position?

6       A       No, that was while I was a sales manager.

7       Q       So in those types of acquisitions where the

8    company purchases new product, they then want that product

9    to be distributed, right?

10      A       That's correct.

11      Q       So if the company today went out and bought

12   another -- let's say a failing bread company and took it

13   over, they would -- the company would want that product

14   distributed to their stores, right?

15      A       Yes.

16      Q       And the company reserves the right to make the

17   decision to either add or subtract authorized products as

18   it sees fit, right?

19      A       Yes.

20      Q       So as my example that we talked about earlier, if

21   all of the sudden a Walmart appears in your territory that

22   wasn't there before, you have to service that product and

23   the company reserves the right under this section, right,

24   to sell that product?

25      A       If there's -- a Walmart opens up in a

1    distributor's territory, are they required to sell the

2    Great Value product, is that the question?

3        Q    Yes.

4        A    Yes.

5        Q    Okay.  We will go to the next page.  2.7 and 2.8,

6    stale is defined there, so stale means products and

7    authorized products removed from the market on the

8    appropriate color code or designated pickup date, right?

9        A    Uh-huh.

10       Q    What does that mean, appropriate color code or

11   designated pickup date?

12       A    That means that each product has a color twist tie

13   or tag that shows when it should be removed from the market

14   to keep product fresh for the customers.

15       Q    Now can the store -- withdrawn.

16            There's an expiration date too of the product,

17   right, there's an expiration date, is that what we are

18   talking about, like bread has an expiration state?

19       A    It's not always the same.

20       Q    It can be different.  So a store can consider a

21   product out of code technically before it expires?

22       A    That's correct.

23       Q    And that's the company's -- that's the store's

24   requirement, correct?

25       A    If stores require that something leaves a number

1    speculation.

2       A    I'm not sure the reason for that.  Different

3    customers have different levels of communication with

4    distributors.

5       Q    Well, by your earlier testimony, if the store

6    manager has such a good relationship with the -- I mean,

7    I'm sorry, if the independent operator has such a good

8    relationship with the store, what do they need the company

9    for, they can just make their own deals and their own

10   decisions?

11      A    Some of these customers are large chains and, you

12   know, the decision-making is made at offices outside of the

13   area where distributors operate.

14      Q    And it's usually made up at a higher level than

15   you are at even, right, in the company?

16      A    Yeah, that's true, but there's customers such as

17   restaurants and things like that that distributors are

18   100 percent in control with working with the customer.

19      Q    Once again, if we are being completely frank here,

20   you are talking about really small customers that -- a

21   Quick Check, for example, is a small customer in most

22   independent distributors' models in our area, correct, or a

23   gas station or a restaurant, it's not a big customer for

24   them, correct?

25      A    That would be smaller, yeah.

1    Q    I mean we can look at some of the sales reports

2  after lunch and show that some of those may be 2 percent of

3  what they sell to a big box store, correct, I mean pretty

4  small numbers, right?

5    A    Yeah, Quick Checks are small.

6    Q    And restaurants compared to a ShopRite or things

7  like that, right?

8    A    Depends on the restaurant, but yeah.

9    Q    Okay.  So 7.1 which is on the next page, three

10  through one, the company reserves the right to solicit and

11  service drop delivery and other nonDSD accounts with

12  products and authorized products in whole or in part in the

13  distributor's territory so long as it is done for a

14  legitimate business reason and not for the purpose of

15  undermining distributor's business.  Do you read that -- do

16  you see that sentence?

17    A    Uh-huh.

18    Q    Do you know what that means?

19    A    I think that would be referring to accounts that

20  get like warehouse delivery and on-line outlets like Amazon

21  Fresh or something, if Amazon Fresh's wearhouse is in the

22  distributor near Boston's territory, people who buy that

23  product get it delivered to their home, you know, via Fed

24  Ex or something or whatever Amazon uses, but it doesn't

25  make sense for our distributor to make that delivery, so

1    it's accounts that are outside of DSD stores which the

2    distributor is buying the rights to, DSD in his territory

3    for these brands, so it's outside of that.  DSD means

4    direct store delivery.

5        Q    So that could potentially cut into the profit of

6    the independent operator, correct?

7             MS. SUDBURY:  Object to the form.  Calls for

8    speculation.

9        A    I really don't have any -- any knowledge of what

10   kind of accounts like this even exist, if any, in this

11   area.

12       Q    But they do it -- the company could do it as long

13   as the purpose is not to undermine the distributor's

14   business, right, the purpose isn't, correct, that's what it

15   says?

16       A    That's what it says.

17       Q    Then 8.1, down below, the settlement of account,

18   that's what we have been discussing before which is each

19   week, an independent operator will get a statement

20   essentially showing sales and then various deductions and

21   then a net settlement amount?

22       A    Correct.

23       Q    Okay.  And next page, 332, 8.5, again, in the

24   event a chain account or customer implements scan based

25   trading, distributor has to comply with the scan based

1     sales histories, preparation of daily and weekly

2     settlements, and there's a whole list of things one through

3     10, correct?

4          A     Yes.

5          Q     And for that, the company charges the independent

6     operator according to 10.2 an administrative fee, right?

7          A     That's right.

8          Q     And that's the same for each operator?

9          A     Yes.

10         Q     And it's a $30 a week charge whether they like it

11    or not?

12         A     That is the charge for using the handheld.

13         Q     They also pay a fee to use the warehouse, right?

14         A     That's correct.

15         Q     Do the company drivers pay a fee to use the

16    warehouse?

17         A     No.

18         Q     For the administration of the reports?

19         A     No.

20         Q     So why do they charge the independent operators

21    those fees?

22         A     I'm not sure.

23         Q     Do you know how much revenue the company makes

24    from those fees on an annual basis?

25         A     I'm not sure.  I'm sure it's a lot less than the

1    rent at the warehouse or the handheld expenses.

2       Q    Well, they would have the rent at the warehouse

3    anyway, right, whether they had independent operators or

4    employees, right?

5           MS. SUDBURY:  Objection to the form.

6       Q    Would the rent change?

7           MS. SUDBURY:  Speculation.

8       A    No, the rent would not change.

9       Q    So then again, down to 11.1 on the same page, 334,

10    company shall deliver products and authorized products to

11    distributor at a location specified by the company, right,

12    that's the warehouse?

13       A    Yes.

14       Q    And distributor will be charged a fee for

15    warehouse use, so it's for using the warehouse, right?

16       A    Yes.

17       Q    The warehouse that the company is already paying

18    rent for and where company operators are not paying any

19    fee, there's a fee charged to my plaintiffs, correct?

20       A    That's correct.

21       Q    Does anybody in the company track the hours that

22    the independent operators work?

23       A    No.

24       Q    And I think all the operators in my case except

25    for Shane Bower, nobody left the State of New York to do

1    Q    And the next sentence, distributor has to apply --
2  I'm sorry, comply with all promotions, feature pricing and
3  things like that, that's the term between the company and
4  the customer, correct?
5    A    That's correct.
6    Q    Okay.  Next page, which is 336, this is the
7  section after that page and 337 that talks about the
8  transfer or the sale of the distributor's rights, correct?
9    A    That's correct.
10   Q    And this is where we talk about the 5 percent
11  transfer fee, right, page 337, 15.4?
12   A    Yep.
13   Q    So it's either 5 percent -- I'm sorry, 15.4, in
14  the event of a sale by distributor or by anyone acting on
15  behalf of distributor, the distributor shall pay a transfer
16  fee to the company in an amount equal to 5 percent of such
17  gross sale price, but not less than $2,000, correct?
18   A    Yes.
19   Q    And the reason that they put here is it's in
20  consideration of the administrative activities taken by the
21  company, right?
22   A    Yes.
23   Q    Which is essentially just changing the names and
24  all the internal documents and getting the lease released
25  to a new person and all the work that you guys have to do

1    to really transfer the rights over?

2        A    Correct.

3        Q    So somebody determined 5 percent is a fair number,

4    not you, I understand, but somebody said that's a

5    reasonable number?

6        A    Yes.

7        Q    Okay.  Then on page 338, 17.2 and 17.3, that talks

8    about the noncurable breaches and curable breaches,

9    correct?

10       A    Yes.

11       Q    And the noncurable ones are the really serious

12   stuff, if something happens, they are pretty defined in

13   there and it's pretty self-explanatory, right?

14       A    Uh-huh.

15       Q    Everything else is what you consider a curable

16   breach, right?

17       A    Yes.

18       Q    Meaning that if you find the independent operator

19   did something wrong under the agreement, you could send

20   them out a letter essentially saying this is what you did

21   wrong, here's in the agreement where the problem came up

22   and you have 10 days to cure that breach, is that the

23   standard letter?

24       A    Yes.

25       Q    Okay.  Couple more pages forward, page -- page

1    342, section 20.2.  Who would get a letter from a

2    distributor saying the company is in breach, would that go

3    to you?

4        A    It could make its way to me.

5        Q    Is that like where Mr. Schucker sent you e-mails

6    regarding the problems with his route, he felt the company

7    was doing something wrong, did you consider that notice of

8    a company breach or just a complaint?

9        A    I don't recall how he worded his e-mails if he

10   alleged that we were in breach of the contract or not.

11       Q    Have you ever personally ever had to deal with a

12   situation where the company was accused of being in breach

13   of the agreement?

14       A    Yes.

15       Q    How many times?

16       A    One time.

17       Q    One time.  In how many years?

18       A    Three, four.

19       Q    Do you know how many breach letters you have sent

20   out over that same period of time?

21       A    No.

22       Q    When I meant you, I meant you or Mr. Price or

23   somebody you are affiliated with.  Is it in the hundreds,

24   thousands?

25       A    It would be over 100.

1   correct?

2       A    I'm not sure if it's in regards to repayment of

3   the money as much as linking his name to the corporation's

4   name.

5              MR. PERLMUTTER:   Okay.  All right.  We can break

6   here if you want.  This will be a good time.

7                  (A lunch break was taken.)

8       Q    Back on.  Welcome back.  We were just discussing

9   before lunch the distribution agreements that are part of

10  the exhibits here.  2.6, good industry practice.  Who

11  determines whether or not the distributor is complying with

12  2.6, good industry practice, from a company perspective?

13      A    From a company perspective, that would be

14  something normally made aware to us by customer complaints.

15      Q    Okay.  So if a customer complains, does that

16  trigger a violation of the 2.6 portion of the agreement?

17      A    Not always.  We would look at the nature of the

18  complaint.  A customer can complain about something they

19  really shouldn't be at times and we look at it on a case by

20  case basis and see if it's actually something that's part

21  of their chain service requirements being violated or not.

22      Q    So is every customer complaint -- well, withdrawn.

23              Generally, does the customer complaint go to the

24  independent operator or to somebody in the company?

25      A    It depends on the customer.  Some stores will have

1   a good relationship with their distributor and open lines

2   of communication and will do it directly to them and others

3   might not.

4       Q    So if a customer complains to an independent

5   operator, you may never -- again, when I say you, I mean

6   the company -- you may never know about it because maybe

7   the independent operator just took care of the problem?

8       A    That's true.

9       Q    But if it comes to the sales manager or somehow

10  gets to your attention, how is that handled?

11      A    If it's something that sales management and the

12  customer, you know, have met with the distributor on before

13  and it's a trend that's not getting better, that could lead

14  to a breach letter, but it's something that the managers

15  would discuss with the distributor before it gets to that

16  step.

17      Q    Mr. Schucker received a breach letter from a

18  complaint from a Quick Check manager and it involved him

19  not servicing the store on the required amount of days.  Do

20  you recall sending him a breach letter regarding that?

21      A    No.

22      Q    If you saw the letter, would that refresh your

23  memory?

24      A    Yes.

25      Q    Okay.  Is there a set number of breach letters

1      A    I'm not sure.

2      Q    If he did that and a third Quick Check manager

3   didn't want him to lower the days of service and that third

4   manager complained that he wasn't providing the service

5   that they requested, would that trigger a breach letter?

6            MS. SUDBURY:  Objection.  Calls for speculation.

7      A    It could.  It wouldn't be automatic.  It would be

8   a discussion we would have with Mr. Schucker about the

9   specifics and he might even be given a timeframe before a

10   breach letter to start servicing the customer for what the

11   customer is asking.

12      Q    You would acknowledge that Quick Check is a very

13   small part of that territory, Middletown, New York, that

14   Mr. Valdez currently has?

15      A    They're smaller customers, yes.

16      Q    And if a smaller store like a Quick Check has a

17   demand that the independent operator believes is

18   unreasonable because it may either impact his ability to

19   service other customers and make more money and they won't

20   change that process, would the company intervene and try to

21   get that three-day service down to two or something like

22   that?

23      A    That would really depend on the case.  If a

24   customer is asking for something that's unreasonable and

25   outside of their general service agreements with the whole

1    Q    We will start broad and then we will go more

2    specific, how is that?  If I'm specific, there are some, so

3    I'm asking if you are aware of whether or not sales

4    managers have supervisory and or disciplinary authority

5    over the independent operators to ensure compliance with

6    company policies?

7            MS. SUDBURY:  Object to the form.

8    A    Sales managers are there to make sure that the

9    brands are represented properly in the market and that the

10   customer requirements are met, so if something isn't being

11   met or if brands are being misrepresented, sales managers

12   would bring that to the attention of the distributor and it

13   could lead to a breach of contract if it's not being

14   followed.

15   Q    And it's not optional for the drivers to return

16   back to the warehouse at the end of each day and upload the

17   data, correct, to the company?

18   A    It's in their best interest because they want to

19   have the handheld information from their day communicated

20   so that they get settled up with properly.

21   Q    So, for example, a person like Mr. Valdez who

22   resides in Middletown goes to the warehouse in Newburgh to

23   pick up his product every day, right?

24   A    Uh-huh.

25   Q    And he delivers it in the Middletown geographical

1    he would be willing to work throughout the week.  I don't

2    know.

3         Q    Well, we all agree there's 24 hours in a day,

4    right?

5         A    Yes.

6         Q    And if you are trying to grow a business and you

7    have a plan to grow your business and then the company

8    comes in and says now you need to do something else that

9    may be different than what your vision was to grow your

10   business, that could affect how you run your business,

11   right?

12              MS. SUDBURY:  Objection.  Calls for speculation.

13        A    I'm not going to disagree that it would take time

14   to service the customer.

15        Q    Again, he had no choice because it's in the

16   distributor agreement that you have to service our national

17   accounts, correct?

18        A    He would be obligated to service a customer in his

19   territory requesting service.

20        Q    Can you give me an example of a requirement the

21   company communicated to any of my plaintiffs that saved

22   them time throughout the day?

23        A    Requirement?  I know we had an upgrade to the

24   handheld recently that made it run a lot smoother.

25        Q    Software update?

1     A     Yep.

2     Q     How about in relation to the way they do their job

3    from picking up the product to delivering the product to

4    doing pack-outs, anything like that that you can think of?

5     A     I can't think of any changes to recommended best

6    practices that we have implemented.

7     Q     Okay.  And if a national account changes its

8    service requirements at any given time, then the

9    independent operator has to change his or her business

10   model to comport with the requirements of that national

11   chain; is that correct?

12    A     Yep.

13    Q     So if a Walmart, for example, wants to get

14   serviced seven days a week, the company would say go

15   service them seven days a week, correct?

16          MS. SUDBURY:  Objection.  Calls for speculation.

17    A     I don't know how the company would treat that.

18   That would be having to have transport bring out product

19   two extra days for the week and that might not be possible.

20    Q     Fair enough.  That's fair.

21      (Exhibit No. 10, E-mails, marked for identification.)

22          This will be Exhibit 10.  It is just a series of

23   e-mails and reports, so we will just kind of go through it.

24   On the first page, I will give you a chance to review that.

25   Please do.

1    Tuesday and Saturday.

2              MS. SUDBURY:  Twice this week.

3              MR. PERLMUTTER:  I'm sorry, what did I say?

4              MS. SUDBURY:  Last week.

5         Q    I'm sorry, I see he did go twice this week,

6    Tuesday and Saturday.  Is this one item out of stock or a

7    couple?  It's a question.  I can either write breach for

8    not meeting days of service requirements or for violating

9    customer's out of stock policy, signed Jake, right, you

10   wrote that, right?

11        A    Uh-huh.

12        Q    So there were multiple ways to breach this

13   particular independent operator, correct, without

14   discussion by the way, between you and Mr. Daoust, right?

15             MS. SUDBURY:  Object to the form.  Calls for

16   speculation.

17        A    I'm having a discussion right now in the e-mail.

18        Q    He sent the e-mail to you at 1:14 P.M. and you

19   responded at 4:00 o'clock and maybe a couple seconds after?

20        A    Uh-huh.

21        Q    Less than three hours from Mr. Daoust's e-mail to

22   yours?

23        A    Uh-huh.

24        Q    Is it your testimony that sometime in between

25   there, you had a conversation with Mr. Daoust about this

```
 1  particular issue?

 2     A    I can't say.

 3     Q    So you don't know?

 4     A    I don't know.

 5     Q    So all we know is you wrote this e-mail, correct?

 6     A    Yes.

 7     Q    And you are calling that a discussion?

 8          MS. SUDBURY:  Object to the form.  Asked and

 9  answered.

10     Q    You are calling that a discussion or guidance on

11  how to breach the independent operator?

12     A    Looks like I'm starting a dialogue.

13     Q    Okay.  So then Mr. Daoust wrote back, Acme should

14  get five days of service, right?

15     A    Yes.

16     Q    10 minutes later, this is the discussion

17  continuing?

18     A    He is responding to my question.

19     Q    Okay.  So was there a breach letter issued from

20  this incident to the best of your knowledge?

21     A    I really don't know.

22     Q    Okay.  And route 7817 is who?

23     A    Heinrich.

24     Q    Okay.  After this e-mail communication, there's

25  another e-mail again produced by your attorneys --
```

1          MS. SUDBURY:  He said over a hundred.

2      Q    Less than a thousand?

3      A    Over 100.  I would say less than a thousand.

4      Q    More than 500?

5      A    I'm really not sure.

6      Q    If you go to the next page, there's a Bates stamp,

7  the next few pages, that start with 0014113.

8      A    Uh-huh.

9      Q    Do you know what these forms are, the next four

10 pages?

11     A    It's not something I have seen before.

12     Q    Okay.  I'm done with that exhibit.  You can put it

13 over there if you want.

14          You agree that the company itself relies very

15 strongly upon the independent operators to be successful so

16 the company is successful?

17     A    Yes.

18     Q    And that their efforts, the work that they put in

19 to delivering the product and taking care of the customer

20 service and doing all the things that a distributor

21 agreement requires is really an integral part of the

22 Flowers and LePage business model?

23          MS. SUDBURY:  Objection.  Calls for speculation.

24     A    I know that Flowers chooses to use independent

25 distributors because it's been a proven industry way to

1  distributor purchases it.

2      Q     Do you know what the average independent operator

3  of Newburgh depot earns per year?

4      A     No.

5      Q     No idea whatsoever?

6      A     I can see totals on their settlement and it's hard

7  for me to tally up total cash collected, like I told you,

8  that's a weekly handheld document that tracks the cash

9  collected, so it's hard for me to know.  I don't know what

10  their expenses are outside of the stuff they chose to have

11  deducted off the statement directly.

12      Q     And some of the drivers that are independent

13  operators today have worked for the company for much longer

14  than the three-year period that they have been independent

15  operators, almost four years, correct, like Steve Heinrich

16  and Mr. Valdez?

17      A     Yes, some of the plaintiffs before they were

18  distributors worked for Route Relievers or Special Teams

19  assigned to LePage Bakeries.

20      Q     And is it fair to say that if the independent

21  operator doesn't breach the agreement and there's no reason

22  for the company to be unhappy, that that relationship

23  between the company and independent operator will continue

24  unabated?

25      A     If they choose to keep running the business, then

1    yep.

2         Q    From the company perspective, the company would

3    have no reason to get rid of the independent operator if

4    they are doing everything they are supposed to do under the

5    agreement, right?

6         A    No.

7         Q    And in the distributor agreement, I know we went

8    over it in some detail, there's no renewal period in there,

9    right, there's nothing that says this is for one year and

10   we renew it?

11        A    No.

12        Q    It is just ongoing subject to the termination

13   rights of both parties in that agreement, right?

14        A    That's true.

15        Q    And when there were employees of these third-party

16   Route Relievers or Special Teams, again, they were told

17   where to go, when to be there and those types of things,

18   right?

19        A    Uh-huh.

20        Q    For Mr. Schucker, for example, who worked for

21   Route Relievers since 2010, for over three years, he had

22   been servicing the same territory he wound up purchasing,

23   right?

24             MS. SUDBURY:   Objection.   Calls for speculation.

25        A    I don't know his assignment during that time, but

1    Q    Size of stores, types of stores, distance to
2  drive?
3    A    Uh-huh.
4    Q    Distance between the stores, some routes may be
5  more urban, some may be more rural, some may have bigger
6  box stores.  There's a whole bunch of factors in coming up
7  with a territory, right?
8    A    Correct.
9    Q    Prior to them becoming independent operators, were
10  all the drivers working on a full-time basis?
11       MS. SUDBURY:  Objection.  Calls for speculation.
12    A    I don't have any knowledge of their hours, but the
13  potential distributor is a full-time position.
14    Q    And that's the position that all my plaintiffs
15  were in, right, before they became independent operators,
16  correct?
17    A    Correct.
18    Q    We have already established that there's a
19  noncompete in the distribution agreement, so we called it a
20  limited noncompete, correct?
21    A    It's only for the territory described in the
22  distributor agreement and for only a year period.
23    Q    And all the independent operators are paid on a
24  weekly basis?
25       MS. SUDBURY:  Object to the form.

1    back to the thrift store all in one location seems pretty

2    convenient to me.

3        Q    Convenient perhaps.  I'm asking how it enhances

4    the value of their -- of what they bought?

5             MS. SUDBURY:  Objection.  Asked and answered.

6        A    I'm not sure.

7             MS. SUDBURY:  We have been at it another

8    hour-and-a-half.

9             MR. PERLMUTTER:  If you want to take a break, we

10   can.  I have another hour or so left.

11            MS. SUDBURY:  Let's take a break then.

12            MR. PERLMUTTER:  No problem.  I want to make

13   everybody happy.

14                  (A short break was taken.)

15       Q    We started talking earlier about store fines.  Are

16   you aware that stores issue fines to the company?

17       A    The fine is made actually to the distributor.

18       (Exhibit No. 12, E-mails, marked for identification.)

19       Q    I'm going to hand you what's been marked as

20   Exhibit 12.  The first page here of the exhibit, take a

21   look at that.  It's the one that's Bates stamped 0140500.

22       A    Uh-huh.

23       Q    This is an e-mail from Jason to -- Jason Thibodeau

24   to Bill Bollati about a couple routes in the territory,

25   correct, in the Newburgh distribution area, correct?

```
1        A    Uh-huh.

2        Q    And Jason writes did you give copies of these

3   fines to Ross and Steve and let them know they will see

4   charges next week.  These fines can be written off at tax

5   season as a business expense.  I know it probably won't

6   matter to these guys, but try to give them a positive

7   twist.  Thanks, Jason.  Do you see that?

8        A    Yes.

9        Q    Are you involved at all in the fine process?

10       A    Not so much.  I'm copied on some e-mails.

11       Q    So under what circumstances does a customer fine

12  an independent operator?

13       A    The ones I'm aware of are the ones shown here

14  which is Shop Rite, their fines as well as Shaw's.

15       Q    Shaw's?

16       A    Shaw's.  I don't know if there is any Shaw's in

17  your plaintiffs' area, but --

18       Q    It's the name of a store, I'm sorry.

19       A    -- for making mistakes on invoicing at the

20  receiving door is waste time at the busy back door, so the

21  stores, if the distributor says to bring in five loaves of

22  white bread and they actually have four loaves, they would

23  have to redo all the paperwork right there on the spot and

24  that's why the store charges those fines.

25       Q    And this is Wakefern who owns ShopRite, correct?
```

1    A    Correct.

2    Q    And so now below the first -- there's a line

3  across the page.  There's a little small typewritten policy

4  dated 9/27/12, policy for the past five years now, quote,

5  enforced, closed quote.  Do you see that?

6    A    Uh-huh.

7    Q    That says mistake on first invoice is $50, 100 for

8  the second, third is 150, and by the same S/A, a $300

9  charge on the fourth.  Do you know what the S/A is?

10   A    I'm not sure.

11   Q    Any fines that are generated from these routes are

12 charged to the independent operator?

13   A    That's correct.

14   Q    Go to the next page, if you don't mind.  This is

15 Bates stamped 0018599.  Take a look at that.

16   A    Yep.

17   Q    Okay.  So this is another e-mail from -- who is

18 Joyce Franklin?

19   A    She's in the accounts receivable department.

20   Q    Okay.  And there's several Lepage employees copied

21 on this?

22   A    Correct.

23   Q    And the subject has to do with vendor fines and

24 administrative fees, right?

25   A    Yes.

1      Q     Now do company drivers get assessed fines?

2      A     No.

3      Q     Why not?

4      A     I'm not sure.  I believe they get written up by

5 their employer.

6      Q     By Lepage, you mean, the company?

7      A     Either Lepage or one of the temp agencies.

8      Q     For a company route like for a Lepage driver, do

9 you know if they get assessed any fines?

10     A     No, they don't.

11     Q     What happens in a situation where an independent

12 operator would get a fine to a company driver, if the

13 independent operator gets fined, what happens to the

14 company driver?

15     A     I believe the company driver receives a writeup,

16 warning.

17     Q     And the company pays the fine?

18     A     Correct.

19     Q     Or doesn't pay the fine?

20     A     I don't know.

21     Q     Okay.  Where would the fines assessed to the

22 independent operators show up on their settlement

23 statements, if at all?

24     A     AR ticket charge-backs.

25     Q     That would be on a weekly settlement statement?

1    points?

2        A    Uh-huh.

3        Q    On December 26th, there were two items he ordered

4    that were cut.  However, a case of another item, with the

5    item number there, was added to my order that I did not

6    need, it was already stocked adequately in my stores.  Do

7    you see that?

8        A    Yep.

9        Q    And an independent operator's complaint with that,

10   isn't it that now I'm going to be delivering product that I

11   know is not going to move off the shelves, it is just more

12   work for me?

13            MS. SUDBURY:  Objection.  Calls for speculation.

14       A    I can see that that was his concern in the e-mail.

15       Q    Wasn't that his complaint in general?

16       A    Yes.

17       Q    Okay.  So the next bullet point, on December 30,

18   six items were cut from his load, a product that his stores

19   needed, and the potential loss of $302.96 in stale -- I'm

20   sorry, in sales, period.  Yet again, I received nine extra

21   items, a total of $666.36 in product, that I did not order

22   and my stores did not need.  Do you see that?

23       A    Uh-huh.

24       Q    So again, this is an independent operator

25   complaining that his orders are being altered without his

1    knowledge or consent, right?

2        A    That's what he's claiming.

3        Q    That's what he's claiming and that it's impacting

4    his bottom line, right?

5        A    Yes.

6        Q    And then he continues, to make matters worse, most

7    of the extra items I received were not fresh product.   And

8    he gave an example, right, item 68767454 was already fully

9    stocked in my stores with a sell by date of January 10th,

10   yet I received an extra 72 pieces on December 30th with the

11   same sell by date of January 10th, period.   Most certainly

12   the product that was added to my order will end up being

13   stale.   Do you see that?

14       A    Uh-huh.

15       Q    Is that a legitimate concern of an independent

16   operator?

17       A    Yep, receiving product dated earlier than it could

18   be --

19       Q    Or later?

20       A    -- is a concern.   Or later.

21       Q    Well, later is the problem, right, not earlier?

22       A    No, I'm saying his concern is that it's dated

23   earlier than the product he already had.

24              MS. SUDBURY:   Right.

25              MR. PERLMUTTER:   Please don't testify.