UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**REDACTED VERSION**

---

ROSS SCHUCKER, EDWARD FRYAR, VIRGILIO
VALDEZ, TOM SHAFFER, STEVEN HEINRICH and
SHANE BOWER on behalf of themselves and all other
employees similarly situated,

Case No. 16-cv-3439

**ECF CASE**

PLAINTIFFS,

v.

FLOWERS FOODS, INC., LEPAGE BAKERIES
PARK STREET, LLC, C.K. SALES CO., LLC and
JOHN DOE 1-10,

DEFENDANTS.

---

## PLAINTIFFS' OPPOSING STATEMENT OF DISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, Plaintiffs Ross Schucker, Virgilio Valdez, Edward Fryar,

Tom Shafer, Steven Heinrich and Shane Bower ("Plaintiffs") submit their responses and

objections to Defendants Flowers Foods, Inc. ("Flowers"), Lepage Bakeries Park St., LLC

("Lepage") and C.K. Sales Co., LLC ("CK Sales") (collectively "Defendants") Rule 56.1

Statement as follows:

## I.  PLAINTIFFS WERE PROPERLY TREATED AS INDEPENDENT CONTRACTORS[1]

### A.  PLAINTIFFS' DISTRIBUTOR AGREEMENTS GOVERN THEIR INDEPENDENT CONTRACTOR RELATIONSHIPS

1.    Distributors contract with CK Sales for the exclusive rights to sell and distribute

certain Flowers products within defined geographic areas.  (Dkt. 79, Linthicum 4/7/17 Dec. ¶ 4).

---

[1] Plaintiffs dispute Defendants' headings in this 56.1 statement and deny any inferences
or legal conclusions that can be drawn from same.

**Plaintiffs' Response:** Disputed. Defendants required Plaintiffs to form corporate entities and Plaintiffs signed on their behalf. (                              , ¶ 3.3). Deny that Plaintiffs were independent and to the contrary, Defendants retained significant control over Plaintiffs' jobs in every significant way as detailed below.

2.    Plaintiffs are current and former independent distributors who contracted with CK

Sales individually and/or through their businesses. (Valdez Dep.[2] 73:10-74:15, 77:2-21, 78:5-

80:16, 87:24-89:21, 90:22-92:11, Schucker Dep. 133:25-134:6, 146:9-12, 148:14-149:4, 174:13-

15, Heinrich Dep. 30:16-18, 71:19-23, 80:21-24, 94:19-95:3, 110:9-13, Bower Dep. 73:3-13,

74:10-25, 75:25-76:7, 122:10-13, 163:9-18, 303:9-13, Shafer Dep. 34:6-15, 65:22-66:3, 74:3-11,

219:10-19, 227:18-228:5, Fryar Dep. 78:4-79:16, 80:18-81:4, 387:7-18).

**Plaintiffs' Response:** Disputed. Defendants prohibited Plaintiffs from contracting with Defendants individually. (                              , ¶ 3.3). Distributors were obligated to form corporations and hold at least a 51% ownership interest prior to purchasing their routes. Id.

3.    Lepage and CK Sales offer independent contractor distributorships to motivate

sales growth by allowing distributors to build equity and profits in their territories. (Linthicum

4/4/17 Dec. ¶ 5; Linthicum Dep. 15:16-16:1).

**Plaintiffs' Response:** ███████████████████████████████████
████████████████████████████████████████████████████████

Denied for other multiple reasons. First, Plaintiffs were already working as employees, performing identical duties without the assumption of any financial risk and cost when they were informed that they would be required to become distributors or lose their employment. (Schucker Dep. 132:9-14, 169:25-170:17, 236: 9-16, 237:10-22, Linthicum Dep. 16:2-7, 17:12-18:3, Valdez Dep. 38:19-39:15, 40:14-21, 41:5-10, 99:24-100:6, Bower Dep. 50:3-51:8, 289:2-12, Heinrich Dep. 35:23-25, 37:3-5, 63:8-9, 150:13, Fryar Dep. 26:5-12, 29: 4-8, 30:2-6, 36-19, 36:22-37:3, Shafer Dep. 51:15-20).   Second, Plaintiffs deny they were "independent" or had any more independence or control as distributors than they did as employees. Plaintiffs were misled into thinking they would be able to build a business by hearing only positive things from Defendants during the sales pitch.[3] (Schucker Dep. 108:2–6, 110:15, 110:19-21, Linthicum Dep.

---

[2] References to "___ Dep. and Exh." are to excerpts from transcripts of deposition testimony and exhibits, all of which are attached to the Declaration of Randy J. Perlmutter submitted herewith.

[3] For example, Defendants never mentioned Plaintiffs would lose money if their routes became de-valued. (Linthicum Dep. 91:2-3, 95:2-24).

91:2–3, 95: 2–24, ▇▇▇ Valdez Dep. 70:5-9, 72:10-15, 251: 14–21, 253: 2 – 8, 137:5-13, Bower
Dep. 53:10–25, 54:14-17, 68:7-8, 69:17-70:10, 134:17-135:4, 135:9-21, 136:14-24, Heinrich
Dep. 60:23-61:2, 62:15-20, 120:4-24, 258:12-260:2, 274:13-20, Fryar Dep. 63:1-17, 65:1–14,
132–133:1–12, 192:3-14, 193:16-194:13, Shafer Dep. 49:22-24, 50:12-14, 215:7-10). Finally,
Plaintiffs were not allowed to participate in the selection process for their territories (or "route")
which were assigned to Plaintiffs at Defendants' sole discretion. (Schucker Dep. 132: 3 – 7,
Valdez Dep. 45:10-22, 50:1-7, 63:15-25).

4.      When Plaintiffs purchased their distribution rights, they signed Distributor

Agreements with CK Sales. (Valdez Dep. 46:19-47:8, 53:17-25, 65:24-66:7, 75:25-76:6, Valdez

Exs. 1, 2, Schucker Dep. 148:14-149:20, 150:19-25, Schucker Ex. 7, Heinrich Dep. 81:8-12,

94:19-95:3, Heinrich Ex. 2, Bower Dep. 73:3-74:25, 93:13-20, Bower Ex. 3, Shafer Dep. 65:18-

66:19, Shafer Ex. 3, Fryar Dep. 77:20-22, 80:2-5, Fryar Ex. 4).

**Plaintiffs' Response:** Disputed. Plaintiffs signed their agreements on behalf of their
corporations. Defendants Flowers and Lepage maintained control over the employment
relationship. (e.g., ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

5.      Plaintiffs acknowledge that the Distributor Agreement governs the terms of their

relationships with CK Sales. (Valdez Dep. 46:19-47:8, 53:17-25, 65:24-66:7, 75:25-76:6,

Valdez Exs. 1, 2, Schucker Dep. 148:14-149:20, 150:19-25, Schucker Ex. 7, Heinrich Dep. 81:8-

12, 94:19-95:3, Heinrich Ex. 2, Bower Dep. 73:3-74:25, 93:13-20, Bower Ex. 3, Shafer Dep.

65:18-66:19, Shafer Ex. 3, Fryar Dep. 77:20-22, 80:2-5, Fryar Ex. 4 ("Distributor Agreement").

**Plaintiffs' Response:** Disputed. Denied that the legal designation of Plaintiffs as
independent contractors is correct. Plaintiffs' core job duties did not change from when they
were employees. Defendants still use employees to cover their unsold routes. (Linthicum Dep.
89:23-90:8, 22:17-25:15, 26:17–23, 27:5–11, 40:20–41:12, 101:1–7, ▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇).[4] Defendants continued to use employee drivers in the same capacity as
distributors were used without them taking on the risk and responsibilities of Plaintiffs. (▇▇
▇ Linthicum Dep. 22:17-23:24, 25:22-23, 26:17-23, 27:5-11, 40:20-41:12).

---

[4] Linthicum conceded that the job function distributors assumed was picking up breads in stacks, delivering
them to stores, pulling stale product, rotating product and then returning to the warehouse at the end of the day with
whatever was left on a distributor's truck, uploading data and going home with the process repeating the next day.
(89:6–23). Core duties did not change when they became Distributors. (Linthicum Dep. Id. 89:23–90:8).

6. Under the terms of their respective Distributor Agreements:

    a. Plaintiffs purchase and own "Distribution Rights," including the "right to sell and distribute" certain products in defined geographic territories. (Distributor Agreement at §2.4).

**Plaintiffs' Response:** Disputed. Admitted that Plaintiffs have the right to sell and distribute products in defined territories. Denied because those rights are "except as expressly limited by [this] Agreement" which gives Defendants, among other things, full autonomy over the product choices, product and service levels and stores where virtually all of the products are sold. (Linthicum Dep. 36:7-21, 37:7-8, 61:5–10, 63:10–13, 64:2 –18, 80:2–4, 124:15-16, 125:4-16, 126:16–23, 128:4–129:4, ███████████████████[5] ¶ 2.3, 6.1, ███████████).

    b. Plaintiffs may sell or transfer their distribution rights in whole or in part at any time. (Distributor Agreement at ¶¶ 2.4, 3.1, 15.1).

**Plaintiffs' Response:** Disputed. Admitted that Plaintiffs could sell their distribution rights per the agreement terms. However, there are other restrictive clauses in the agreements where Defendants retain control. Specifically, such rights could only be sold "<u>subject to the prior written approval of the company</u>" who must evaluate and approve the potential buyer. Defendants also maintain a Right of First Refusal that further restricts to whom Plaintiffs may sell. Plaintiffs are also required to sign a release in favor of Defendants as a condition of any sale, waiving any claims they may have against Defendants. (Schucker Dep. 198–199:2-24, Valdez Dep. 95:6-15, Bower Dep. 303:14-22). Finally Defendants imposed a 5% fee to the distributor on any transfer. (Linthicum Dep. 148:10–149:2, ████████████████, ¶¶ 15.1-16.4, ████).

    c. Plaintiffs purchase products from CK Sales, and the "[r]isk of loss [on the products passes] to [Plaintiffs] upon delivery [of product]." (Distributor Agreement at ¶ 4.1).

**Plaintiffs' Response:** Disputed. Defendants retain ultimate control for product ordering. "Delivery" occurs at a warehouse where Plaintiffs are charged a fee for its use and where the alleged risk of loss occurs. (████████████, ¶ 11.1, ████, Linthicum Dep. 145:5-146:18).

---

[5] All of the Distributor Agreements Defendants use contain identical terms. The only differences are that they have individual territories and purchase prices. To avoid unnecessary waste, only three of the Distributor Agreements are attached as examples within Exhibit 2. (Linthicum Dep. 124:15-16, 125:4-16).

d.  Plaintiffs' "business[es] [are] separate and apart from that of Company and it is of

the essence of [their] Agreement that [their businesses] [are] independent

business[es]." (Distributor Agreement at ¶ 16.1).  Plaintiffs' "shall not be

controlled by Company as to the specific details or manner of Distributor's

business." Id.

**Plaintiffs' Response:** Disputed.  Admitted that Defendants have this provision in the
agreement.  Denied that Plaintiffs were independent or free from Defendants' control.  To the
contrary, by way of examples in the agreement alone, Defendants retain control over (i) what
products could be sold, (ii) adding or terminating the sale of any product, (iii) the right to
discipline Plaintiffs for failing to meet good industry practice, (iv) the transfer of distribution
rights and (v) Plaintiffs in that they could not deliver competing products and were bound by a
covenant not to compete that survives termination of the agreement.  These controls are in
addition to the others Defendants exercise over Plaintiffs, discussed infra. (███████████████
█████████, ¶¶ 2.1, 2.3, 2.6, 3.2, 15.1, 15.2, 20.8, ██████████))).  Defendants
concede that Plaintiffs are integral to Defendants' business and that they rely very strongly on
Plaintiffs to be successful so Defendants can be successful. (██████████████).

e.  "Neither [Plaintiffs] nor any of [Plaintiffs'] employees, agents, or servants shall

be considered or deemed in any way to be employees, agents or servants of

Company." (Distributor Agreement at ¶ 16.1).

**Plaintiffs' Response:** Disputed.  Admitted to the extent that Defendants have this
paragraph in their agreement.  Denied to the extent that this constitutes a legal conclusion.
Further denied in that Defendants controlled the significant areas relating to Plaintiffs' job duties.
See Response No. 6 d. (*e.g.,* ██████████).

f.  Plaintiffs have a "contractual obligation" to run their distributorships consistent

with "good industry practice." (Distributor Agreement ¶ 2.6).

**Plaintiffs' Response:** Disputed.  Admitted that Defendants have this paragraph in their
agreement.. Denied in that this clause is vague and ambiguous and imposes a one-sided
obligation upon distributors for no consideration.  Defendants use this provision to discipline
Plaintiffs and force compliance with their many requirements. (██████████).[6]

---

[6] ██████████████████████████████████████████████████████████████.
Defendants' Director of Distribution Relations personally issued between 100 and 1,000 breach letters. (Linthicum
Dep. 150:11-25, 202:1-4).  Defendants, not Plaintiffs, field customer complaints and retain unilateral control to issue
such letters without Plaintiffs' input. (Id. 155:8-156:16, ██████).

g. Plaintiffs must "maintain[] proper service and delivery to all [customers]

requesting service in accordance with the [customer's] requirements."

(Distributor Agreement at ¶ 2.6).

**Plaintiffs' Response:** Disputed. Admitted to the extent that Defendants have this paragraph in their agreement. Denied in that Defendants contracted directly with customers and imposed the manner and methods of service requirement upon Plaintiffs. Further, Defendants routinely supervised, directed and disciplined Plaintiffs, using paragraph 2.6 of the Distributor Agreement to threaten distributions with loss of their routes for non-compliance. See previous response. (See also, ███████████ ).[7]

h. Plaintiffs must use their "commercially reasonable best efforts to develop and

maximize the sale" of products in their territories and "maintain[] an adequate and

fresh supply" of products for their customers. (Distributor Agreement at ¶¶ 2.6,

5.1).

**Plaintiffs' Response:** Disputed. Admitted to the extent that Defendants have this paragraph in their agreement. Denied that Plaintiffs are able to maximize sales or develop their "business" due to Defendants' excessive controls over their job activities. In addition to those controls previously cited, Defendants retain the unilateral right to add or subtract stores to a distributors route (regardless of the increase of the distributor's workload) (████████)[8] and the right to control the amount and type of product distributors can order. (████████). Plaintiffs are limited by the makeup of their territory. Plaintiffs are also limited in that their jobs are full-time, seven days per week, encompassing more than 50 hours per week so Plaintiffs have no time to seek out business opportunities. (Schucker Dep. 155:2-23, 158:6-10, 162:25-164:6, 236:9-6, 237:10-22, Linthicum Dep. 212:12-13, Valdez Dep. 99:3-23, 123:5-7, Bower Dep. 78:15-80:6, Heinrich Dep. 86:9-10, 229:9-21, Fryar Dep. 256:15-258:10, Shafer Dep. 85:8-16, 86:1-8).

i. Plaintiffs may "carry noncompetitive products." (Distributor Agreement at ¶

5.1).

---



**Plaintiffs' Response:** Disputed. Admitted to the extent that Defendants have this paragraph in their agreement. Denied in that Plaintiffs had no realistic opportunity to carry such products. (e.g., Schucker Dep. 182:10-185:19 (not realistic to carry other products "unless someone is delivering products to the Newburgh Depot at 2:00 a.m.")). No Plaintiff carried non-competitive products. (e.g., Schucker Dep. 183:21–184:25, Bower Dep. 78:16–24).

  j. Plaintiffs are "free to engage such persons as [they] deem[] appropriate to assist in

    discharging [their] responsibilities hereunder." (Distributor Agreement at ¶

    16.2).

**Plaintiffs' Response:** Disputed. Admitted that Defendants have this paragraph in their agreement. Denied to the extent that Plaintiffs had unfettered control to engage such persons and it cost Plaintiffs more money than they would make, thus, requiring them to operate at a loss. Also, Plaintiffs had to pay Defendants if they wanted vacation service and Defendants retained control over when Plaintiffs could take vacations. (Schucker Dep. 165:15-166:3, 168:14-19, Linthicum Dep. 106:16-107:11, 108:14-16,[9] Heinrich Dep. 90:20-91:8, Valdez Dep. 84:17-85:9, 85:23-86:15, 139:3-10, Fryar Dep. 119:2–13, ▮▮▮▮).

  k. Plaintiffs must "actively solicit[] all [customers] not being serviced." (Distributor

    Agreement at ¶ 2.6).

**Plaintiffs' Response:** Disputed. Admitted that Defendants have this paragraph in their agreement. Denied that this was a realistic requirement based upon Plaintiffs' work schedules imposed by Defendants, lack of available customers to solicit and product prices Defendants set. (See Response (i), see also, Valdez Dep. 91:11-21, 92:18-93:4, 141:6-18, Heinrich Dep. 118:1-119:17, 120:4-24, Shafer Dep. 85:8-16, 86:1-8).

  l. Plaintiffs are "responsible for obtaining [their] own delivery vehicle."

    (Distributor Agreement at ¶ 9.1).

**Plaintiffs' Response:** Admitted that Defendants required this of Plaintiffs while as employees they were given a vehicle to use that Defendants maintained. However, Defendants provided the vehicles and 100% financing to Plaintiffs who did not have to invest any of their own money. (▮▮▮▮▮▮▮▮▮▮, ¶ 9.1, Linthicum Dep. 26:17-23).

  m. Plaintiffs are responsible for acquiring and maintaining "at all times throughout

    the duration of [their] Agreement insurance policies from reputable and

---

[9] Employee drivers do not have to pay Defendants or other individuals to service their routes. (Linthicum Dep. 110:22-111:7).

established insurance companies" for automobile liability insurance with single

limit coverage of at least $1,000,000 and collision and comprehensive loss

coverage for the actual cash or replacement cost value of their delivery vehicle.

(Distributor Agreement at ¶ 9.2).

**Plaintiffs' Response:** Admitted that Defendants shifted this cost to Plaintiffs. (███████ ███████████, ¶ 9.2, Linthicum Dep. 16:2-7).

n.   Plaintiffs are responsible for acquiring and maintaining comprehensive general

liability coverage of at least $1,000,000 and workers compensation coverage for

any employees they decide to hire.  (Distributor Agreement at ¶ 9.2).

**Plaintiffs' Response:** Admitted that Defendant created and enforced this policy.

o.   The "company shall not terminate or cancel th[e] Agreement, provided

[Plaintiffs] faithfully carr[y] out the terms hereof," and can only terminate the

Agreement upon a non-curable breach by Plaintiffs or a curable breach that

Plaintiffs failed to cure.  (Distributor Agreement at ¶ 17.1-17.3).

**Plaintiffs' Response:** Disputed.  Admitted to the extent that Defendants have this paragraph in their agreement. Denied that this was the actual practice of Defendants who used, among other things, the vague and ambiguous paragraph 2.6 of the Distributor Agreement to force Plaintiffs to comply with policies and practices whether they agreed with them or not or may have restricted their ability to earn money.  (██████).  Four Plaintiffs voluntarily terminated their routes or had them terminated due to lack of income.  (Schucker Dep. 381:17-382:5, Bower Dep. 65:12-66:14, 104:15-22, 193:8-196:12, 304:18-305:11, Shafer Dep. 244:17-250:18, Fryar Dep. 340:6-342:4, 356:3-11, 387:3-18).

p.   "[N]one of the benefits provided by Company to its employees are available from

Company to Distributor…"  (Distributor Agreement at ¶ 16.1).

**Plaintiffs' Response:** Disputed.  Admitted to the extent that Defendants have this paragraph in the agreement.  Denied as a legal conclusion that Plaintiffs were properly classified and not eligible for benefits and aver that this was part of Defendants' overall plan to make/save money with this model.

7.     Distributors, including Plaintiffs, purchase products from CK Sales at a specified

discount percentage from the suggested wholesale price and resell those products to customers

within their territories at a higher price for a profit. (Linthicum 4/7/17 Dec. ¶ 6, Schucker Dep.

123:21-25, Valdez 177:21-178:11, Bower Dep. 261:14-19, Shafer Dep. 206:13-207:9, Fryar

Dep. 127:4-23).

**Plaintiffs' Response:** Disputed. Admitted that Defendants sell products to Plaintiffs to
pass the risk of loss to them. However, Defendants retained complete control over the specified
discount percentage that changed over time and other controls (such as product quantities) that
affected Plaintiffs' profitability. (Linthicum Dep. 45:13–22, Schucker Dep. 144:2-4, 203:8–
205:4, 297:15– 22, 337:10–23, 338:20–339:5, 13–16, Valdez Dep. 70:5-9, 72:10-15, Bower Dep.
101: 12–23, 156:19–157:12, Heinrich Dep. 112:5–25, 114:18-20, 123:2–21, Fryar Dep. 122-
123:18–22, 124:17–24).

8.     If Plaintiffs sold their territories to third-party buyers, they could sell it at a profit

or a loss. (Linthicum 7/21/17 Dec. ¶ 2, Exh. A Item 12, Schucker Dep. 145:21-146:3).

**Plaintiffs' Response:** Disputed. Admit that Defendants have this paragraph in the
agreement. Denied that Defendants informed Plaintiffs of potential loss of value to their
territories in their sales pitch or Distributor Agreement. (███████████████). Further,
Defendants restricted Plaintiffs' ability to sell their routes by retaining a right of first refusal for
any proposed sale. (██████████████████████, ¶ 15.2).

9.     Distributors order products from CK Sales for each of their customers.

(Linthicum 7/21/17 Dec. ¶ 7).

**Plaintiffs' Response:** Disputed. Admit that distributors place orders with Defendants.
Denied that CK Sales retains control over this aspect of the business. (████████████).

10.    Distributors must purchase back from their customers product that is not sold

prior to its expiration date (also known as "stales"). (Linthicum Dep. 38:3-7, 61:24-62:4, 129:5-

14, 130:18-21).

**Plaintiffs' Response:** Disputed. Admitted that Defendants require Plaintiffs to re-
purchase stale product. However, Defendants unilaterally set and modify the percentage of stale
they purchase back from Plaintiffs which is critical to Plaintiff's income. (██████).

11.    Distributors have discretion to decide what to do with that stale product, including

"sell[ing] it to farmers," "giv[ing] it to charity," "writ[ing] it off on their taxes, "bring[ing] it

home," selling it back to CK Sales at the original purchase price, or selling it to other customers

such as Big Lots or Dollar Tree. (Linthicum Dep. 68:2-6).

**Plaintiffs' Response:** Disputed. This may be Defendants' representative's belief.
Denied that this was a practical or used practice. Defendants unilaterally set and in their sole
discretion, revised a "stale cap" percentage.[10] If that percentage was exceeded, Plaintiffs were
charged by Defendants, reducing Plaintiffs' income (Linthicum Dep. 60:5–18, 67:12–17, 68:7–
12, Schucker Dep. 218:23-219:7, 295:5-296:25, 297:15-22). Defendants routinely manipulated
this figure. Balancing "sales versus stales" was virtually impossible for Plaintiffs who did not
control the ordering process. Defendants concede this is a big complaint of distributors
(Linthicum Dep. 62:1–23). One main problem was that large volume stores required a multitude
of product on their shelves, which created more labor for Plaintiffs but less sales and more
chances to have stale product to pull from the stores. More product kept competitors out but
resulted in less sales and more work for Plaintiffs for less money. (Schucker Dep. 285:13-20,
286:2-21, 287:3-15, Linthicum Dep. 66:2-6, Valdez Dep. 100:10-101:5, 101:12-21, 126:9-
127:21, Bower Dep. 90:11-21, 91:4-11, 91:24-92:3, Heinrich Dep. 158:10-23, 159:2-20, 253:13-
257:16, 258:12-260:2, Fryar Dep. 94:25-95:6, Shafer Dep. 76:11-24, 86:24-87:6, 220:6-222:22).
Plaintiffs signed a letter to Defendants complaining about this issue. (███████████████████
██████████).

12.    Distributors may take time off whenever they so choose. (Linthicum Dep. 101:3–

102:10). A distributor is free to hire workers to service customers, have a family member service

their customers, or devise any other arrangement to meet their contractor obligations to service

customers. (*Id.*). Also, for short-term vacation periods, the distributor has the option of paying a

fee to have a Lepage employee service customers. (*Id.*).

**Plaintiffs' Response:** Disputed. Admitted to the extent that Plaintiffs could allow
somebody to operate their route. Denied that they could take off time whenever they want as
Defendants had to coordinate their schedules, provide approval, and retained control to deny
such support per the agreement. (Linthicum Dep. 106:16-107:–11, p. 108:14–16, Schucker Dep.
165:15–166:3, Heinrich Dep. 89:2–22, 90:20-22, 90:20– 91:8, Shafer Dep. 161:9-15, ███████).

---

[10] The stale percentage is the amount of product Plaintiffs could return to Defendants without being
charged. Originally, Plaintiffs were told that Defendants would purchase back all stale products and sell it to
Defendants' thrift store. Only later did Defendants set and enforce stale product percentages. (Schucker Dep.
177:18-178:5).

13.     Distributors are treated as independent contractors and are not on the payroll of

Lepage or CK Sales. (Linthicum 4/7/17 Dec. ¶ 4, Schucker Dep. 124:2-6, Bower Dep. 63:25-

64:8).

**Plaintiffs' Response:**  Disputed.  Admitted that Defendants treated Plaintiffs as
independent contractors for payroll purposes.  Denied to the extent that this legal classification
was correct.

14.     At the time CK Sales began selling distribution rights to particular territories,

Lepage held meetings for potential distributors.  (Linthicum Dep. 82:10-84:20).  Potential

distributors were told, among other things, that operating a distributorship was "for people who

are self-starters," "motivated to grow sales and push on their own, and it's not for people who

just want to put their head down and follow orders and guidelines.  It's for people who want to

operate a business themselves."  (*Id.*).

**Plaintiffs' Response:**  Disputed.  Defendants presented the distributorship in a way that
one Plaintiff described as "[Defendants] said you would be able to run their route the way you
want to and everything was going to be beautiful and roses and stars shining up in the sky."
(Schucker Dep. 99:23-25, 108:10).  Denied that the job duties changed upon becoming
distributors. (Linthicum Dep. 89:6 – 90:8, ████████████  Plaintiffs also deny they
were able to operate their businesses independently as previously set forth.  (e.g., Schucker Dep.
122:5-12, Shafer Dep. 49:22-24, 50:12-14).  Further, Defendant had no substantive criteria for
who would own a distributorship.  (████████████).

## B.     PLAINTIFF VALDEZ

### 1.     Valdez' Decision To Purchase A Distributorship

15.     Valdez is a current distributor of Flowers products in New York.  (Valdez Dep.

73:10-74:15, 77:2-21, 78:5-80:16, 87:24-89:21, 90:22-92:11).  He views himself as a

"salesman."  (Valdez Dep. 87:24-88:10, 132:15-133:3).

**Plaintiffs' Response:**  Disputed.  Admitted that Valdez is a current distributor.  Denied
that Valdez viewed himself as a "salesman" or that the deposition excerpts state that.  To the
contrary, after he purchased a second route, he tried to build sales without success and eventually

sold it at a loss.[12] (Valdez Dep. 64:15-17, 66:1-14, 74:6-9, 78:17-79:4, 90:16-24, 251:14–21, 97:5-9, 253:2–8). Defendants' controls deprived him of the ability to be a salesman. (Valdez Dep. 74:6-9, 75:2-76:9, 251:14-23, 255:2-8, Exhs. 9-16).

16.     Prior to becoming a distributor, Valdez studied mechanical engineering before taking a "sales position" at a high-rise condominium building. (Valdez Dep. 14:19-16:10).

**Plaintiffs' Response:**  Admitted.

17.     Valdez subsequently worked as a freight supervisor at Kohl's department store. (Valdez Dep. 20:25-21:15, 22:7-25:10). In this position, he managed employees and gave performance evaluations.  (*Id.*).

**Plaintiffs' Response:**  Admitted.

18.     Valdez briefly left Kohl's for an assistant manager position at New York & Company, where he was in charge of scheduling, interviewing and hiring. (Valdez Dep. 26:22-28:7).

**Plaintiffs' Response:**  Admitted.

19.     Valdez returned to Kohl's, but left for a second time to "look[ ] to venture to have [his] own business," including "looking to buy [a] FedEx" delivery route. (Valdez Dep. 29:17-30:21). Valdez wanted his own business so he could have the flexibility to pick up his daughter after school. (Valdez Dep. 28:13-29:7, 31:2-7).

**Plaintiffs' Response:**  Admitted.

20.     Valdez ultimately took a position with Route Relievers in July 2012, delivering Flowers' bakery and snack products. (Valdez Dep. 28:13-31:11, 38:5-20). In August 2013, he moved into a similar position with Special Teams. (Valdez Dep. 33:8-21).

---

[12] For some inexplicable reason, Plaintiffs' copy of the deposition transcript for <u>Valdez only</u> is one page off from Defendants' transcript. For example, Defendants' page 87 is Plaintiffs' page 88. Therefore, when Plaintiffs refer to Valdez' transcript, the pages will be one page later than Defendants'. Plaintiffs attach all relevant pages as exhibits hereto which will avoid any confusion.

**Plaintiffs' Response:** Admitted.

21.    When Valdez heard about the opportunity to become an independent distributor, he attended three meetings to learn more. (Valdez Dep. 42:4-16). At these meetings, he received a Franchise Disclosure Document. (Valdez Dep. 42:4-45:19, ███████████; Linthicum 7/21/17 Dec. ¶ 2).

**Plaintiffs' Response:** Disputed. Valdez was informed that he could either become a distributorship or lose his job. (Valdez Dep. 40:14-21-41:5-10, 43:10-45:22, 50:1-7).

22.    Valdez then decided to enter into a Distributor Agreement with CK Sales, purchasing for $50,120 the right to sell and distributor Flowers products in a territory in Newburgh, NY. (Valdez Dep. 46:24-47:8, 52:3-6, 59:16-60:15, Valdez Exhs. 1, 3). Valdez entered into the business relationship with CK Sales because he was interested in the "flexibility of [his] time" that came with being an independent distributor. (Valdez Dep. 46:9-14).

**Plaintiffs' Response:** Disputed. Valdez entered into this arrangement because he would have lost his livelihood otherwise. He was told "you buy it or you are out." Pursuant to Defendants' agreement, Plaintiffs were required to form corporations and contracts are between corporations and Defendants. Valdez purchased a territory he did not want because Defendants assigned the territories. (Linthicum Dep. 52:10–15, Distributor Agreement, ¶ 3.3, Valdez Dep. 40:14-21, 41:5-10, 43:10–45:22, 50:1–7, 63:15-25, 67:3-6).

23.    Valdez formed a corporation called G&T Corporation, which he named after his daughters. (Valdez Dep. 59:16-21, 60:10-15).

**Plaintiffs' Response:** Disputed. Defendants require Plaintiffs to form corporations and hold at least 51% ownership. (████████████ ██ █).

### 2.    Valdez Purchases Multiple Territories

24.    A year after making his initial $50,120 investment, Valdez made the business decision to purchase a second territory in Middleton, NY for $63,090. (Valdez Dep. 62:10-12, 65:24-66:16, 73:10-12, Valdez Exh. 2).

**Plaintiffs' Response:** Disputed. Admitted that Valdez purchased a second territory when Defendants would not agree to re-purchase his first territory, forcing him to find a private

buyer. (Id. 64:15-17, 66:1-14, 171:3-12, 172:13-15). Denied that purchasing the second route was a business decision. To the contrary, the decision was personal. Defendants did not originally allow Valdez to purchase the route of his choice and when that route opened up, he purchased the second to be closer to his home and his children after it became available. (Valdez Dep. 45:10-22, 50:1-7, 63:15-25, 67:3-16).

25.     After the purchase of his second territory, he subsequently bought another partial

territory from Plaintiff Shafer because he wanted to "make more money." (Valdez Dep. 73:13-

74:15).

**Plaintiffs' Response:** Admitted.

26.     In November 2016, Valdez sold one of his territories to a third-party buyer he

found on his own because he was "losing a lot of money." (Valdez Dep. 77:2-78:4, 95:8-16).

**Plaintiffs' Response:** Valdez was losing money due to Defendants' controls over his ability to obtain sales. (Valdez Dep. 78:19-79:4). Defendants would not re-purchase his route. He eventually sold it to a buyer who Defendants had to approve. His only other option would have been to abandon the route. (Valdez Dep. 77:2-78:4, 95:3-4, 95:6-16, 96:3-7).

### 3.     Valdez Independently Operates His Business

27.     When Valdez bought his second territory, he hired a worker, Adonus DuBose, to

service customers in his first territory so that Valdez could focus on servicing customers in his

second territory. (Valdez Dep. 79:3-6, 132:10-133:3).

**Plaintiffs' Response:** Disputed. Responses nos. 24-26 are incorporated herein. Valdez could not operate two routes at once. Valdez did not want two routes and he continued to service both. (Valdez Dep. 90:16-24, 158:19-25).

28.     In June 2015, Valdez decided to hire another worker, Titus DuBose, brother of

Adonus Dubose, so that he could have one worker servicing each territory and Valdez could

focus exclusively on growing sales from new and existing customers in his territory. (Valdez

Dep. 87:24-88:20, 89:3-6, 133:4-8).

**Plaintiffs' Response:** Disputed. Admitted that for a short period Valdez had two workers. Denied that he focused exclusively on growing sales and, to the contrary, he continued performing his core delivery duties providing special attention to Hannaford. (Valdez Dep.

90:16-24, 158:19-25).  Denied he was able to focus on growing sales or had any real opportunity
to do so.  (Id. 74:6-9, 89:3-16, 91:11-21, 92:18-93:3, 141:6-18).[13]

29.    Valdez gave the Dubose brothers on-the-job training, showing them the route and

having them ride along with him while he serviced customers. (Valdez Dep. 83:8-16).

**Plaintiffs' Response:** Admitted.  Valdez used help and that Defendants did not provide
training.

30.    Valdez chose to treat his workers as independent contractors, and he gave them "a

1099 at the end of the year." (Valdez 78:5-23, 237:17-238:19, 249:5-11, Valdez Exs. 15, 19).

**Plaintiffs' Response:** Admitted. Valdez used help.

31.    Valdez determined how to compensate his workers, giving each "70 percent of

the total check every week of the route," "after all expenses." (Valdez 78:5-23, 86:15-87:21,

172:17-22, 227:22-230:9, 231:17-232:8, 233:18-21, 240:23-241:24, 244:5-245:15, Valdez Exhs.

11, 12, 14, 16, 17, 18).

**Plaintiffs' Response:** Disputed.  Admitted that Valdez originally intended to pay 70% of
his income after expenses.  However, this arrangement did not work and he had to guarantee a
minimum weekly payment of $600 because there was not enough available income to use a
percentage split.  Also denied that he wanted to operate in this manner to begin with. (See
Response Nos. 26 and 27, Valdez Dep. 78:19-79:4, 228:25-230:13).

32.    During periods that his workers took vacation, Valdez chose to pay a fee to have a

Lepage driver service customers in his territories. (Valdez Dep. 244:23-245:15, 246:12-247:11).

Valdez required his workers to pay the fee. (Id.).

**Plaintiffs' Response:** Disputed.  Defendants required a fee for providing vacation
service and retained approval rights over the chosen time.  ( ▮▮▮▮▮

33.    Around January 2016, Valdez terminated his business relationship with Adonus

DuBose, and Valdez decided to service the customers in that territory himself. (Valdez Dep.

---

[13] Valdez even requested to go back to work as an employee because he could make more money than he
was as a distributor, with only a five day work week and he could pick up overtime.  His expenses were much higher
than Defendants explained during the sales pitch. (Valdez Dep. 136:20-13, 169:10-20).

142:12-143:3). In October 2016, after he sold one of the territories he owned, Valdez terminated

his business relationship with Titus DuBose. (Valdez Dep. 143:8-24).

**Plaintiffs' Response:** Disputed. See Response Nos. 24-28. Valdez was forced to fully
service one route due to his lack of income. Finally, after months of losing money, he was able
to unload his first route, which he had never wanted. (Valdez Dep. 95:3-4, 6-16, 96:3-7).

34.    Currently, Valdez pays a part-time helper $50 a day to work for him on some

Wednesdays and Sundays. (Valdez Dep. 79:22-81:8, 163:8-18). Valdez uses the services of this

his helper approximately once every two months. (*Id.*).

**Plaintiffs' Response:** Disputed. Due to the seven day per week requirement of the job,
distributors are required to enlist service from time-to-time which they would not have had to do
as employees. (Valdez Dep. 39:9-15).

35.    Valdez maintains a business bank account for G&T Corporation and uses this

account to pay his workers. (Valdez Dep. 167:22-24, 169:3-5).

**Plaintiffs' Response:** Admitted.

36.    Throughout his tenure as a distributor, Valdez has "ma[de] [his] own schedule" so

that he can pick up his daughter from school at 3:30PM. (Valdez Dep. 101:7-16, 118:20-120:4,

121:20-122:13, 132:2-4).

**Plaintiffs' Response:** Disputed. Admitted that Valdez was able on many days to pick
up his daughter after she returned home from school around 3:30 p.m. because his day started at
3:00 a.m. Denied in that Defendants set his schedule based solely upon their service
requirements that they required Plaintiffs to comply with, which was seven days per week. They
enforced service requirements through store visits and audits. (Valdez Dep. 102:11-103:16,
112:24-113:19, 123:5-7, 149:7-9,



37.     Valdez determines the order in which to service customers, taking into account customer requirements, creating a "ledger" in which he slots customers for service on certain days, and deciding on routes that "make[s]...sense." (Valdez Dep. 117:4-118:10).

**Plaintiffs' Response:** Disputed. See Response No. 37. Defendants set the majority of Plaintiffs' schedules. Distributors have some discretion over the exact order to service customers depending on the particular day.  By way of example, Defendants require service for some stores daily, others four days and others three.  ( ███ ███ )

38.     Valdez has done his own ordering throughout his time as a distributor.  (Valdez Dep. 97:25-98:20, 123:3-20, 156:4-8, 206:8-207:17, 214:20-216:14)  He decides how much to order for particular customers "[b]ased on capacity," "whatever a company got...as a display," and "how much the stores really sells." (Valdez Dep. 123:3-15).  Valdez uses his "judgment" to decide how much to order because "there's no mathematic[al] tool to do it." (Valdez Dep. 206:8-207:5, 214:20-216:14); ( ██████████████████████ ██████████████████ ).

**Plaintiffs' Response:** Disputed. Distributors attempted to balance ordering against what will sell because they get a "suggested" order from Defendants daily that is based upon historical data.  Since that suggested amount is often not relevant to present circumstances, Plaintiffs had some leeway to adjust same which was the same discretion they had as employees.  However, Defendants retain the ultimate control over how much product must be ordered and delivered, especially to the chain stores[14] which comprise most of Plaintiffs' sales. Distributors must also comply with all store promotions. (Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, 216:15-23, 217:8-11, █████ ).

39.     Valdez has never purchased or worn a uniform from Flowers Foods, Lepage Bakeries or CK Sales.  (Valdez Dep. 240:13-19).

**Plaintiffs' Response:**  Denied as Valdez wore branded shirts provided to him by Defendants. (Valdez Dep. 240:7-20).

---

[14] "Chain or "large volume" stores are those that comprise the overwhelming majority of Plaintiffs' sales. ( ███ ). These stores negotiate with Defendants only and have planograms for their products which Plaintiffs have no ability to impact, limiting their sales independence. (Linthicum Dep. 36:7-21, 37:7-8).

### 4.   **Valdez Maximizes His Profit**

40.   Valdez advertises his business. (Valdez Dep. 249:25-250:25, 263:7-265:23).  He "ordered…business card[s]" that he hands out to current and prospective customers in order to "build up a relationship with [his] stores."  (Valdez Dep. 249:25-250:25, Valdez Exh. 20).  He also ordered car stickers for his truck, and put "G&T Distribution" and "Fresh Of All" on the stickers, which was a marketing slogan for his business that he came up with. (Valdez Dep. 263:7-264:6, 265:18-23, Valdez Exhs. 21, 22).

**Plaintiffs' Response:** Disputed.  Valdez bought business cards which did not bring him any additional business or in any way maximize his profits.  Defendants required Valdez to put "stickers" on his truck. (Schucker Dep. 323:18–24, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, ¶ 9.1, Valdez Dep. 251:6–256:21).

41.   Valdez has always tried to minimize G&T's business expenses. (Valdez Dep. 163:5-18, 164:9-21,166:15-167:6, 288:17-289:8, 291:2-12, 298:21-299:2, 301:19-302:6, Valdez Exhs. 4, 5, 28, 30, 31).  For example, he tracks his gas expenses and "separate[s] the money and [his] expenses," by paying himself a salary. (Valdez Dep. 163:5-18, 164:9-21, 166:15-167:6, 169:9-170:3, Valdez Exhs. 4, 5).

**Plaintiffs' Response:**  Admitted.

42.   Valdez deducts business expenses from his income on his tax returns, including his daily meals, advertising expenses, insurance, legal and professional services, office expenses, postage, telephone, leasehold expenses, gasoline and oil, car repairs and maintenance and work clothes and cleaning. (Valdez Dep. 271:18-272:8, 277:23-278:24, 283:22-287:9, 289:2-8, 291:20-298:13, Valdez Exhs. 26, 29, 2016 Form 1040).

**Plaintiffs' Response:**  Admitted.  However, after expenses, Valdez netted $53,828.31 in 2014 (Valdez Exh. 28). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

43.      ███████████████████████████████. (Valdez Dep.

289:2-15, Valdez Exh. 28).  In ███████████████████████████. (Valdez

Dep. 291:20-292:8, 293:9-294:2, Valdez Exh. 29).

**Plaintiffs' Response:**  Admitted.

C.    **PLAINTIFF SCHUCKER**

1.    **Schucker's Decision To Purchase A Distributorship**

44.      Schucker is a former distributor of Flowers' products in New York.  (Schucker

Dep. 133:25-134:6, 146:9-12, 148:14-149:4, 174:13-15).  He owned and operated his

distributorship from March 2014 until January 2015.  (*Id.*).

**Plaintiffs' Response:**  Admitted.

45.      Prior to becoming a distributor, Schucker managed several restaurants, including

Boston Market, Taco Bell, Sbarro's and Burger King.  (Schucker Dep. 17:14-18:9, 18:24-19:7,

42:6-20, 43:11-21, 44:6-9, 46:16-47:10, 48:2-12).  As a general manager of these restaurants, he

was responsible for managing the restaurant's profit and loss and for hiring employees.  (*Id.*).

**Plaintiffs' Response:**  Admitted.

46.      Schucker also started his own grocery business, JMS Markets, which he owned

for nearly a decade.  (Schucker Dep. 20:4-24, 33:8-10).  Schucker used his business acumen and

product knowledge to purchase grocery products from supermarkets and other local stores, and

then resold those items for a profit at his own store.  (Schucker Dep. 20:15-22:18, 23:19-24:10,

27:25-28:17).  Over time, Schucker developed a "loyal customer base" and was able to sell

almost anything he brought to his customers.  (Schucker Dep. 24:11-25:4).

**Plaintiffs' Response:**  Admitted.

47.      Schucker's business grew, and at one point it operated out of three different

locations.  (Schucker Dep. 50:8-18).  JMS Markets put competitors "out of business" because

Schucker was "better than them" and "[s]old product cheaper than they could sell and was able to get some more product than they could." (Schucker Dep. 49:14-50:7).

**Plaintiffs' Response:** Admitted.

48.     At JMS, Schucker tracked his expenses for his business and gave them to an accountant. (Schucker Dep. 33:19-22). He also deducted those business expenses from income on his tax returns. (Schucker Dep. 34:17-24).

**Plaintiffs' Response:** Admitted.

49.     Schucker joined Route Relievers as an employee around 2010 or 2011. (Schucker Dep. 55:9-11). In that position, he delivered Flowers bakery and snack products. (Schucker Dep. 104:25-105:16). He eventually closed JMS Markets between 4 and 6 months after he started working for Route Relievers because the profit margin for JMS Markets was not "where it was supposed to be." (Schucker Dep. 40:12-41:20). Schucker subsequently transitioned into a similar position working for Special Teams. (Schucker Dep. 75:7-14, 76:16-77:3).

**Plaintiffs' Response:** Admitted.

50.     While he was working for Special Teams, Schucker learned of the opportunity to become an independent distributor. (Schucker Dep. 82:15-21, 102:23-103:14, 105:24-106:15). He attended three meetings to learn more about the opportunity. (Schucker Dep. 86:15-23, At one of those meetings, he received a Franchise Disclosure Document. (Schucker Dep. 109:19-110:12, Linthicum 7/21/17 Dec. ¶ 2).

**Plaintiffs' Response:** Disputed. Denied that Schucker voluntarily "transitioned" to Special Teams. He was directed to apply there as part of Defendants' plan to convert employees to independent contractors. (Linthicum Dep. 14:18–21, 16:23–25, 20:1–4, Bower Dep. 44:13-24, 46:18–47:2). Schucker was told he could either sign up as a distributor or lose his job. (Schucker Dep. 132:9-14).

51.     Schucker was also given a presentation to "to go home and look at" concerning

the distributorship opportunity. (Schucker Dep. 115:9-116:2). This presentation stated that

"being an independent contractor is not really for everyone" and not for "people who want to be

delivery people." (Schucker Dep. 120:5-12, Schucker Exh. 5).

**Plaintiffs' Response:** Disputed. The sales pitch focused on the positive aspects
Defendants wanted Plaintiffs to hear. (                          , Schucker Dep. 2-15). Denied that
Defendants had any criteria for people to become distributors. For example, they did not even
perform credit checks before offering their financing because they took payments from
Plaintiffs' sales and could take the route back if somehow they did not get paid. Denied as to
whether the legal classification stated therein is correct. Further denied that distributors had the
independence Defendants had provided. (Schucker Dep. 108:2–6, 110–15, 110:19–21, 116:21–
25, 117:7–14, 122:5–12, Linthicum Dep. 51:17-20, 51:23-52:3, 89:6-90:8).

52.     Schucker decided enter into a Distributor Agreement with CK Sales, purchasing

for $52,930 the right to sell and distribute Flowers products in a territory in Middleton, New

York. (Schucker Dep. 148:24-149:9, 161:23-162:24, 239:21-25, Schucker Exhs. 7, 8).

**Plaintiffs' Response:** Disputed. If Schucker did not become a distributor, he would
have lost his employment. (Schucker Dep. 132:9–14).

53.     Schucker paid for the purchase price of his territory in cash. (Schucker Dep.

161:23-162:24).

**Plaintiffs' Response:** Schucker did not avail himself to Defendants' 12% interest
financing option and found private financing instead.

54.     Schucker formed a corporation, which he named Starring Rolls, Inc., to operate

his distributorship. (Schucker Dep. 174:9-24).

**Plaintiffs' Response:** Disputed. Defendants required Plaintiffs to form corporations and
hold at least a 51% ownership interest prior to signing their agreements. (                  , ¶
3.3).

55.     Schucker purchased a delivery truck from a car dealership, negotiating the

$38,000 purchase price. (Schucker Dep. 186:17-188:7). Schucker paid cash, rather than leasing

the trucker, because he believed it "was not financially responsible" to enter a lease. (*Id.*).

**Plaintiffs' Response:** Admitted that he privately financed the vehicle to save money rather than finance through Defendants who now saved this cost since they provided vehicles to employees. (Linthicum Dep. 26:17-23). The correct price was $30,000.00. (Schucker Dep. 186:9–188:18).

### 2.    Schucker Independently Runs His Business

56.    Schucker set his own schedule. (Schucker Dep. 207:25-208:13). He determined what time to start his day based on how much product he had coming in and the number of customers he was servicing that day. (Schucker Dep. 208:7-13).

**Plaintiffs' Response:** Disputed. Defendants set Plaintiffs' schedules. (⬛⬛⬛⬛⬛⬛). However, his daily schedule was based in part upon his incoming product and number of customers to be serviced on a particular day as previously detailed. (⬛⬛⬛⬛⬛. Defendants created this service schedule and Schucker could be disciplined for not meeting service deadlines. (Schucker Dep. 208:15–209:16, 221:13–21, 230:14–231:7, 268:19– 24, 270:6–23, 271:6–13, ⬛⬛⬛⬛ Distributor Agreement, ¶ 2.6 (



57.    Schucker tried to time his deliveries to minimize the amount of time he spent waiting at each customer location, and he typically took breaks while he was waiting for the receiver to check him in. (Schucker Dep. 308:10-19, 309:8-310:8). Occasionally, he would take another five to ten minute break during the day. (Schucker Dep. 309:4-7).

**Plaintiffs' Response:** Admitted that he often had to wait to be checked into a store just as often when he was an employee. (Schucker Dep. 61:5-11, 72:13-24).

58.    Schucker determined when and how often to service each of his customers based on sales and the customers' requirements. (Schucker Dep. 251:7-252:5, 252:23-253:19, 258:3-

22, 259:20-260:17). On delivery days, he could have serviced them in any order he wanted, but

he prioritized customers based on the customers' own requirements. (Schucker Dep. 222:7-12,

259:20-260:6, 260:24-261:17, 271:14-19, 270:6-271:19).

**Plaintiffs' Response:** Disputed. See Response No. 56. Defendants set Plaintiffs'
schedules. (████████). Schucker could determine the exact order of his service depending on
the day since not all stores required the same amount of service days. (████████). Denied that he
had any independence in this regard in that Defendants and the individual stores contracted
regarding times to be serviced and Schucker had to comply. ████Also, all of Schucker's stores
were within one mile of each other so geography dictated a "common sense" approach, one he
developed as an employee. (Schucker Dep. 60:15-23). His schedule was the same schedule he
operated under as an employee. (Linthicum Dep. 29:16–19, 38:13–39:6, Schucker Dep. 208–
209:15–16, 221:13–21, 230–231:14–7, 236:9–16, 237:10–22, 268:19–24, 270:6–23, 271:6–13,
Distributor Agreement, ¶ 2.6, ████████).

59.     Schucker decided how often to service certain customers based on sales volume.

(Schucker Dep. 251:7-11, 235:20-236:5, 259:20-260:17, 268:19-24). For example, he delivered

product to Walmart three times a week because there was "no reason" to deliver more often.

(Schucker Dep. 235:20-236:5).

**Plaintiffs' Response:** Disputed. See Response Nos. 56-57. Defendants set Plaintiffs'
schedules. (████████). Admitted that Schucker had some discretion as to the exact order of
service depending on the day since Defendants did not require Plaintiffs to service all stores
every day just as when he was an employee. Denied that he could independently decide when
and how to service the stores because Defendant retained ultimate control over that process.
(Schucker Dep. 184:22-185:5, 208:15–209, 221:13–21, 230:14–231:7, 268:19–24, 270:6–23,
271:6–13, Linthicum Dep. 38:13–39:6, 39:16–19, Distributor Agreement, ¶ 2.6, ████████).
Defendants also audited Plaintiffs' compliance with Defendants' policies and practices and,
without Plaintiffs' involvement, discussed disciplinary measures for their alleged non-
compliance. (████████).

60.     On Wednesdays and Sundays, Schucker did not go into the warehouse. (Schucker

Dep. 310:14-311:12). Instead, Schucker went only to select customer locations to merchandise

product that he had previously delivered to those customers. (Schucker Dep. 227:16-21, 234:23-

235:9, 260:7-20, 312:19-314:4). This increased the likelihood that shoppers would purchase his

products. (Schucker Dep. 253:7-15).

**Plaintiffs' Response:** Disputed. Schucker did not generally go to the warehouse on Wednesdays or Sundays because Defendants did not deliver product on those days. However, he was required by Defendants to service some stores Wednesdays and Sundays and went to other lower volume stores as well.[15] Schucker also delivered product to stores on non-delivery days in his own personal vehicle. (Schucker Dep. 318:21-320:8).

61.     Schucker decided not to go to his Rite Aid stores on Wednesdays and Sundays

because, based on sales volume, it "wasn't worth it." (Schucker Dep. 251:17-252:5). Sales

volume also determined how frequently he visited stores like Target on Wednesdays and

Sundays—because sometimes it "wasn't worth it" based on the sales volume being too low.

(Schucker Dep. 258:3-22).

**Plaintiffs' Response:** Disputed. Schucker had some discretion as to what days to service his lower volume stores because they did not have much product, same as when he was an employee. These stores comprised a fraction of Schucker's total sales. ██████████████ ███████████████████████████████████████████████

62.     Schucker also made ordering decisions and customized his orders based on his

customers' needs. (Schucker Dep. 229:12-16). For instance, he adjusted his orders so that

Hannaford supermarket had large orders on Fridays; Schucker believed he maximized sales at

Hannaford by focusing most of his time and effort on Fridays towards that customer. (Schucker

Dep. 224:12-24, 229:12-16).

**Plaintiffs' Response:** Disputed. Schucker had little discretion to adjust orders to the small degree discussed *supra*, just as he did as an employee. Defendants retained the ultimate control over how much product must be ordered and delivered and negotiated those deals with the store.   In connection to the large volume stores, Distributors must also comply with all store

---

[15] Wednesdays and Sundays were days that Plaintiffs, both as employees and distributors, did not go to the warehouse but would go to stores to take bread that was previously delivered and move it from the back of the store to the front. The shelves would then be straightened out to fill in gaps, etc. Occasionally, they would deliver product from their cars. (Schucker Dep. 55:25-56:25, 318:21-320:8).

[16] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

promotions and Defendants' directives. (Schucker Dep. 62:3–7, 205:19–23, 221:13–21, 271:21–272:14, 285:13–20, 286:5–21, 287:3–15, Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, Distributor Agreement, ¶ 2.6, ▮▮▮▮▮▮). Plaintiff could also be fined for violating Defendants' directives on servicing. (Linthicum Dep. 215:17, 216:10, 217:11-12, 218:1–18, ▮▮▮▮▮).[17]

63.    Schucker "didn't need to get approval [for orders] from anybody." (Schucker Dep. 256:14-257:3).

**Plaintiffs' Response:** Disputed. Schucker could adjust orders as previously set forth. Denied. However, he had to meet Defendants' product requirements and Defendants could override his orders unilaterally. If Schucker complained to Defendants, the response was basically, "shut up, you work for us." (Schucker Dep. 62:3–7, 203:8–204:22, 24–4, 205:19–23, 212:3–24, 213:18–214:5). Defendants retain ultimate control over how much product must be ordered and delivered, especially to the chain stores which comprises the overwhelming majority of Plaintiffs' sales. Distributors must also comply with all store product promotions and could be disciplined for non-compliance which was another control Defendants exercised. (Linthicum Dep. 128:4–15, 140:5–141:15, 148:1–5, ▮▮▮▮▮▮▮▮

64.    When placing orders, Schucker relied on his "own knowledge of understanding the business." (Schucker Dep. 194:10-195:15). He also took into account factors such as holidays, sales, and weather when determining how much product to order for each of his customers. (Schucker Dep. 194:18-195:2, 196:10-17, 245:9-14, 254:4-11). For example, Schucker increased his orders around holidays like July 4th to account for increased product demand. (Schucker Dep. 245:9-14). Similarly, if there was a snowstorm in the forecast, he increased his orders "as much as possible" because "the entire store would sell out." (Schucker Dep. 254:4-11).

**Plaintiffs' Response:** Disputed. Admitted that distributors took events such as weather, holidays and sales trends into account when adjusting orders as they did when they were employees. Denied that this implies distributors had independence in ordering product. Defendants do retain the ultimate control over how much product must be ordered and delivered,

_____

[17] 

especially to the large volume stores. Distributors must also comply with all store promotions and would be disciplined if they did not meet all of Defendants' requirements. Such discipline was discussed by Defendants informally without Plaintiffs' input.[18]  (Schucker Dep. 62:3-7, 203:8–204:22, 24–4, 205:19–23, 212:3–24, 213:18–214:5). (Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, 188:2-189:21, 215:7-216:10, ███████████). Plaintiffs' decisions were *de minimis* when viewed in light of their total revenue. (███████).

65.     Schucker "reject[ed] product" at the warehouse through load adjustments if, in his

determination, it was not "salable" or if it was damaged. (Schucker Dep. 219:18-220:3). Those

load adjustments put money back in his pocket because he did not bear the cost of purchasing

product that he rejected. (Schucker Dep. 362:10-18).

**Plaintiffs' Response:** Disputed. Distributors had to make load adjustments when they received product so that they did not get charged for damaged product. (Schucker Dep. 213:7-214:16). Denied that load adjustments "put money back" into the distributors' pockets because Defendants had the sole right to approve the load adjustments and distributors do not make money on product that they cannot sell so this actually cost him money. (Schucker Dep. 363:11-18, ███████).

66.     No one from Defendants provided "a shot" of guidance to Schucker because, in

his own view, Schucker "was better than both of them, if not all three. Nobody knew [his] stores

like [he] knew [his] stores." (Schucker Dep. 328:7-14, 330:7-12).

**Plaintiffs' Response:** Denied. This excerpt is taken out of context and applies only to the multiple warehouse managers who had never delivered bakery products that were employed during the time Schucker had his distributorship. (Schucker Dep. 327:7-328:25).

67.     Lepage Sales Manager Bill Bollati occasionally went to Schucker's stores and

changed his Tastykake displays. (Schucker Dep. 329:2-5).  After Bollati did so, Schucker went

out and fixed it back to the way he had it, because sales went up when it was done Schucker's

way. (Schucker Dep. 329:2-5, 329:15-20).  Bollati was disciplined by Lepage for touching

Schucker's displays. (Schucker Dep. 329:21-24).

---

[18] Employee drivers are not assessed fines. (Linthicum Dep. 217:11-12, 218:10-12).

**Plaintiffs' Response:** Disputed. Schucker later corrected that Bollati did not get disciplined, only that Schucker moved the product back to the way he had set it up when he merchandised the store. (Schucker Dep. 329:15-330:6). However, Defendants routinely visited and audited Plaintiffs' stores to enforce compliance with their policies and could and did discipline Plaintiffs for any non-compliance. (Schucker Dep. 328:15-22, 329:2-20, ██████).

██   Schucker did not wear a uniform. (Schucker Dep. 320:25-321:12).

**Plaintiffs' Response:** Admitted.

69.    Schucker could have carried and distributed non-competing products but chose not to do so. (Schucker Dep. 185:6-22).

**Plaintiffs' Response:** Disputed. The agreement provided that distributors could carry non-competing products but this was impractical. Distributors could not carry and sell non-competitive products since their working hours were not conducive to other businesses and the full-time nature of their jobs precluded more work. (Schucker Dep. 182:10-183:19, 183:21–184:25, 184:14–17, 185:6–19, Linthicum Dep. 94:18–21, 212:12–13).

70.    Schucker understood that he could retain employees, but he made the business decision not to do so. (Schucker Dep. 164:12-165:5).

**Plaintiffs' Response:** Enlisting help to service Plaintiffs' routes only cost them money which was an issue he did not need to worry about as an employee. (e.g., Linthicum Dep. 40:20-41:12, 100:22-101:7).

71.    When he went on vacation, Schucker hired his friend Heather to help service his customers. (Schucker Dep. 165:16-166:24). He paid her about $50 a day because "that's what it was worth." (Schucker Dep. 167:2-18). He chose this amount and could have paid her more or less. (Schucker Dep. 168:4-8). Apart from those four days that Heather worked for him, Schucker paid a fee to have Lepage employees to service his customers on his other vacation days. (Schucker Dep. 165:16-166:21).

**Plaintiffs' Response:** Since Plaintiff had a seven day per week job requirement, every distributor requires help from time-to-time which was not an issue he had to worry about as an employee.[19]

### 3.    Schucker Maximizes His Profits

72.    Schucker made business decisions geared towards maximizing his profits, such as "decid[ing] to [rotate all of his product at one client] on Friday" because he "didn't want to lose one of [his] better days" for sales. (Schucker Dep. 224:12-225:23, 227:9-15). He also minimized stale, made his shelves look nice, and serviced his accounts as early in the day as possible so as to not miss any sales. (Schucker Dep. 269:2-270:5).

**Plaintiffs' Response:** Disputed. These statements reflect normal business practices Plaintiffs employed while working as employees and do not override the stringent service requirements Plaintiff were required to adhere to. ( █████ Linthicum Dep. 38:13-39:6, 39:16-19, 141:9-142:4, Schucker Dep. 66:17-67:7, 169:25-170:17).

73.    Schucker obtained a new customer after hearing about the opportunity from a competitor. (Schucker Dep. 156:16-157:24). This customer paid him directly in cash, and he did not need approval from the Defendants to sell product to this customer. (Schucker Dep. 159:3-7, 160:13-18). Schucker decided how frequently to service this customer based on the expiration date of the product. (Schucker Dep. 159:15-20).

**Plaintiffs' Response:** Schucker was able to obtain one cash account, a gas station, during the entire time he had his distributorship which provided virtually no income. █████████ ).

74.    To increase sales at his existing customers, he maintained "good relationship[s]" with the store managers. (Schucker Dep. 250:4-19 ("had a good relationship with pretty much every store manager")). These good relationships helped him maximize his sales; store

---

[19] Currently, employee drivers never have to hire people to run their routes in their absence nor do they work seven days per week unless they want to. (Linthicum Dep. 41:9-12, Schucker Dep. 55:18-24, 55:25-56:14).

managers had discretion to give Schucker additional space for his product, such as additional

displays. (Schucker Dep. 250:11-19, 273:6-20).

   **Plaintiffs' Response:** Disputed. Shucker maintained good relationships with managers,
relationships he began while an employee that might have gotten him better locations for his
displays. Denied that this enabled him to increase sales. In fact, these "good" relationships did
not even get him in and out of the store faster. (Schucker Dep. 250:14-251:3). It is also denied
that Schucker received additional space or displays for his product. Specifically, Schucker stated
"the space you designed had to do with C.K. Sales and Flowers, they bought the space, so you
got that." (Schucker Dep. 271:21-272:5). It is further denied that distributors had a real ability
to impact their profitability in any meaningful way which Defendants admit. (Linthicum Dep.
63:10-13, 64:2-18, ████ █



████████ Thus, it is denied that any of the practices that distributors
would employ to tweak orders or service in general had virtually no impact on their ability to
gain business.[20]

   75.   Schucker stickered products for sales because then they would "sell quicker."

(Schucker Dep. 253:7-15). When his bread looked better, it sold better. (*Id.*).

   **Plaintiffs' Response:** Disputed that this demonstrates distributor independence.
Defendants provided the stickers and it was their policy to enforce that policy through store
audits. (████). Merchandising bread was part of Plaintiffs' normal job duties. (Schucker
Dep. 310:11-311:12, 316:5-16, 318:8-21).

   76.   In an effort to reduce the amount of product that went stale, Schucker decided to

"stop[] delivering a lot of product" that did not sell well. (Schucker Dep. 296:10-16, 301:7-12).

   **Plaintiffs' Response:** Defendants maintained control over ordering product. (████
████). Schucker could use some discretion from time-to-time and further admit the Defendants

[20] ████████████████████
████████████████
████████████████
███████████████
██████████████
███████████████
██████████████

imposed allowable stale percentages or distributors would be financially impacted.  However, Defendants unilaterally set and adjusted stale cap percentages, thus, controlling a large part of Plaintiffs' income.  (█████ Linthicum Dep. 62:5-18, 67:12-17).  Deny that Schucker had independence on product ordering and further state that management of stale product was a major complaint of distributors.  (Schucker Dep. 218:23–219:7, 285:13–20, 286:2–21, 287:3 -15, 295:5– 296:25, 297:15–22, Linthicum Dep. 62:5–18, 67:12–17, 68:7-12, 232:9–16, 233:2–20, See also, ████████████████ , email indicating Defendants' employees were "taking a lot of heat for not charging any stale in Newburgh").

77.     Schucker tracked his business expenses.  (Schucker Dep. 400:7-406:18, 408:20-409:6, Schucker Exhs. 18, 19, 20).

**Plaintiffs' Response:**  Due to Defendants' illegal classification, Plaintiffs tracked business expenses.

78.     Schucker filed corporate tax returns for Starring Rolls, Inc.  (Schucker Dep. 413:4-22, 414:14-415:16, 416:18-417:6, 418:24-419:3, Schucker Exhs. 21, 22, 23, Schucker 2015 Form 1120S).  He deducted expenses for accounting, advertising, auto expenses, insurance, miscellaneous expenses from his pro forma, administrative fees, office expenses, house rent, traveling expenses, insurance, truck payments, gas and tolls. (Schucker Dep. 415:25-416:6, 417:7-16, Schucker Exhs. 18, 19, 20).



**Plaintiffs' Response:**  Due to Defendants' illegal classification, Plaintiffs tracked business expenses.

### 4.     Schucker Sells His Distributorship

79.     Schucker ultimately made the business decision to sell his territorial rights in January 2015.  (Schucker Dep. 144:11-145:19, 145:21-146:3, 381:17-382:5, 387:23-388:8, Schucker Exh. 16).  He sold his rights to CK Sales for $52,930 cash.  (Schucker Dep. 389:4-20, Schucker Exh. 17).

**Plaintiffs' Response:** Schucker decided to sell his route because he was working seventy to ninety hours per week and making $300. Admitted as to the sales price. (Schucker Dep, 381:21-382:-5).

80.     Schucker now works, through Starring Rolls, Inc., as an independent contractor distributor for Mission Foods, distributing Mexican food products. (Schucker Dep. 134:7-10, 135:2-23, 136:10-13, 336:5-337:2, 390:24-391:3). Schucker purchased his Mission territory for cash. (Schucker Dep. 135:2-23). Schucker services his Mission customers with the same delivery truck he used to service his Flowers/Lepage customers. (Schucker Dep. 175:5-15, 188:14-23).

**Plaintiffs' Response:** Admitted.

D.     **PLAINTIFF HEINRICH**

1.     **Heinrich's Decision to Purchase A Distributorship**

81.     Heinrich is a current distributor of Flowers' products in New York. (Heinrich Dep. 30:16-18, 71:19-23, 80:21-24, 94:19-95:3, 110:9-13). He views himself as a "bread salesman." (Heinrich Dep. 336:2-7).

**Plaintiffs' Response:** Admitted but deny any legal conclusion same represents.

82.     Prior to becoming a distributor, he worked as a Wonder Bread Salesman for approximately seventeen years. (Heinrich Dep. 35:17-25, 45:22-46:2). As a Salesman for Wonder Bread, he was responsible for ordering product. (Heinrich Dep. 37:22-38:7). He had "flexibility" to determine how much product to order for his clients (Heinrich Dep. 37:22-38:7), and he made ordering decisions based on his assessment of product demand, which fluctuated depending upon sales, product popularity, and holidays. (Heinrich Dep. 43:24-44:4, 44:22-45:21). To increase sales to customers, he focused on having good relationships with store managers and persuading store managers to give him additional display space for the Wonder Bread products. (Heinrich Dep. 39:21-41:16).

**Plaintiffs' Response:** Disputed. Statements are taken out of context.

83.     Heinrich joined Special Teams as an employee in October 2013. (Heinrich Dep. 46:3-6, 51:17-23). In that position, he was responsible for delivering Flowers bakery and snack products. (Heinrich Dep. 50:10-51:10). About three months after he was hired by Special Teams, Heinrich learned about the opportunity to become an independent contractor distributor. (Heinrich Dep. 55:13-57:21). He then attended three meetings to learn more about the distributorship opportunity, where he received a Franchise Disclosure Document and a presentation entitled Independent Distributor Franchisee Program. (Heinrich Dep. 58:8-24, 61:8-62:13, 64:12-21 66:16-24, Heinrich Exhs. 1, 3, Linthicum 7/21/17 Dec. ¶ 2). At these meetings, Heinrich was told he would "own his own business" and "could pick up customers." (Heinrich Dep. 61:8-62:13, 66:13-24.

**Plaintiffs' Response:** Disputed. He attended these meetings because he was not given the option of remaining as an employee. (Linthicum Dep. 14:18-21, 16:23-25, 20:1-4). However, the sales pitch presented only the positive side of the business, promised that "everything was going to be good" and that Defendants were "family oriented," a concept he has yet to experience. (Heinrich Dep. 60:23-61:2, 62:15-20, ███████, Schucker Dep. 99:23-25, 108:10-15). He was also faced with the prospect of losing his job if he did not become a distributor. (Heinrich Dep. 63:8 – 9).

84.     Heinrich decided to enter into a Distributor Agreement with CK Sales, purchasing for $31,470 the right to sell and distributor Flowers products in a territory in Carmel, New York. (Heinrich Dep. 94:5-13, 94:19-95:19, 109:24-110:22, Heinrich Exhs. 2, 4).

**Plaintiffs' Response:** Disputed. See Response No. 83. Defendants required Plaintiffs to form corporations who entered into the Agreements. (Heinrich Dep. 63:8-9, ████ ██████ ██ ).

85.     Heinrich formed a corporation—SAGN Corporation—which he named using the initials of his children. (Heinrich Dep. 30:12-18, 80:21-81:3).

**Plaintiffs' Response:** Defendants required Plaintiffs to form corporations and hold at least a 51% ownership interest. (██████████, ¶ 3.3).

### 2.    Heinrich Purchases Additional Distribution Rights

86.    Just a month after this initial $31,470 investment, Heinrich decided to purchase

additional distribution rights for $20,340.  (Heinrich Dep. 67:22-68:9, 69:6-12, 131:15-132:21,

137:25-138:8, Heinrich Ex. 6).    This increased the overall value of his territory to $55,150.

(Heinrich Dep. 122:5-10, 124:19-125:4, Heinrich Ex. 5).

**Plaintiffs' Response:**  Heinrich's territory was readjusted several times early in his
distributorship for various reasons.  (See e.g., Heinrich Dep. 69:9-70:18).

87.    A few months later, Heinrich chose to sell back part of his territory to CK Sales

because he thought the operating costs were too high.  (Heinrich Dep. 69:9-70:4, 132:5-21).  By

the time of the sale, Heinrich had "built equity" of $2,000 in this partial territory.  (Heinrich Dep.

141:24-142:14, 143:13-23, 145:8-16, Heinrich Ex. 8).

**Plaintiffs' Response:**  Disputed. Defendants re-purchased part of his route but it was
because the route was too big so it was not fair to him or the customers.  (Heinrich Dep. 69-
70:21-4).

### 3.    Heinrich Independently Operates His Business

88.    Heinrich understood that he could retain employees under the terms of his

Distributor Agreement, but he made the business decision not to do so.  (Heinrich Dep. 84:13-21,

221:4-17).

**Plaintiffs' Response:**  As employees, Plaintiffs did not have to find replacement
coverage and there was no financial benefit to enlisting help to assist distributors. (e.g.,
Linthicum Dep. 40:20-41:12, Heinrich Dep. 222:3-7).

89.    Heinrich sets his own schedule.  (Heinrich Dep. 198:23-199:20, 232:16-20, 236:3-

9).  About twice a week, his workday is complete in time for him to pick up his children at the

school bus at around 2:45-3PM.  (Heinrich Dep. 14:6-17, 301:21-302:19).  Heinrich's workday

is typically complete and he is home between 11AM and 3PM.  (Heinrich Dep. 225:2-6, 226:11-

227:8, 228:19-229:8).

**Plaintiffs' Response:** Disputed. Defendants set Plaintiffs' schedule. (███████). All distributors have some discretion as to the service order of their stores since they are all in the same geographic area and not all stores required service daily which was the same practice as when Heinrich was an employee. Deny that he has autonomy to set his own schedule since Defendants give him strict service requirements. For example, he has to service BJ's warehouse before 9:00 a.m. (Heinrich Dep. 82:20-21, 83:8- 84:6, Linthicum Dep. 38:13-39:6, 39:16–19, ████). Heinrich could be and was disciplined for failing to comply with Defendants' practices and procedures. (Distributor Agreement, & 2.6.███████



90.   Heinrich decides the order in which to service his customers. (Heinrich Dep. 198:21-199:20, 212:24-213:10, 232:16-20). Specifically, he starts with the "furthest one out" and ends with the customer "closest one to [his] house." (Heinrich Dep. 199:2-6, 232:16-20). He chooses this route to minimize his gas expenses. (Heinrich Dep. 198:21-199:20).

**Plaintiffs' Response:** Disputed. See Response No. 89. Defendants set Plaintiffs' schedule. (███ ██ █). Heinrich has some discretion as to the service order of his stores since not all stores require service seven days per week but deny that he has autonomy to set his own schedule since Defendants dictate his service requirements and supervise and audit his compliance. This is no different from when he was an employee. (Heinrich Dep. 82:20-21, 83-84:8- 6, Linthicum Dep. 38:13-39:6, 39:16-19, ████████).

91.   On Wednesdays and Sundays, Heinrich services a few select customers, and replenishes displays and shelves—moving previously delivered product from the customer's stockroom to the shelves and merchandising the product on the shelves to increase the likelihood that shoppers will purchase his products. (Heinrich Dep. 85:5-86:3, 229:15-231:10). Heinrich decides which customers to service on these days, and he typically services additional customers during the summer months help boost sales. (Heinrich Dep. 230:12-231:10, 232:2-7).

**Plaintiffs' Response:** Disputed. Defendants set Plaintiffs' schedule. Heinrich had minimal discretion to service low volume stores as when he was an employee. See response numbers 89-90.[21]

92.     When Heinrich goes on vacation, he has in the past decided to use a service offered by Lepage where he pays Lepage to service his customers. (Heinrich Dep. 90:23-92:11, 319:23-320:17). However, Heinrich did not think that employee who filled in for him did a good job. (Heinrich Dep. 89:16-90:23, 314:20-315:6). In the future, he plans to use a worker he found on his own. (Heinrich Dep. 321:4-322:7). He plans to pay the worker $800 per week because that is what "competing distributors" pay the worker to fill-in and service a territory for a week. (Heinrich Dep. 321:4-322:7).

**Plaintiffs' Response:** Defendants require Plaintiffs to work seven days per week such that distributors need to enlist help from time-to-time. Denied that this helps distributors since it only cost them money. Finally, if Plaintiffs need company coverage, vacations are subject to Defendants' approval who can unilaterally withhold approval. Employee drivers do not have any obligation to pay someone to operate their routes. (Heinrich Dep. 89:2–22, 90:20–91:8, 319:6-323:2, Linthicum Dep. 106:16–107:11, 108:14–16, 110:22–111:7,███████).

93.     There are no requirements set by Defendants as to when customers must be serviced. (Heinrich Dep. 81:19-24). Some customers have requirements as to when they must be serviced, and other customers have no requirements, leaving it to Heinrich to decide when to service them. (Heinrich Dep. 102:3-20, 199:21-200:4, 201:11-23, 206:20-207:15, 209:22-210:8, 211:7-212:13, 212:5-13, 213:11-214:10, 340:21-341:21).

**Plaintiffs' Response:** Denied. Defendants, specifically contract with chain stores and create and enforce service requirements for distributors. (███████). The smaller stores, such as "Mom and Pop" gas stations do not have daily service requirements but these stores make up only a small volume of sales. (Linthicum Dep. 38:13–39:6, 39:16–19,███████). Heinrich, like all distributors, is required to make sure there is fresh product available for sale over the

---

21 

weekends and then do inventory after the weekend. (Heinrich Dep. 211:7-21, 213:11-22, , ¶ 2.6). Defendants' terms of service of chain stores such as BJ's, Hannaford, ShopRite, and Price Chopper required more than once per week because "they are a club store so you can't get away [with only one day of service]." However Defendants negotiated a deal that removed product choices from this particular store. Heinrich complained about this but Defendants never responded to him. (Heinrich Dep. 214:3-10, 214:17-215:9).[22] BJ's can only give the distributor more space on the shelves if Defendants' management deals directly with the store and obtains it which limits his autonomy. (Heinrich Dep. 215:11-216:11). ████████

████████████████████████████████████████████████.

    a.   He decides how frequently to service his gas station customers based on their "average money-wise . . . what they sell and what you give them and [the] volume and traffic they have going through the store." (Heinrich Dep. 102:3-20).

**Plaintiffs' Response:** Denied that Defendants do not have requirements for distributors to service stores. (Heinrich Dep. 82:20-21, 83:8–84:6, Linthicum Dep. 38:13–39:6, ████████, ¶ 2.6). Not all accounts, specifically the low volume stores, have daily service requirements but those stores comprised only a small fraction of Heinrich's sales volume. (████████████████████████████████).

    b.   Heinrich services Walmart twice a week—Tuesday and Friday—because Friday is inventory and Tuesday is "right after the weekend." (Heinrich Dep. 206:20-24, 212:5-13). Walmart does not require a set number of service days, so he just "go[es] by what sells" the best. (Heinrich Dep. 206:25-207:15).

**Plaintiffs' Response:** Disputed. See responses nos. 89-93. Distributors have to comply with Defendants' service requirements but not all stores require seven day per week service. (████████████████████████████████).

    c.   Acme has set no specific service requirements. (Heinrich Dep. 209:19-210:8). Heinrich services the Acme supermarkets in his territory twice a week, but he could "get away with Acme one day a week if [he] wanted to." (Heinrich Dep. 200:24-201:3, 210:2-8). He can choose whichever two days he wants to

---

[22] In fact, Heinrich was in regular contact with Defendants' sales managers regarding all of his daily job functions and to resolve product issues. (████

service Acme (Heinrich Dep. 211:25-212:4), but he services the Acme

supermarkets once before the weekend and once after the weekend. (Heinrich

Dep. 211:6-14). Heinrich has found that this service schedule maximizes

weekend sales. (Heinrich Dep. 211:6-14 ("get[s] the sales before the weekend

and then after the weekend [he] fill[s] up")).

**Plaintiffs' Response:** Denied. See responses nos. 89-93. Defendants specifically contract with chain stores and create and enforce service requirements for distributors. ( ███ ). Heinrich, like all distributors, is required to make sure there is fresh product available for sale over the weekends and then do inventory after the weekend. (Heinrich Dep. 211:7-21, 213:11-22, ██████████ ██ ). The terms of service of chain stores such as BJ's, Hannaford, ShopRite, and Price Chopper still had to be serviced more than once per week because "they are a club store so you can't get away [with only one day of service]."

    d.    Heinrich services his Shop Rite supermarkets three times a week because

the stores have good sales. (Heinrich Dep. 200:24-201:3, 209:22-210:8). He

typically chooses to service these stores on Monday, Thursday and then Saturday

so that he is "ready for the weekend." (Heinrich Dep. 211:15-21). But, he could

choose to go on other days if he wanted. (Heinrich Dep. 211:22-24).

**Plaintiffs' Response:** Denied. See responses 89-93. Defendants specifically contract with chain stores and create and enforce service requirements for distributors. Heinrich, like all distributors, is required to make sure there is fresh product available for sale over the weekends and then do inventory after the weekend. (Heinrich Dep. 211:7-21, 213:11-22, ████ ███████ ██ ). The terms of service of chain stores such as BJ's, Hannaford, ShopRite, and Price Chopper still had to be serviced more than once per week because "they are a club store so you can't get away [with only one day of service]." (Heinrich Dep. 215:11-216:11).

    e.    Heinrich services the BJ's stores in his territory twice a week—Friday and

Tuesday—because those days are right before and right after the weekend.

(Heinrich Dep. 213:11-22).

**Plaintiffs' Response:** Denied. See responses 89-93. Defendants specifically contract with chain stores and create and enforce service requirements for distributors. The smaller stores, such as "Mom and Pop" gas stations do not have daily service requirements but these stores make up only a small volume of sales. (Linthicum Dep. 38:13–39:6, 39:16–19, ████ ).



). Heinrich, like all distributors, is required to make sure there is fresh product available for sale over the weekends and then do inventory after the weekend. (Heinrich Dep. 211:7-21, 213:11-22, ▮▮▮▮▮▮▮▮ ▮▮ ). The terms of service of chain stores such as BJ's, Hannaford, ShopRite, and Price Chopper still had to be serviced more than once per week because "they are a club store so you can't get away [with only one day of service]." However Defendants negotiated a deal that removed product choices from this particular store. Heinrich complained about this but Defendants never responded to him. (Heinrich Dep. 214:3-10, 214:17-215:9).[25] ( ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ). Whereby Defendants voluntarily changed Heinrich's service requirements for BJ's. BJ's can only give the distributor more space on the shelves if Defendants' management deals directly with the store and obtains it which limits his autonomy. (Heinrich Dep. 215:11-216:11).

     f. Heinrich services his two Stop & Shop supermarkets four days a week.

    (Heinrich Dep. 200:5-23).

  **Plaintiffs' Response:** Denied. See responses nos. 89-93. Defendants specifically contract with chain stores and create and enforce service requirements for distributors. Heinrich, like all distributors, is required to make sure there is fresh product available for sale over the weekends and then do inventory after the weekend. (Heinrich Dep. 211:7-21, 213:11-22, ▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮ ). The terms of service of chain stores such as BJ's, Hannaford, ShopRite, and Price Chopper still had to be serviced more than once per week

  94. Heinrich decides how much product to order for his customers. (Heinrich Dep.

240:17-24). Heinrich customizes his product orders for each customer. (Heinrich Dep. 237:7-

14, 238:13-239:20, Exhibit 9). The handheld device provided by CK Sales contains suggested

product orders, but Heinrich does not follow the suggested orders because it is typically "[w]ay

out of whack." (*Id.*).

  **Plaintiffs' Response:** Disputed. Plaintiffs retain unilateral control over product ordering. Distributors receive daily suggested orders. (e.g., ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮ ). Those suggested orders are sometimes not accurate as to what is needed by the stores. Denied that Heinrich can control how much product he orders for his customers. Specifically, chain stores have set planograms that dictate how much and what type of product can be delivered to its stores. Those products and product levels are negotiated between the stores and Defendants and the distributor has virtually no ability to increase sales in these stores as a result. Defendants tell the distributors what they need to deliver to those stores and often distributors are required to put more product on the shelves, not to increase sales, but to prevent competing companies from

---

[25] In fact, Heinrich was in regular contact with Defendants' sales managers regarding all of his daily job functions and to resolve product issues. ( ▮▮▮▮ ).

using that space.[27] (Linthicum Dep. 36:7–21, 37:7–8, "there is normally a mapped area of the isle for each brand determined by the store.", 37:4–24, 63:10–13, 64:2–18, 64:5–17, 66:2–6, █████). These changes create work for Plaintiffs and can undercut their ability to earn money. (Linthicum Dep. 180:6-19, 181:2-12, Schucker Dep. 271:21-272:14). Distributors must also comply with all store promotions. Plaintiffs have limited discretion to modify orders, discretion they had as employees. (Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, █████ ████████████████ ¶¶ █████).

95.    He makes ordering decisions by first checking to "see if there is anything on sale"

that week. (Heinrich Dep. 157:8-20). If none of the products he is offering are on sale, then

Heinrich looks, for each product, at sales "in the past week on the average" as well as a "monthly

average of" sales to determine how much of each product to order for his customers. (*Id.*).

**Plaintiffs' Response:** Disputed. See Response No. 94. Plaintiffs could make minor order adjustments just like when they were employees. They are required to check sales because Plaintiffs have to comply with Defendants' promotions and product requirements. (Linthicum Dep. 66:2- 6, 148:1-5, █████████████, ¶ 13.2).

96.    In making his orders, Heinrich regularly deviates significantly from the suggested

order. (Heinrich Dep. 239:11-20). For example, in one instance, he subtracted 118 pieces of

product from the suggested order because "there [was] no way [he] was going to sell 214 Giant

bread" based on his understanding of his customers. (Heinrich Dep. 239:11-20, Heinrich Ex. 9).

**Plaintiffs' Response:** Disputed. See responses nos. 94-95. Distributors can make certain adjustments to orders, just like when they were employees. Denied that Heinrich had autonomy as to ordering which Defendants ultimately controls. (Linthicum Dep. 63:10–13, 64:2–18, 80:2-4, 126:16-23, 128:16-129:4, █████████████, ¶ 2.3, █████████████).

97.    Heinrich will increase orders to account for situations where he believes there will

be an increase in demand for product, such as when products are on sale, prior to snowstorms,

and in advance of holidays. (Heinrich Dep. 179:18-180:2, 240:17-241:8). For example, before

Thanksgiving, he might increase orders for white bread. (Heinrich Dep. 179:18-180:2).

---

[27] E.g., stores such as Hannaford, the largest store in the area, were the most labor intensive, requiring numerous types of products, but were less profitable for Plaintiffs because their products had the lowest commissions. (Shafer Dep. 76:11-24, 86:24-88:4, Schucker Dep. 285:13-20, 286:2-21, 287:3-15).

**Plaintiffs' Response:** Disputed. Distributors can tweak orders from time-to-time and the suggested order levels are often inaccurate, just as when they were employees. Denied that Heinrich has freedom to order products since Defendants retain ultimate control. He is also forced to sell product he does not want to carry.[28]  (Heinrich Dep. 129:3-20, 135:2-9, 157:10-17, 157:21-158:7, 180:3-21, 181:12-182:9, Linthicum Dep. 63:10-13, 64:2-18, 80:2-4, 128:16-129:4, 148:1-5, █████ ) .

98.     Conversely, he decreases orders in August because it is a "dead month" and many

shoppers are going on vacation. (Heinrich Dep. 260:8-20).  He also decreases orders to avoid

stale charges. (Heinrich Dep. 335:16-22).

**Plaintiffs' Response:** Disputed. Distributors can tweak orders from time-to-time and the suggested order levels are often inaccurate, just as when they were employees. (See footnote 27). Denied that Heinrich has freedom to order products since Defendants retain ultimate control as previously set forth. He is also forced by Defendants to sell product he does not want to carry. Plaintiffs have to manage stale product, a core duty of the business. (Heinrich Dep. 129:3-20, 135:2-9, 157:10-17, 157:21-158:7, 180:3-21, 181:12-182:9, Linthicum Dep. 62:5-18, 63:10-13, 64:2-18, 67:12-17, 68:7-12, 80:2-4, 128:16-129:4, 148:1-5, █████ ) .

99.     Heinrich is not required to wear any kind of uniform or particular clothing.

(Heinrich Dep. 149:23-150:3).

    **Plaintiffs' Response:** Admitted.

### 4.     Heinrich Maximizes His Profits

100.    Heinrich was able to add four new customers due to his own efforts.  (Heinrich

Dep. 97:11-17, 100:4-101:20).  He obtained three new customers by going to the store

unannounced and persuading the mangers to buy his products. (Heinrich Dep. 100:23-101:20).

He obtained the fourth new customer through a contact that he worked with while at Wonder

Bread.  (Heinrich Dep. 101:8-12).

    **Plaintiffs' Response:** Disputed. Heinrich serviced three gas stations and a C-Town. (Heinrich Dep. 100:10-16). This revenue is minor compared to his chain stores that comprise the vast majority of his sales. Heinrich was unable to obtain business at other places because the

---

[28] Defendants will send Plaintiffs product that does not sell at times determined by Defendants. Plaintiffs have to deliver that product anyway. This happens often in the summer months. (Heinrich Dep. 158:10-23, 159:2-20, 260:8-261:3).

managers would only speak to Defendants directly and because he did not have time.  When Heinrich asked for sales support from Defendants, they did not provide any help to him. (Heinrich Dep. 118:1-119:17, 120:4-24, Linthicum Dep. 63:10-13, 64:2-18, 140:5-25, ███ ).

101.    Heinrich's "sales went up from prior [to] when [he] bought the route."  (Heinrich Dep. 128:2-5).  He estimates that, since the time he purchased his initial territory, sales in that territory have increased by $1,500 a week.  (Heinrich Dep. 128:2-13).

**Plaintiffs' Response:** Disputed. Heinrich stated that he thought his sales went up but denied to the extent that he "does not know exactly how much" and later conceded that business is "really the same." Distributors have virtually no ability to impact the revenue at the large volume stores.  (Heinrich Dep. 128:7-20, ███ , Linthicum Dep. 36:7-21, 37:4-24, 63:10-13, 64:20-18, 66:2-6, 140:5-25, ███ ).

102.    To increase his sales, Heinrich focuses on maintaining good relationships his customers' store management because managers can "increase your business…if they put you in the right location" and/or give you displays.  (Heinrich Dep. 219:9-18).   He tried to build these relationships "[a]ll the time." (Heinrich Dep. 219:16-18).

**Plaintiffs' Response:** Disputed. Heinrich maintained good relationships with managers and that may have gotten better locations for his displays. (Heinrich Dep. 219:12-18). Denied that this resulted in him getting additional sales or that this was a different practice then he utilized as an employee. (Id. 150:13, 214:17-216:17, 218:19-220:11).

103.    Heinrich maintains a separate business bank account for SAGN Corp.  (Heinrich Dep. 31:2-10).  His distributor income is deposited into this account, and he uses a debit card associated with this account.  (Heinrich Dep. 31:19-22, 32:3-9).

**Plaintiffs' Response:** Admitted.  Defendants' misclassification of Plaintiffs required them to form corporations.  ( ███ ██ ).

104.    He has the name of his business, SAGN Corp., on the side of his delivery truck. (Heinrich Dep. 30:9-25).

**Plaintiffs' Response:**  Admitted that Defendants dictated this in the agreement.  ( ███ ███ ██ ).

105.    Heinrich keeps track of his business expenses in a notebook for his accountant.

(Heinrich Dep. 23:14-25:18).  He fills in the lines himself with expenses like "cash usually 125 a

week, so usually 500 a month . . . . Tolls 35 a week."  (Heinrich Dep. 25:12-18).

**Plaintiffs' Response:**  Deny any legal conclusion.  Defendant's misclassification of
Plaintiffs forced them to track expenses.

106.    He deducts numerous business expenses on his tax returns. (Heinrich Dep. 23:7-

13, 26:13-23).  For example, in 2014, he deducted nearly $43,000 in business expenses,

including truck expenses, accounting, bank charges, entertainment and promotion, insurance,

legal and professional fees, permits and licenses, office expenses, parking fees and tolls,

telephone, tools, travel, uniforms, fuel and safety boots.  (Heinrich 2014 Form 1120S).  He

deducted over $47,500 in similar expenses in 2015 and over $43,000 in expenses in 2016.

(Heinrich 2015 Form 1120S, 2016 Form 1120S).

**Plaintiffs' Response:**  Deny any legal conclusions.  He is forced to deduct certain
expenses on his tax returns that would be an expense of Defendants if not for Defendants'
misclassification.

107.    Heinrich's settlement statements show that his distributor income has nearly

doubled since he started operating his distributorship, going from $45,311.26 in 2015 to

$81,336.22 in 2016.  (Heinrich Dep. 325:8-327:18, Heinrich Exhs. 16, 17).  This does not

account for income from other sources such as his cash accounts.  (Heinrich Dep. 262:8-20).

**Plaintiffs' Response:**  Deny the implication that Heinrich "grew" his business as
Defendants seek to allege or that he admitted such growth.  (Heinrich Dep. 325:15-327:23).

### E.    PLAINTIFF BOWER

#### 1.    Bower's Decision To Purchase A Distributorship

108.    Bower is a former distributor of Flowers' products in New York.  (Bower Dep.

73:3-13, 74:10-25, 75:25-76:7, 122:10-13, 163:9-18, 303:9-13).  He operated his distributorship

from February 2015 to October 2016.  (Bower Dep. 122:10-13, 163:9-18, 303:9-13).

**Plaintiffs' Response:**  Admitted.

109.    Prior to becoming a distributor, Bower held various positions in the bread industry.  (Bower Dep. 15:18-25).  Bower also worked as a gas station manager for ATI and later as a manager/dispatcher at Beekman Taxi.  (Bower Dep. 16:2-17:23, 20:14-21:6, 14:18-15:16).

**Plaintiffs' Response:**  Admitted.

110.    Immediately prior to becoming a distributor, Bower worked for Ambassador Personnel delivering Tastykake products.  (Bower Dep. 29:7-23).  While he worked for Ambassador, Bower solicited potential customers and generated approximately ten new customer accounts.  (Bower Dep. 37:4-39:18).  He was also responsible for ordering product. (Bower Dep. 40:2-13).

**Plaintiffs' Response:**  Admitted.

111.    Bower joined Special Teams as an employee in 2014 with the intention of purchasing a territory from CK Sales.  (Bower Dep. 44:10-45:5).  As a Special Teams employee, he delivered Flowers bakery and snack products.  (Bower Dep. 48:13-49:24).

**Plaintiffs' Response:**  Disputed.  Bower was hired as an employee with Special Teams and worked in that capacity for eight months.  (Bower Dep. 44:4-22).

112.    Prior to becoming a distributor, Bower was given various documents, including a Franchise Disclosure Document and an Independent Distributor Franchisee Program presentation to review.  (Bower Dep. 60:15-61:4, 71:18-72:5, Bower Exhs. 1, 2).

**Plaintiffs' Response:**  Admitted.

113.    Bower then decided to enter into a Distributor Agreement with CK Sales, purchasing for $29,260 the right to sell and distribute Flowers products in a territory in Pawling, New York.  (Bower Dep. 73:3-74:25, 103:9-19, Bower Exhs. 3, 4).

43

**Plaintiffs' Response:** Disputed. Defendants did not give Plaintiffs the option of remaining as employees. He relied on representations of Defendants that turned out to be untrue such as becoming classified as an independent distributor would allow him to have control and an opportunity for financial success. (Linthicum Dep. 14:18-21, 16:23-25, 20:1-4, Bower Dep. 53:10-25, 54:14–17, 68:7–8, 69:17–70:10, ███████████).

114.    Bower liked the "the prospect of having [his] own business," having "more control," "the opportunity to expand," "working for [him]self" and being able to save "something for retirement." (Bower Dep. 53:13-54:17, 67:21-24).

**Plaintiffs' Response:** Disputed. Admitted that due to Defendants' misrepresentations, Bower believed that he would have a business that he would have control over with the possibility of expanding it. However, this was not the case. In fact, he wound up doing the same job duties he had as an employee and learned that the promises of more independence and financial growth were false. (Bower Dep. 50:3-51:8, 53:10–25, 54:14-17, 68:7-8, 69:17-70:10, 110:23-111:7, 289:2-12, Linthicum Dep. 89:6–90:8).

115.    Bower formed a corporation called Bowers Breads and Cakes, Inc., to run his distributorship. (Bower Dep. 74:20-25, 237:23-238:18).

**Plaintiffs' Response:** Defendants required Plaintiffs to form corporations and held at least a 50% ownership interest. (Linthicum Dept. 52:10–15, ████████████████, ¶ 3.3).

### 2.    Bower Independently Operated His Business

116.    Bower knew he could hire employees for his distributorship, but he made the business decision not to hire employees because, in his view, it was not "cost efficient." (Bower Dep. 65:3-11, 94:14-95:6, 153:12-24).

**Plaintiffs' Response:** Enlisting help to run their routes costs distributors money and does not increase business. As employees, this was not an issue they had to worry about. (Linthicum Dep. 40:20-41:12, 100:22-101:7, 101:17-23, Bower Dep. 151:7-11, 153:16-24, 155:10-17).

117.    Bower paid a fee to use Lepage employees to fill in for him while he was on vacation. (Bower Dep. 247:23-248:6). Bower also asked Valdez to cover for him for a day and paid him $100 in exchange for his services. (Bower Dep. 245:13-247:22).

**Plaintiffs' Response:** Defendants required Plaintiffs to pay route coverage which was subject to Defendants' approvals. (Schucker Dep. 168:14-19, ███ ).

118.    The needs of Bower's customers dictated the frequency of his deliveries. (Bower Dep. 211:13-212:7). Some of Bower's customers required service five days a week. (Bower Dep. 211:13-24). Other customers needed service two to three days a week. (Bower Dep. 212:6-8).

**Plaintiffs' Response:** Disputed. Defendants set forth Bower's service requirements and enforced compliance via audits. This process dictated his service frequency. For stores that did not require daily service, distributors had some discretion over the order of service. This was the same process as when he was an employee. (Linthicum Dep. 38:16-39:6, 39:16-19,



119.    Bower worked out an arrangement with his customers that allowed him to deliver additional product to stores earlier in the week, and thus avoid incurring the expense of an extra delivery day. (Bower Dep. 207:2-208:9).

**Plaintiffs' Response:** Disputed. This was one low volume store and this arrangement occurred with Defendants' consent because this store was an hour away from Bower's other stores. (Bower Dep. 207-208:13-9). Defendants retained control over Plaintiffs' service schedule. ( ███ ).

120.    On Wednesdays and Sundays, Bower went to some of his customers and replenished the shelves with product he had already delivered. (Bower Dep. 231:13-234:22). Only one of Bower's accounts, Hannaford, required service on those days. (*Id.*). Bower chose to service additional stores on Wednesdays and Sundays because he thought that having full shelves would "make[] a difference in [his] sales." (Bower Dep. 234:8-22).

**Plaintiffs' Response:** Disputed. See Response Nos. 118-119. Defendants set Bower's service requirements and enforced this policy through store visits and audits. Not all customers required seven days per week service which allowed Bower to service his low volume stores on varying days as time allowed. (███████, Bower Dep. 140:3-146:7, Linthicum Dep. 38:13-39:6, 39:16-19).

121.    On Wednesdays and Sundays, Bower's schedule would vary day-to-day and it was "entirely up to [him]" which customers to service. (Bower Dep. 233:6-15, 235:8-236:17). Bower determined which other customers to service based on which customers were busy, which customers were running sales, and which customers he wanted to build relationships with. (Bower Dep. 232:13-234:7).

**Plaintiffs' Response:** Disputed. See Response Nos. 118-120. On non-delivery days, Bower had some discretion over what stores needed to be "straightened out." Denied that he had autonomy over this service schedule. Defendants dictated the non-delivery days. Defendants required Hannaford to be serviced every day. (Bower Dep. 233:16-20, 242:9-24, ███████, Linthicum Dep. 38:13–39:6, ███████, ¶ 2.6).

122.    Bower also scheduled personal appointments for Wednesdays and Sundays. (Bower Dep. 242:4-15).

**Plaintiffs' Response:** Bower may have scheduled a doctor's appointment on a Wednesday or Sunday which were his lighter days and since Plaintiffs had no days off as opposed to employee drivers who received time off. (e.g., ███████).

123.    Bower made ordering decisions. (Bower Dep. 90:3-24). When Bower decided how much product to order, he took into factors such as whether customers were buying certain products, weather and time of year. (Bower Dep. 86:10-87:22, 88:2-8). Bower "ordered every day based on what [he] felt would sell in the stores." (Bower Dep. 90:3-24).

**Plaintiffs' Response:** Disputed. Defendants controlled ordering. Bower made some slight ordering decisions[29] and had to consider the same factors all other distributors had to take into account. Deny the implication that he had autonomy over ordering product. Denied that Bower can control how much product he orders for his customers especially to the chain stores

---

[29] Defendants continue to take stray comments out of context. These are the same decisions they could make as employees and do not represent any type of independence. (e.g., Schucker Dep. 62:3-7, Linthicum Dep. 9:11-19, 10:2-5 (a basic driver duty is to keep customers full of product)).

that comprise the overwhelming majority of Plaintiffs' income. Specifically, Bower's chain stores have set plan-o-grams that dictate how much and what type of product can be delivered to its stores. ( ██████ Those products and product levels are negotiated between the stores and Defendants, and the distributor has virtually no ability to increase sales in these stores as a result. Defendants mandate what Plaintiffs need to deliver to those stores and often distributors are required to put more product on the shelves, not to increase sales, but to prevent competing companies from using that space. (Linthicum Dep. 36:7–21, 37:7–8, "there is normally a mapped area of the isle for each brand determined by the store." (Bower Dep. 37:4–24, 63:10–13, 64:2–18, 66:2–6, ██████ ). Distributors must also comply with all store promotions. (Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, Bower Dep. 90:11–21, 91:4–11, 91:24–92:3, 187:21–188:6, 188:21–189:7, 189:23-190:22, 198:5–21, ██████ , ¶ 13.2, ██████

124.   Bower believed that good ordering decisions "certainly" increased his profit and bad decisions decreased his profit. (Bower Dep. 178:4-179:3).

**Plaintiffs' Response:** This may be Bower's belief but deny that he had control over these decisions or that his profit increased. (Bower Dep. 178:4-11, 198:4-10, see also, 289:2-12 where he states he was performing the same work and making less money with no more independence than when he was an employee).

125.   Bower exercised "freedom in regards to how much…product…[he] could bring in" for some of his stores. (Bower Dep. 198:22-200:2). He believed that this was profitable for him. (Bower Dep. 199:24-200:2).

**Plaintiffs' Response:** Disputed and said statements were taken out of context. See Response No. 124. Bower had some discretion to order product in places such as an auto body store. (Bower Dep. 198:22-199:19). Denied in that all of his chain stores had set product placements that they negotiated with Defendants and which were outside of Bower's control. (Bower Dep. 198:5-21, ██████ ).[30] Specifically, Bower's chain stores have set planograms that dictate how much and what type of product can be delivered to its stores. Those products and product levels are negotiated between the stores and Defendants and the distributor has virtually no ability to increase sales in these stores as a result. ( ██████ Linthicum Dep. 36:7-21, 37:7-8). Defendants tell the distributors what they need to deliver to those stores and often distributors are required to put more product on the shelves, not to increase sales, but to prevent competing companies from using that space. (Linthicum Dep. Id., "there is normally a mapped area of the isle for each brand determined by the store." (Bower Dep. 37:4–24, 63:10–13, 64:2–18, 66:2–6, ██████ ). Distributors must also comply with all store promotions. (Linthicum Dep. 128:4–15, 140:5–25, 140:25-141:15, 148:1–5, Bower Dep. 90:11–21, 91:4-11, 91:24–92:3, 187:21–188:6, 188:21–189:7, 189:23-190:22, 198:5–21). With regard to profit, Bower's sales were primarily from large volume stores where he had virtually no input which does not translate to profit. ( ██████ , ¶ 13.2, ██████ ).

---

[30] Bower had the same ordering and service responsibilities as an employee. (Bower Dep. 50:3-51:8).

126.   Bower transferred product to other distributors if a particular product was selling better on another distributor's route. (Bower Dep. 179:4-11, 180:7-21). Bower would also sometimes receive product from other distributors if he needed it. (Bower Dep. 182:9-183:8). Bower did not need Defendants' approval to transfer product to other distributors or to receive product from other distributors. (Bower Dep. 183:9-11).

**Plaintiffs' Response:** On a rare occurrence, Plaintiffs could transfer a minimal amount of product. (Bower Dep. 179:4-11, 181:15-16).

127.   Bower never wore a uniform bearing the logos of Flowers, Lepage or CK Sales. (Bower Dep. 183:20-184:7).

**Plaintiffs' Response:** Admitted.

### 3.   Bower Maximizes His Profits

128.   Bower thought he a good distributor because he was "responsible, a good manager of time, [and] a good manager of people." (Bower Dep. 31:8-13).

**Plaintiffs' Response:** Disputed. This was true whether he was an employee or independent contractor. As an employee, he stated that good time management, "knowing what to order, product control," made him a good employee or distributor. (Bower Dep. 31:14-34:18).

129.   Bower grew sales at existing accounts by building "good rapport" with customers. (Bower Dep. 108:21-113:14, 126:3-24, 130:15-23). To increase sales, Bower also asked customers for display hutches and space near store registers to display sale items. (Bower Dep. 184:16-186:19, 187:3-19).

**Plaintiffs' Response:** Denied. Bower stated he was told that his sales "increased somewhat." (Bower Dep. 108:24-109:3). He did the best he could with the little control he had which was to make sure his product displays looked good in the smaller customers such as an auto body store but not a store that had any sales volume of note. (Id. 109:9-118:15, ██████

130.   For example, he grew business at Hannaford by giving them high quality service

and, in turn, Hannaford raved that he "was the best bread vendor they had ever had." (Bower

Dep. 131:3-132:7).

**Plaintiffs' Response:** Bower made these statements, but this would be true whether he
was an employee or independent contractor. See Response No. 128. Denied that this translates
to increased sales. Specifically, Hannifords was not profitable at all. (████, Bower Dep.
131:6-132:7, 134:17-135:4, 135:2-21, 136:14-24, see also, Shafer Dep. 76:11-24, 86:24-87:6,
180:11-18).

131.   Bower also convinced two customers, who had previously purchased only bread

products, to also buy Tastykake snack products from him. (Bower Dep. 111:2-113:14).

**Plaintiffs' Response:** Bower obtained an auto body store and one other small store
which quickly eliminated the product. These sales were *de minimis* and he had the same
responsibility to seek business as an employee. (Bower Dep. 50:3-51:8, 111:2-115:23, ████)

132.   Bower put stickers on his bread when it was on sale to maximize his sales.

(Bower Dep. 197:4-19).

**Plaintiffs' Response:** Defendants required this policy that sales managers enforced via
audits. Deny that it maximized his sales and he had the same responsibilities as an employee.
(Bower Dep. 50:3-51:8, ████)

133.   Bower successfully negotiated additional shelf space at some of his accounts.

(Bower Dep. 117:14-25).

**Plaintiffs' Response:** Disputed. Bower obtained space at an auto body shop and small
store which sales were "very limited." Defendants clearly maintained control over the vast
majority of shelf space obtained. (Bower Dep. 116:9-117:25, e.g., ████
████. See response to No. 125. Bower had the same responsibilities as an employee.
(Bower Dep. 50:3-51:8).

134.   Bower leveraged a relationship he had with Patterson Auto Body from when he

delivered Tastykake by bringing them in as a new customer. (Bower Dep. 114:19-115:18).

**Plaintiffs' Response:** Disputed. Bower asked to bring a small amount of product into
the shop after Defendants forced Plaintiffs to deliver TastyKake. (Bower Dep. 111:8-113:14).

135.    Bower's customer service and sales efforts "increased the value" of his territory,

and that it "benefit[ted] [him] financially." (Bower Dep. 108:21-109:3, 119:4-16, 121:18-122:9,

Bower Ex. 5).

**Plaintiffs' Response:** Disputed. Bower was told by Defendants his sales increased and
that he "at times" he benefitted financially. (Bower Dep. 108:21-25, 122:3-9). Denied in that,
overall, Bower's sales decreased to the point that he could not operate his route any longer and
the decrease was outside of his control. He eventually had to terminate his distributorship as a
result. (Id., 101:12–23, 104:15-22, 136:14–137:13, 149:9–151:2, 156:19–157:12). See
Response No. 144.

136.    Bower sold his stale product to the thrift store in order to reduce the amount of

stale product he lost money on. (Bower Dep. 238:19-25). Bower also adjusted his orders to try

and reduce stale. (Bower Dep. 240:12-241:4).

**Plaintiffs' Response:** Disputed. Reducing stale was essential to Defendants' business
and that they set stale percentages which they unilaterally altered. (████████).
Mismanagement by Defendants of the stale negatively impacted Plaintiffs and it was a big point
of contention between Plaintiffs and Defendants. The big issue was that Defendants negotiated
all product levels with the stores themselves and this created a conflict because Plaintiffs had to
deliver product whether it sold or not. (Linthicum Dep. 62:5-23, 67:12-17, 68:7-12, ██████
███████████, Bower Dep. 86:16-23, 87:14-88:16, 89:2-6,
90:11-21, 91:4-11, 91:24-92:3).

137.    Bower could have given out discounts or samples, but he chose not to because he

did not think it made good financial sense. (Bower Dep. 147:14-148:9, 195:2-25).

**Plaintiffs' Response:** Disputed. Giving away product he was charged for did not make
financial sense. (Bower Dep. 147:22-148:21).

138.    Bower could have carried non-competitive products. (Bower Dep. 78:16-19).

**Plaintiffs' Response:** Disputed. This provision was in the Agreement. However, it was
an illusory option due to the time constraints placed on distributors by Defendants. (Bower Dep.
78:22-79:3, 108:16-20, 110:-4-9, 136:14-137:13, 149:9-151:2).

139.    Bower understood that he was responsible for business expenses that were

deducted from his settlement statements. (Bower Dep. 105:23-106:11).

**Plaintiffs' Response:** Disputed. Bower was forced to deduct certain expenses that would be an expense of Defendants if not for the misclassification.

140.    Bower had a business bank account that he used to pay business expenses, such as his E-Z Pass tolls, interstate Department of Transportation fees, general truck repairs, oil changes, and truck inspections. (Bower Dep. 262:23-264:14). Bower utilized a Certified Public Accountant and kept receipts to keep track of his business expenses. (Bower Dep. 264:18-265:12, 333:23-25, 336:12-337:11, Bower Ex. 20).

**Plaintiffs' Response:** Disputed. Bower was forced to pay certain business expenses that would be an expense of Defendants if not for the misclassification.

141.    Bower decided to pay himself a salary of $500 a week out of the business bank account. (Bower Dep. 269:23-270:13, 272:6-16, Bower Ex. 11).

**Plaintiffs' Response:** Denied. Bower paid himself $400 per week when he had it to pay. (Bower Dep. 272:9-11).

142.    Bower filed tax returns on behalf of Bowers Bread and Cakes, Inc. (Bower Dep. 265:22-266:19, 269:23-270:5, Bower Exhs. 9, 11). To the extent Bower filed tax returns individually and on behalf of Bowers Bread and Cakes, Inc., he deducted business expenses from his income. (Stipulation ¶ 2).

**Plaintiffs' Response:** Disputed. Bower was forced to deduct certain business expenses that would be an expense of Defendants if not for the misclassification.

143.    Bowers Bread and Cakes, Inc. had unemployment insurance coverage. (Bower Dep. 268:2-12, Bower Ex. 10).

**Plaintiffs' Response:** Disputed. This was an expense that Defendants were able to pass onto Plaintiffs which would have been borne by Defendants if not for misclassification.

### 4.    Termination Of Bower's Distributorship

144.    Bower's Distributor Agreement was terminated in October 2016. (Bower Dep. 122:10-13, 163:9-18).

**Plaintiffs' Response:** Disputed. Defendants misrepresented to Bower that they would re-purchase his route. After months of trying to work something out with Defendants so he could actually stop operating at a loss, but Defendants ignored him for several months. Bower sold his route which required Defendants' approval. By the time he unloaded his route, it had negative equity. Defendants also required Bower to sign a release of claims as a condition of Defendants' repurchase. █████████████, ¶¶ 15.1–15.3, Bower Dep. 65:12–66:14, 104:15-22, 193:8–196:12, 304:18–305:11, 310).

## F.   PLAINTIFF SHAFER

### 1.   Shafer's Decision To Purchase A Distributorship

145.   Shafer is a former distributor of Flowers products in New York. (Shafer Dep. 34:6-15, 65:22-66:3, 74:3-11, 219:10-19, 227:18-228:5). He operated his distributorship from March 2014 until April 2016. (Shafer Dep. 34:6-15).

**Plaintiffs' Response:** Admitted.

146.   Prior to becoming a distributor, he worked as merchandiser for Pepsi for six months. (Shafer Dep. 18:10-23). As a merchandiser for Pepsi, he organized and displayed Pepsi products on shelves. (Shafer Dep. 18:21-25).

**Plaintiffs' Response:** Admitted.

147.   After Pepsi, he worked as a driver salesman for Hostess for fourteen years. (Shafer Dep. 17:19-18:5, 22:16-19). As a driver salesman for Hostess, he ordered and delivered Hostess products. (Shafer Dep. 22:16-23:6). When placing orders, he used his knowledge of Hostess products and took into account various trends. (Shafer Dep. 24:6-9).

**Plaintiffs' Response:** Admitted.

148.   After he left Hostess, he joined Special Teams as an employee in early 2014. (Shafer Dep. 35:3-17, 41:6-8). In that position, he delivered Flowers bakery and snack products. (Shafer Dep. 40:2-19).

**Plaintiffs' Response:** Admitted.

149.    During his first week at Special Teams, Shafer learned of an opportunity to

become an independent distributor. (Shafer Dep. 41:9-15). Shafer attended a few meetings

regarding the independent distributor opportunity, where he received a "binder" of documents,

including a Franchise Disclosure Document. (Shafer Dep. 42:21-24, 44:19-45:24, 54:16-55:6,

Shafer Ex. 2). He also viewed an Independent Distributor Franchisee Program presentation at

one of the meetings. (Shafer Dep. 48:5-16, Shafer Ex. 1).

**Plaintiffs' Response:** Denied. Specifically, Shafer was "told" Defendants were shifting
Plaintiffs to independent contractors, a designation Shafer had not known. Defendants presented
a binder and made a presentation which falsely touted the claim that Plaintiffs would obtain more
control and more money if misclassified as an independent contractor. (Shafer Dep. 41:11-
42:20, 67-21,          ).

150.    A few weeks later, Shafer decided to enter into a Distributor Agreement with CK

Sales and purchased the right to sell Flowers products in a territory in Newburgh, NY for

$35,290. (Shafer Dep. 65:18-66:19, 74:3-15, 219:10-15, 225:16-226:2, 227:14-228:5, Shafer

Exs. 3, 6).

**Plaintiffs' Response:** Disputed. Shafer had no choice. (See Response No. 149). He
took the opportunity because if he did not, he would have been terminated. He also knew he had
a window within which he could return his route to Defendants. (Shafer Dep. 51:15-20, 219-
220:16-5,            ). Deny to the extent this call for a legal
conclusion regarding Defendants.

151.    Shafer formed a corporation—Noahmiles Corp.—which he named after his

children. (Shafer Dep. 74:3-15).

**Plaintiffs' Response:** Defendants required Plaintiffs to form corporations and hold at
least a 51% ownership interest. (        , ¶ 3.3).

## 2.    Shafer Purchases Additional Distribution Rights

152.    A few months after purchasing his initial territory, Shafer invested an additional

$12,410 to purchase more distribution rights because he "wanted to make more money." (Shafer

Dep. 75:22-76:24, 77:8-79:21, 228:17-229:25, Shafer Ex. 7). This purchase of additional

distribution rights added value to his territory. (Shafer Dep. 230:16-231:6, 232:12-23, 233:10-22, Shafer Ex. 8).

**Plaintiffs' Response:** Disputed. Shafer wanted to earn more money but he was forced to take additional stores he did not want, specifically "if I wanted a ShopRite, I had to take [Hannaford]. (Shafer Dep. 77:8-14, 78:8-21). Disputed that the values of the territory went up because if "you add more stores to [the route], I guess it is going to make the value go up, yeah," but data does not support this. (Shafer Dep. 230:16-22, ███). Further denied because he wound up losing money on the additional territory. (Id. 233:10-22).

153.    However, a month later, Shafer sold back the additional territory he purchased to Plaintiff Valdez. (Shafer Dep. 234:21-235:2, 236:15-19, 238:7-18, 243:17-24, 248:21-23, Shafer Exs. 9, 10).

**Plaintiffs' Response:** Denied. Because Shafer was not making any money on the new route, he asked Defendants to take back the stores he had just added, something that Defendants had promised to do. When Defendants reneged, he was able to transfer some stores to another distributor without receiving any profit, a transaction over which Defendants retained control to approve. (Shafer Dep. 233:10-22, 236:15-241:15).

### 3.    Shafer Independently Operates His Business

154.    Shafer did not receive any recommendations from any Flowers or Lepage employees with respect to operating his business. (Shafer Dep. 140:2-141:8). He had "three times the amount of experience that these guys had. There was nothing they could tell [him] as far as service patterns, customer treatment." (Id.).

**Plaintiffs' Response:** Disputed. Shafer had more delivery experience than Defendants' sales managers who worked at the warehouse. Denied to the extent that the above statements infer that Defendants did not monitor or direct Shafer's duties (███). In fact, he and Bollati [sales manager] worked "a lot together" especially with respect to Hannaford. (Shafer Dep. 141:9-143:2). Shafer was also required to comply with terms of the Distributor Agreement, paragraph 2.6 (███ and all the other controls regarding product ordering and service set forth supra. (███, see also Linthicum Dep. 161:7-14).

155.    Shafer hired two part-time workers—Noah Shafer and Tino Desoussa—who assisted him at various points throughout his distributorship. (Shafer Dep. 151:23-152:22,

154:25-155:9, 156:7-12). Using workers "trim[med] an hour off [his] day." (Shafer Dep. 157:19-23).

**Plaintiffs' Response:** Due to the seven day per week job requirements, distributors, including Shafer, had to enlist help from time-to-time. This only cost distributors money. (Shafer Dep. 163:12–13, Schucker Dep. 165:15-166:3). As employees, distributors did not have to pay for help or work seven days per week. (Schucker Dep. 165:15-166:3, ███ █ Linthicum Dep. 40:20-41:12, 161:1-7).

156.   Shafer trained both workers himself. (Shafer Dep. 158:24-25, 159:7-11, 160:12-13).

**Plaintiffs' Response:** Disputed. Defendants did not require distributors to have any special skills or training.

157.   Noah, Shafer's son, helped out throughout Shafer's distributorship. (Shafer Dep. 151:25-153:11, 156:7-12). Noah mainly stacked and organized loads. (Shafer Dep. 153:2-7).

**Plaintiffs' Response:** Admitted, which demonstrates Defendants did not require distributors to have any special skills.

158.   Tino helped Shafer on Fridays, and sometimes on Mondays, during Shafer's last year as a distributor. (Shafer Dep. 154:25-155:9). Generally, Tino worked eight hours a day, one day per week. (Shafer Dep. 156:5-6).

**Plaintiffs' Response:** See Response No. 156.

159.   Shafer decided how much to pay his workers. (Shafer Dep. 153:12-154:4). He typically paid Noah and Tino $10 an hour for an average of $80 per day. (Shafer Dep. 153:12-15).

**Plaintiffs' Response:** Disputed because as an employee, Shafer would not have this expense. (Linthicum Dep. 40:20-41:12, 161:1-7).

160.   Shafer did not need Defendants' approval to hire these workers and did not report their hours to Defendants. (Shafer Dep. 154:5-15, 154:22-24).

**Plaintiffs' Response:** Disputed. Shafer did not seek approval.

161.   Shafer determined his own schedule.  (Shafer Dep. 170:22-171:8).

**Plaintiffs' Response:**  Disputed.  Shafer had some discretion over the geographic order he would take to service his stores since not all stores required seven days per week, but this would be true even if they were classified as employees.  (████  Shafer Dep. 40:20-41:5). Denied that he had autonomy over his schedule as he had company requirements to comply with daily. (Linthicum Dep. 38:3-39:16, Shafer Dep. 170:9–172:16, 186:3-12, ████ Distributor

162.   Shafer determined the order in which he serviced customers.  (Shafer Dep. 170:9-18).  He always started in Walden and finished in Highland.  (Shafer Dep. 171:9-24).  He chose this route because it was the most cost effective with respect to gas.  (Shafer Dep. 170:9-21).

**Plaintiffs' Response:**  Disputed.  See Response No. 161.  While Shafer had some discretion over the order to service his stores on lower volume days, Defendant controlled his schedule.

163.   Shafer decided what time to arrive at the warehouse each morning.  (Shafer Dep. 149:25-150:25).

**Plaintiffs' Response:**  Disputed.  Shafer arrived at the warehouse between 4:00 a.m. and 5:00 a.m. depending on what his workload for the day would be as set forth by Defendants. Distributors had some discretion to adjust their start times but were ultimately controlled by Defendants' schedule requirements.  (Shafer Dep. 149:18–19, 150:2–25, 170:9–171:24, 186:3–12), ████ ).

164.   Shafer decided whether and when to take breaks, but typically did not take any breaks during his days. (Shafer Dep. 164:7-165:2).

**Plaintiffs' Response:**  Admitted that he took breaks as time allowed.

165.   When Shafer took time off, he decided to pay Lepage workers to cover his route during this time.  (Shafer Dep. 160:17-161:6).  However, he felt that the Lepage workers did a

poor job. (Shafer Dep. 160:20-161:6). He knew that he could have hired someone of his own

choosing to cover his route while he was on vacation instead, but he never did. (Shafer Dep.

161:16-23).

**Plaintiffs' Response:** Disputed. Due to the job requiring seven days of service per
week, distributors had to enlist help from time-to-time which only cost them money. As
employees, Defendants would bear this cost. Also, Defendants "help" did a terrible job which
cost Plaintiffs more than it was worth. (Shafer Dep. 160:21-161:6, 163:12–13, Linthicum Dep.
40:20-41:12, 101:1-7).

166.    Shafer determined when and how often to service his customers either based on

sales or the customer's own requirements. (Shafer Dep. 149:25-150:25, 186:13-189:5, 189:17-

22, 170:9-171:824).

**Plaintiffs' Response:** Denied. See Response No. 161-162. Defendant maintained
ultimate control over Shafer's service requirements which was primarily comprised of chain
stores. He only had limited discretion to service stores on lighter volume days but he had to
comply with Defendants' requirements. (■■■■■■, Linthicum Dep. 38:16–39:6, 39:16–19,
Shafer Dep. 40:23-41:5, 186:3-12, 188:16-21, ■■■■■■■■, ¶ 2.6, ■■■■).

167.    Shafer did not service every customer on delivery days—Mondays, Tuesdays,

Thursdays, Fridays and Saturdays. (Shafer Dep. 148:20-24, 186:13-21). He determined how

frequently to service customers based on his "experience based on the space that [he] had [and]

the business that [he] did." (Shafer Dep. 186:13-21, 187:3-188:7). He went "to every chain

account twice a week at the very least and [his] delis just once a week." (*Id.*). As for his smaller

customer accounts, he determined how often to service them based on "volume." (Shafer Dep.

186:22-187:2).

**Plaintiffs' Response:** Disputed. Shafer had some discretion as when to service his
smaller stores because not all stores required seven days per week service. Denied because
Defendants contracted with the larger stores such as Hannaford and ShopRite where virtually all
of his sales volume exists so "[Defendants] dictated your service pattern." (Shafer Dep. 185:21-
186:12, Linthicum Dep. 38:16–39:6, 39:16–19, ■■■■■■).

168.   Shafer sometimes changed his schedule if he had to build a display or if there was

bad weather. (Shafer Dep. 171:9-24).

**Plaintiffs' Response:** Disputed. This was the same duty he performed as an employee.[31]
(e.g., Linthicum Dep., core duties did not change when Plaintiffs became distributors, 89:6-
90:8).

169.   On Wednesdays and Sundays, Shafer did not go into the warehouse and instead

merchandised product that had previously been delivered to the customer. (Shafer Dep. 148:25-

149:13, 189:6-16). On these days, whether a store was "busy" or "slow" would impact the

frequency with which he serviced his accounts. (Shafer Dep. 190:12-24). For instance, Shafer

did not typically go to his slower accounts on Wednesdays and Sundays. (Shafer Dep. 191:3-

10). Instead, he focused on his "higher volume stores," which were supermarkets. (Shafer Dep.

189:17-25).

**Plaintiffs' Response:** Disputed. Defendants did not deliver product to the warehouse on
Wednesdays and Sundays. Denied that he had autonomy over his service schedule on those days
since he was required to go to stores such as Hannaford and ShopRite on set days. (Shafer Dep.
149:9-13, 189:8-25, 189:7-190:25, ▮▮▮▮▮

170.   Shafer customized his product orders for each customer in order to "develop a

service pattern" for each customer. (Shafer Dep. 28:7-10, 115:14-116:10). He adjusted his

orders "every day" for "every customer." (Shafer Dep. 117:20-25, 184:10-23). Some of those

adjustments were larger than others. (Shafer Dep. 118:7-14).

**Plaintiffs' Response:** Disputed. Regarding low volume stores, Shafer could tweak
orders as did all distributors due to the inaccuracy of the Defendants' orders.[32] Deny the
implication that he had control over product ordering. (▮▮▮▮▮▮ Distributor Agreement, ¶
2.6, Valdez Dep. 100:10–15, 100:16–101:5, Bower Dep. 192:14–193:18, Heinrich Dep. 157:10–
17, 157:21–158:9, 172:13–173:14, 238:23–239:16, 180:3–21, Linthicum Dep. 63:10-13, 64:2-18,
66:2-6).

---

[31] Shafer felt more like an employee or slave instead of an independent contractor. (Shafer Dep. 215:7-10).

[32] Plaintiffs had to keep shelves full so in the chain stores, if a Plaintiff saw empty space, he would have to
adjust the suggested order so that he had enough product to fill empty space. This is no different than when
Plaintiffs were employees. (Shafer Dep. 90:18-22, 115:14-23, 116:24-118:14, 120:24-121:17, 179:6-13).

171.    The handheld device provided to him by CK Sales contained suggested orders,

but Shafer did not follow them because the numbers were "usually completely wrong." (Shafer

Dep. 115:19-23).

**Plaintiffs' Response:**  Disputed.  See Response No. 170.  Default orders were set by
Defendants and usually were inaccurate so Plaintiffs had to make adjustments to meet sales
pattern and reduce stale. (Shafer Dep. 115:14-23, 116:24-118:14).  Distributors could tweak
orders due to open space needing to be filled, but Defendants retained ultimate control over
ordering product. (███████ Linthicum Dep. 64:5-17 (Plaintiffs have no say over product levels)).
This process was the same as when they were employees. (Schucker Dep. 62:3-7, 203:8-204:4).

172.    In placing his orders, Shafer took into account various factors, including shopping

trends. (Shafer Dep. 28:18-30:2, 184:24-9).  For example, "most American families, they get

paid Thursday, Friday, Saturday…so those would be the high times to put the bulk of your

product out, versus Monday and Tuesday, whereas not as many people are shopping.  So

Monday and Tuesday, [he]…d[id] a light bread order.  Thursday, Friday, Saturday, [he]…buil[t]

up for [his] weekend."  (Shafer Dep. 28:18-30:2).  He took these "purchasing trends" into

account when ordering, which helped him increase his profits. (Shafer Dep. 26:13-27:8, 119:18-

120:15).

**Plaintiffs' Response:**  Disputed.  Defendants detailed Plaintiffs' service patterns. (███████
██████.  In the small volume stores he would have some discretion over the exact products to
order at times.  Denied in that all of his large volume stores had set product placements that they
negotiated with Defendants and which were outside of Shafer's control. (███████ Shafer Dep.
28:7–12, Linthicum Dep. 64:5-17).  Deny the implication that he had autonomy over ordering
product.  Denied that Shafer can control how much product he orders for his customers. (See
Response Nos. 170–171).  Specifically, Shafer's largest volume stores have set planograms that
dictate how much and what type of product can be delivered to its stores and would not take '
Shafer's product recommendations and his job was to fill empty space. (███████ Shafer Dep.
104:15-18, Linthicum Dep. 36:7-21, 37:4-24, 63:10-13, 64:2-18).  Those products and product
levels are negotiated between the stores and Defendants and the distributor has virtually no
ability to increase sales in these stores as a result.  Defendants tell the distributors what they need
to deliver to those stores and often distributors are required to put more product on the shelves,
not to increase sales, but to prevent competing companies from using that space. (Linthicum
Dep. 36:7–21, 37:7–8, "there is normally a mapped area of the aisle for each brand determined
by the store.", 37:4–24, 63:10–13, 64:2–18, 64:5–17, 66:2–6, ███████ Distributors must also

comply with all store promotions. (Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, Shafer Dep. 76:11-24, 86:24-87:6, 180:11-18, 94:6–15, 95:3–13, 96:9–14, 102:17-23, 122:5–123:13, 124:8–125:12).

173.   When ordering, Shafer also took into account how well particular products sold. (Shafer Dep. 26:13-23). Based on his experience, he knew which products were "best selling" and was "aggressive" with those products. (Shafer Dep. 26:2-12, 30:18-31:6). For example, one of his "best selling items was the Honey Wheat Bread," and he was "aggressive" with that and "less aggressive" with other items. (Shafer Dep. 26:2-12). He was "not aggressive" with TastyKake snack products because, in his experience, they did not sell as well as the bread products. (Shafer Dep. 30:18-31:6).

**Plaintiffs' Response:** Disputed. See Response Nos. 170-172. (███). If shelves were empty, he had to fill them. Shafer lamented: "If your shelf calls for sixteen (16) loaves of Wonder and [the] manager thinks I am the greatest guy in the world, it is not going to do nothing for my sales. I am still going to put sixteen (16) loaves of Wonder on [the] shelves." (Shafer Dep. 93:18-22). Further, Defendants unilaterally dictated to Plaintiffs that they distribute TastyKake Products. (Linthicum Dep. 128:4-15).

174.   When deciding how much of each product to order, he also took into account the weather, the amount of shelf space he had at each particular account, the products' expiration dates, and past sales at that customer. (Shafer Dep. 30:5-15, 119:18-120:23, 121:14-21).

**Plaintiffs' Response:** Disputed. See Response Nos. 170-173.

175.   Shafer's clients trusted him with ordering based on his experience. (Shafer Dep. 126:24-25). At one Shop Rite supermarket, Shafer was given a four-foot section of shelf space and was told only to "keep it full," leaving it to Shafer to decide what products to order. (Shafer Dep. 104:25-105:3). Shafter chose to order the items that "sold the best." (Shafer Dep. 105:15-106:5). Hannaford supermarket likewise "trusted" him with ordering because "knew [he] knew a lot" about ordering. (Shafer Dep. 126:3-127:6).

**Plaintiffs' Response:** Disputed. Hannaford and ShopRite may have trusted Shafer both as an employee and a distributor. Denied that he had autonomy over ordering as has previously been set forth in multiple responses. He had "some discretion" over product recommendations at ShopRite regarding a four-foot shelf space but Defendants retained ultimate control and dictated the product ordering. As to Hannaford, he was able to "recommend" product during a brief trial period when Hannaford ordered its own bread and Defendants still would make unilateral decisions. This frustrated Shafer who felt that he should have independence to order what he thought was needed. (Shafer Dep. 106:20-107:7, 124:10-127:6). Deny the implication that Shafer had autonomy over the ordering process. (e.g., ████████████, ¶ 13.2, 9, 13, 14, Linthicum Dep. 36:7-21, 37:7-8).

176.    Shafer also made additions to his orders in the form of late adjustments when he

thought he could sell more product. (Shafer Dep. 144:25-145:15). For example, he increased his

orders for hot dog buns over the summer. (Shafer Dep. 144:25-145:7). Similarly, if the weather

was nice over a weekend, he would make a late increase to his orders. (Shafer Dep. 145:8-15).

He did not need Defendants' approval to make these late adjustments. (Shafer Dep. 146:9-11).

**Plaintiffs' Response:** Disputed. See Response Nos. 170-176.

177.    Shafer never wore a uniform. (Shafer Dep. 138:17-23).

**Plaintiffs' Response:** Admitted.

### 4.    Shafer Maximizes His Profits

178.    Through his own solicitation efforts, Shafer added three new customers. (Shafer

Dep. 83:4-13, 83:23-25). All three were profitable for him. (Shafer Dep. 83:14-22).

**Plaintiffs' Response:** Disputed. Shafer was able to obtain three small accounts. He made only about $160 per week total gross revenue servicing the cash accounts he was able to pick up because the owners knew him previously. This was a fraction of his income. (Shafer Dep. 83:6-25, ████). He was only able to service these routes because they were on routes he took to service his large stores. (Shafer Dep. 85:12-16). Further, the majority of Shafer's income was from his large volume stores where he had no impact on the product choices or space. (██ ████[33] Those chain stores such as Hannaford were even less profitable because they were more labor intensive with lower commissions. (Shafer Dep. 87:10–88:4, 180:11–18).

---

[33] ███████████████████████████████████

179.    To increase his sales, Shafer put stickers on sale products because he thought that

was an effective sales technique. (Shafer Dep. 98:12-19).  He chose which stickers he wanted to

use and when to place them on his products. (Shafer Dep. 99:16-25).  He "kn[ew] from

experience that if you stick a price on the product, the customer is going to know how much it

could cost and . . . they are going to buy." (Shafer Dep. 99:19-25).

**Plaintiffs' Response:** Disputed.  This was Defendants' policy that sales managers
enforced via audits and there is no evidence it ever increased his sales. (████). Failure to
comply with this policy could lead to Defendants sending Plaintiff letters of breach. (
████, ¶ 2.6).

180.    Shafer further increased his profits by reducing his stales. (Shafer Dep. 118:21-

25).  He did this by ordering in "the most accurate way" and trying to make sure "[the

customers] get what they need." (Shafer Dep. 102:5-13, 118:21-25).  Further, up to a certain

amount, Shafer sold any stales that he had to the Lepage thrift store. (Shafer Dep. 181:16-

182:11).

**Plaintiffs' Response:** Disputed.  While all distributors attempted to reduce their stale
product and this was Defendants' requirement, Defendants set the acceptable percentages and
unilaterally adjusted them.  This limited Plaintiffs' losses rather than increased their income.
(████, Shafer Dep. 30:4-17, 119:7-17). Denied that distributors had control over this
issue and, in fact, it was one of the biggest issues that Defendants had to address with
Distributors because Defendants controlled the amount of product ordered, the expiration dates
on the product and the amount of product that had to be placed on the shelves and could, and did,
discipline distributors for non-compliance. (Linthicum Dep. 62:5–18, 62:15–23, 66:2–6, 67:12–
17, Shafer Dep. 30:4–17, 116:24-118:14, 119:7-17, 122:5–123:13, ████).

181.    To the extent Shafer filed tax returns on behalf of Noahmiles Corp., he deducted

business expenses from his income. (Stipulation ¶ 2).

**Plaintiffs' Response:** Disputed.  Plaintiffs were forced to deduct business expenses that
would have been expenses of Defendants if not for the misclassification.

### 5.   Shafer Sells His Distributorship

182.   Shafer sold his remaining territory in April 2016. (Shafer Dep. 250:23-251:13, Shafer Ex. 11). Shafer's territory increased in value since 2014. (Shafer Dep. 233:10-22, 250:23-251:13).

**Plaintiffs' Response:** Disputed. Admitted that Shafer sold back his route to Defendants after failing miserably in attempting to sell it to an outside buyer which was subject to Defendants' approval. Shafer also had to sign a release of all claims in order to have Defendants purchase his route. (Distributor Agreement, ¶ ¶ 15.1 – 15.4,          ). Denied that the value of the route had increased. (Shafer Dep. 244:17-250:18).

183.   Shafer now works as a route sales representative at Entenmann's—a competing bakery company. (Shafer Dep. 251:14-252:17).

**Plaintiffs' Response:** Admitted.

### G.   PLAINTIFF FRYAR

#### 1.   Fryar's Decision To Purchase A Distributorship

184.   Fryar is a former distributor of Flowers products in New York. (Fryar Dep. 78:4-79:16, 80:18-81:4, 387:7-18). He operated his distributorship from March 2014 until January 2017. (Fryar Dep. 206:8-13, 387:7-18, 388:18-389:19)

**Plaintiffs' Response:** Admitted.

185.   Prior to becoming a distributor, Fryar worked as a Route Relievers employee for twelve years. (Fryar Dep. 23:8-15, 30:16-19). In this position, he delivered Lepage bakery and snack products (and subsequently Flowers bakery and snack products after Flowers acquired Lepage in 2012), but he did not have any ordering or marketing responsibilities. (Fryar Dep. 37:4-23, 43:3-11).

**Plaintiffs' Response:** Disputed. His duties were the same as when he was an employee. (Fryar Dep. 37:24-39:25).

186.     Fryar subsequently learned about the opportunity to become an independent

contractor distributor. (Fryar Dep. 29:5-30:19).  His understood that he would "become [his]

own boss, own a route." (Fryar Dep. 30:7-12, 63:10-17).  Fryar attended meetings to learn more

about the opportunity.  At one of the meetings, he received a "binder" of documents, including a

Franchise Disclosure Document.  (Fryar Dep. 48:25-49:12, 50:16-51:8, 69:2-71:16, Fryar Ex. 3,

Linthicum 7/21/17 Dec. ¶ 2).

**Plaintiffs' Response:** Disputed.  He was informed of the transition to independent
contractors from Defendants.  (Fryar Dep. 48:19-24).  He received these materials and attended
the meetings.  Denied because the "sales pitch" was misleading and he quickly learned that he
was not his own boss and Defendants had misled him. (Fryar Dep. 63:1-17, 65:1-14, ███████
███████.

187.     Fryar decided to enter into a Distributor Agreement with CK Sales, purchasing for

$62,960 the right to sell and distributor Flowers products in a territory in Poughkeepsie, NY.

(Fryar Dep. 64:12-65:3, 77:20-79:16, 80:18-25, 120:24-121:19, 125:24-126:7, Fryar Exs. 4, 5).

**Plaintiffs' Response:** Disputed.  Defendants entered into agreements with Plaintiffs'
corporations.  (███ ██ ████████).

188.     Fryar formed a corporation—Ryan F. Baby, Inc.—which he named after his son.

(Fryar Dep. 80:18-81:4).

**Plaintiffs' Response:** Defendants required Plaintiffs to form corporations and to hold at
least 51% ownership.  (Distributor Agreement, ¶  3.3).

## 2.     Fryar Sells Partial Distribution Rights

189.     Fryar invested $62,960 in his territory because he believed that his territory had

substantial growth opportunity.  (Fryar Dep. 66:19-22, 125:24-126:7).

**Plaintiffs' Response:** Disputed.  Defendants represented to Fryar he would be able to
grow business which turned out to not be true. (███████████, Fryar Dep. 63:1-17, 65:1-
14).

190.     Fryar chose to sell a portion of his territory in April 2014 for $20,340.  (Fryar

Dep. 150:3-24, 157:6-23, Fryar Ex. 6).

**Plaintiffs' Response:**  Denied.  Fryar was promised a certain territory with specific stores contained therein and his original territory was "forced" upon him with the promise it would later be amended. (Fryar Dep. 151:6-152:23, 153:11-12, 153:23-154:4, 154:11-22).

### 3.    Fryar Independently Operated His Business

191.    Fryar hired three workers to help him run his distributorship—Ryan Fryar, Kumar Everett and Shane Bower.  (Fryar Dep. 119:14-25, 289:20-290:2).

**Plaintiffs' Response:**  Disputed.  Due to Plaintiffs' seven day work requirements, all distributors needed to enlist help from time-to-time, something he did not need to do as an employee for twelve years. (Linthicum Dep. 40:20-41:12, 101:1-7).

192.    Kumar Everett, Fryar's nephew, worked for Fryar for about eight months during which time Fryar was at "home." (Fryar Dep. 119:14-25, 290:11-291:24, 292:7-13).  For those eight months, Kumar had "full control over the route," including responsibility for deliveries and handling of stales.  (Fryar Dep. 290:17-291:8).  Fryar paid Kumar weekly for his services. (Fryar Dep. 291:9-22).

**Plaintiffs' Response:**  Plaintiff needed help when he was sick/injured with his sales manager's permission and Defendants' approval. (Fryar Dep. 119:2-13, 294:5-20, 295:16-242, 296:8-297:19, 303:2-20, 321:8-23).  But deny Kumar had full control over the route, as Defendants had control over the route. (███████████).  Further, as an employee, Plaintiffs would not have to worry about this expense. (Linthicum Dep. 40:20-41:12, 101:1-7).

193.    Ryan Fryar, Fryar's son, worked for Fryar for around three months.  Ryan would go into stores "ahead of [Fryar]," "pull[] stale" and otherwise make Fryar's "day easier." (Fryar Dep. 18:7-22, 298:4-22, 299:10-21).  He paid Ryan for his services. (Fryar Dep. 293:18-20).

**Plaintiffs' Response:**  Disputed.  See Response Nos. 191-192.

194.    Shane Bower covered Fryar's route for a two or three day period in January 2017, but Fryar did not pay him for these services—it was a favor. (Fryar Dep. 119:22-25, 376:8-22, 377:13-17).

**Plaintiffs' Response:**  Admitted, but see Response Nos. 191-193, Linthicum Dep. 40:20-41:12, 101:10-17.

195.   Fryar set his own schedule. (Fryar Dep. 61:17-22, 262:4-7, 266:21-268:8, 277:20-24).

**Plaintiffs' Response:** Disputed. Defendants set Plaintiffs' schedules. ███████████ Fryar had some discretion over what order to service his stores because not all stores required seven days per week service. Denied that he had autonomy over his schedule due to Defendants' requirements. (Linthicum Dep. 38:16–39:6, Fryar Dep. 268:6–273:15, ████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

196.   Fryar also decided the order in which to service his customers. (Fryar Dep. 272:15-274:18). When servicing his customers, Fryar took into account the proximity of stores to each other. (Fryar Dep. 273:24-274:14). For example, Hardy's, Price Chopper supermarket and his Stop & Shop supermarkets were all on the same major road so he would "do all of them" together to "get [them] out of the way early." (Fryar Dep. 272:15-273:10).

**Plaintiffs' Response:** Disputed. All of Fryar's stores were in a confined geographical area, but dispute the balance of the statements. Defendants retained ultimate control over his schedule. See response number 195.

197.   On his delivery days, Mondays, Tuesdays, Thursdays, Fridays and Saturdays, Fryar generally arrived at the warehouse between 3AM and 4AM. (Fryar Dep. 266:21-268:8). He decided what time to arrive based on what customers he was servicing that day. (Fryar Dep. 267:19-268:8). For example, if he was servicing Price Chopper, one of his "major" customers, he would make sure to be at the warehouse by 3AM so that he could get to Price Chopper when it opened. (Fryar Dep. 267:19-268:8).

**Plaintiffs' Response:** Disputed. Defendants' requirements dictated Plaintiffs' schedules which they enforced. This was due to not all stores requiring seven day per week service.

Plaintiffs had some discretion just as when they were employees.  (Fryar Dep. 38:3-39:7, ███

████████.

198.   On Wednesdays and Sundays, Fryar did not go into the warehouse and instead

merchandised for certain customers product that he had previously delivered.  (Fryar Dep.

261:11-262:7).

**Plaintiffs' Response:**  Disputed.  The Defendants did not deliver product to the
warehouse on those days but required seven day per week service for some but not all stores.
(███████).  As employees, these extra days would have been optional, not mandatory and
employees make more money on those non-delivery days. (Valdez Dep. 33:1-9, e.g., ███████).

199.   Fryar took fifteen to twenty minute breaks each day for breakfast.  (Fryar Dep.

284:14-25).  He did not need approval for breaks.  (Fryar Dep. 285:19-286:5).

**Plaintiffs' Response:**  Admitted.  This would be what employees were entitled to.

200.   Fryar took one vacation per year, during which time he decided to use the Lepage

service to pay for a Lepage employee to cover his route.  (Fryar Dep. 288:2-289:8).  He paid this

Lepage employee out of his own pocket.  (Fryar Dep. 288:14-15).  He understood that he could

also have hired someone else to service his customers while he was on vacation.  (Fryar Dep.

288:16-22).

**Plaintiffs' Response:**  Disputed.  Due to the seven day per week job requirements,
distributors had to enlist help from time-to-time which cost him money, an issue he did not have
as an employee, nor do present employees. (Linthicum Dep. 4:25, Fryar Dep. 288:2–15, 303:2–
20, 321:8–23, 40:20-41:12, 101:1-7).  Defendants retained approval rights over Plaintiffs'
vacation requests.  (███████).

201.   Fryar sometimes changed his delivery route if a customer asked him to arrive

earlier.  (Fryar Dep. 273:24-274:14).  For example, Fryar typically started his days at Price

Chopper supermarket because Price Chopper supermarket opened the earliest.  (Fryar Dep.

272:15-273:15).  After Price Chopper supermarket, "there [were] a couple managers that really

wanted [him] to be there a little earlier to get the day started" so Fryar would go to those next.

(Fryar Dep. 272:15-24).

    **Plaintiffs' Response:**  Disputed.  Defendants retained ultimate control over Plaintiffs' work schedules. ▮▮▮▮▮▮▮▮ ).  Fryar tried to schedule his deliveries in a sensible order subject to Defendants' controls previously detailed, but this was the same thing he would have done as an employee. (Fryar Dep. 38:3-39:7).

    202.    How long Fryar spent delivering product to each of his accounts varied based "on

what -- what kind of sales was going on, if [he] had to be in one place longer than the other," as

well as the weather. (Fryar Dep. 271:14-272:4, 277:20-24).

    **Plaintiffs' Response:**  Admitted and this was the same whether he was an employee or distributor.

    203.    Fryar made "different product[]" ordering decisions based on the customer.

(Fryar Dep. 98:4-99:23, 227:7-9).  He made his ordering decisions based on the customer's

needs, sales, and other factors, such as increased demand due to snowstorms. (Fryar Dep.

224:22-226:19).

    **Plaintiffs' Response:**  Disputed.  Fryar had some discretion in product ordering based upon sales or weather and due to the default orders being inaccurate as did all distributors and employees.  Deny the implication that he had autonomy over ordering product.  Denied in that all of his large volume stores had set product placements that they negotiated with Defendants and which were outside of Fryar's control. (Fryar Dep. 102:5-22). Denied that Fryar can control how much product he orders for his customers except he had to keep shelves full, same as when he was an employee. (Id. 105:2-109:18, 173:15-174:24, 218:3-16, 224:2-25). (Id. 173:15-174:24, 240:8-241:21, ▮▮▮▮▮ Those products and product levels are negotiated between the stores and Defendants and the distributor has virtually no ability to increase sales in these stores as a result. Defendants tell the distributors what they need to deliver to those stores and often distributors are required to put more product on the shelves, not to increase sales, but to prevent competing companies from using that space. (Linthicum Dep. 36:7–21, 37:7–8, "there is normally a mapped area of the aisle for each brand determined by the store.", 37:4–24, 63:10–13, 64:2–18, 64:5–17, 66:2–6, ▮▮▮▮ Distributors must also comply with all store promotions. (Linthicum Dep. 128:4–15, 140:5–25, 140:25–141:15, 148:1–5, Fryar Dep. 175:6–176: 3, 245:17–246:11).

    204.    The handheld device provided to him by CK Sales contained suggested orders,

but Fryar did not follow them. (Fryar Dep. 89:17-94:15, 227:10-21).  Instead, he used his

handheld to "keep track of what [he] was doing . . . in certain stores" and would then increase or decrease future orders accordingly.  (Fryar Dep. 90:21-92:7, 216:6-217:6, 229:11-25); (Fryar Ex. 8 – multiple additions and subtractions of product up to 36 pieces); (Fryar Ex. 9 – multiple additions and subtractions of product up to 29 pieces).

**Plaintiffs' Response:**  Disputed.  (See Response number 203).  Suggested orders were inaccurate as they could not account for present day sales.  This was the same process that occurred when Plaintiffs were employees.  (Schucker Dep. 61:5-11, 72:13-24, Valdez Dep. 100:16-101:5, 101:12-25, 126:9-127:21, Bower Dep. 36:21-37:19, 40:8-13).

205.    Fryar increased the amount of product he ordered if he knew a sale was coming.  (Fryar Dep. 98:10-99:14).  "Whatever product [he] felt was strong" he would "increase…for sales."  (Fryar Dep. 98:10-99:6).  For example, "if Stop & Shop had a two for five on a certain bread, like Honey Wheat – Honey Wheat was a big seller," he would "order extra" Honey Wheat because he knew he could "sell it fast."  (Fryar Dep. 98:10-99:6).  Fryar knew whether a product was "strong" "based on firsthand going to the store every day."  (Fryar Dep. 98:10-99:14, 179:14-23).

**Plaintiffs' Response:**  Disputed.  Fryar had some small discretion to adjust orders subject to the controls previously detailed.

206.    Sometimes Fryar even made late adjustments to his orders in order to take advantage of sales.  (Fryar Dep. 233:21-234:18, 234:25-235:10).

**Plaintiffs' Response:**  Disputed in that this was Defendants' practice for employees as well.

207.    Conversely, Fryar decreased product in his orders when "[he] didn't need [the product]" or if he was "too heavy out there in the field."  (Fryar Dep. 235:17-236:18).  If he was "too heavy" in the field, he "let the product sell off and then [he] could start . . . fresh [product] in about four days."  (Fryar Dep. 235:19-236:2).

**Plaintiffs' Response:** Disputed. Defendants' practices required distributors to balance ordering product for sale against charges Defendants would levy against them for having stale product returned. Plaintiffs were also required to comply with all store promotions. (Linthicum Dep. 148:1-5, 161:7-14, ▮▮▮▮▮▮▮▮▮, ¶ 13.2).

208.    Fryar never wore a uniform. (Fryar Dep. 265:24-266:4).

**Plaintiffs' Response:** Admitted.

209.    Apart from once telling him about a change in a particular customer's

requirements, managers at Defendants never gave him any recommendations on running his

business. (Fryar Dep. 329:4-330:9, 333:19-334:8).

**Plaintiffs' Response:** Denied. Distributors were required to follow a multitude of Defendants' directives. (▮▮▮▮▮▮▮▮, Agreement, ¶ 2.6, Linthicum Dep. 161:7-14).

### 4.    Fryar Maximizes His Profits

210.    Fryar advertised to increase his sales. (Fryar Dep. 264:12-265:15).  He had the

name of his corporation, Ryan F. Baby Inc., printed on the side of his delivery vehicle and had

business cards printed with that name as well. (Fryar Dep. 264:12-265:15).  He then took these

business cards and stopped in various businesses to "just let them know that [he] had – that [he]

was selling [] product, and [he] was trying to gain business." (Fryar Dep. 264:22-265:7).

Through these efforts, Fryar added one new customer—Market Fresh—in his territory. (Fryar

Dep. 364:2-16).

**Plaintiffs' Response:** Disputed. Defendants' policy required him to have his corporate name on the side of his truck. (▮▮▮▮▮▮▮▮, ¶ 9.1). Denied that any of this maximized his products due to Defendants' tight controls over him and restrictions on his time. (Fryar Dep. 105:2–109:18, 132:1–133:12, 145:14-21, 148:7–17, 149:9–12, 265:2-10). Further, the majority of Fryar's sales occurred in the chain stores whose product levels were strictly controlled and where he had no input over product placement. (▮▮▮▮▮▮▮▮, Linthicum Dep. 36:7-21, 37:7-8, 63:10-13, 64:18).

211.    Fryar was also able to increase his sales with existing customers over the course

of his distributorship—which he agreed put "more money in [his] pocket." (Fryar Dep. 163:21-

25, 165:8-23, 179:3-186:21, 202:15-203:3, 203:20-204:8).

**Plaintiffs' Response:**  Disputed.  Fryar "believed" his sales may have increased but denied that his attempts at growing sales resulted in him making more money and, more often, Defendants' control over his business prevented that.  For example, Defendants added or removed stores at their sole discretion which increased his workload but did not result in more money.  (███, Fryar Dep. 105:2–109:18, 114:20-115:12, 144:21-145:13, 145:17-1 46:6, 328:22-329:3, 148:19-25, 151:6-16, 163:6-25, 165:17-19, 165:10-15, 207:6-23, 322:15-323:25, Linthicum Dep. 36:7-21, 37:4-24, 63:10-13, 64:2-18, 64:5-17, 140:5-25, 180:6-19, 181:2-12, ███).[34]

a) At Hannaford supermarket, he leveraged his relationship with the store manager to get more shelf space and displays.  (Fryar Dep. 168:21-173:14).  In fact, Fryar asked for more shelf space and displays "every chance [he] got," but especially when there was "a sale [coming] up."  (Fryar Dep. 169:7-17).  He further grew sales at Hannaford supermarket by purchasing "certain pieces from certain distributors" just for Hannaford—pieces which had to be ordered by the whole tray otherwise.  (Fryar Dep. 187:6-188:17).

**Plaintiffs' Response:**  Disputed.  See previous response of Defendants maintaining final control over product ordering and the other limitations set forth previously herein.  This was also Plaintiffs' job duties as employees.

b) At his Stop & Shop supermarkets, Fryar "reconstructed [his] route in order to take care of [the store managers]."  (Fryar Dep. 180:8-183:22).  Another Stop & Shop supermarket manager gave Fryar "massive displays, like tables that held five -- $500.00 worth of bread at one time in the front and $500.00 worth of bread in the back."  (Fryar Dep. 182:17-183:22).  This manager, in particular, "showed [Fryar] a lot of love" because Fryar "showed him how eager [he] was" to "mak[e] money" for the store.  (*Id.*).

---

[34] 93.7% of Fryar's sales over the representative sample came from chain stores where he had no real sales impact.  (███

**Plaintiffs' Response:**  Disputed in accordance with the prior denials regarding Defendants maintaining final control over product ordering. (Linthicum Dep. 36:7-21, 37:7-8, 63:10-13, 64:2-18).  Deny that these statements demonstrate that he had any impact in growing his sales. (Fryar Dep. 199:13-200:17, ████).  Additionally, this activity had no impact on his sales.

      c)  At Price Chopper supermarket, he had good relationships with both the manager

      and the receiver.  (Fryar Dep. 194:23-200:17).  The store manager helped Fryar

      make money by giving Fryar displays.  (Fryar Dep. 194:23-196:13).  And, during

      resets, where normally Fryar's space would have been decreased, the store

      manager increased his space.  (*Id.*).  The receiver gave Fryar "every opportunity

      [Fryar] needed . . . to make more money."  (*Id.*).

**Plaintiffs' Response:**  Disputed in accordance with the prior denials regarding Defendants maintaining final control over product ordering. Deny that he had any impact in growing his sales based upon these statements. (Fryar Dep. 199:13-200:17, See ████). Plaintiffs had no ability to impact shelf space or product placement in chain stores which accounts for virtually all of Fryar's sales.  Those decisions are made by Defendants' higher-ups. (Linthicum Dep. 36:7-21, 37:7-8, 63:10-13, 64:2-18, 140:5-141:15).

      d)  At his Family Dollar stores, Fryar did "extremely well."  (Fryar Dep. 201:7-

      202:18).  His relationship with the store manager there helped him increase his

      shelf space.  (*Id.*).  At one Family Dollar, he went from two feet of space to eight

      feet, which increased his sales.  (Fryar Dep. 202:19-23).

**Plaintiffs' Response:**  Disputed in accordance with the prior denials regarding Defendants maintaining final control over product ordering. Deny that he had any impact in growing his sales based upon these statements. (Fryar Dep. 199:13-200:17, ████).

      e)  After negotiating with store managers at Stop & Shop supermarkets, Hannaford

      supermarket and Price Chopper supermarket, Fryar received permission to leave

      extra bread in the back of the store "so if [his] display had a good weekend [he]

      was able to replenish the bread" using the bread he had "waiting" in the back.

      (Fryar Dep. 257:20-260:25).

**Plaintiffs' Response:** Disputed because leaving product in stores was a common practice for employees and distributors. (*e.g.,* Schucker Dep. 310:14-311:12, 316:5-16, 318:8-21, Valdez Dep. 146:5-147:9, Bower Dep. 231:5-232:12, 233:16-234:18).

    f) He maintained these strong relationships with the store managers by deciding to

        go to his customers on Wednesdays and Sundays to replenish the shelves even

        though he was not required to. (Fryar Dep. 260:8-25).

**Plaintiffs' Response:** Denied that he did not have a requirement to service some stores on Wednesday and Sunday, but he was still required to work those days. (███████████████ ████████.

    g) In addition to store managers, Fryar maintained good relationships with the "sign

        ladies" at his various accounts so that they would make signs for him that said

        things like "Wonder Bread two for five." (Fryar Dep. 184:6-186:21). This use of

        signage attracted customers to his products and thus helped him increase sales.

        (*Id.*).

**Plaintiffs' Response:** Disputed. Denied to the extent this had any real impact on his sales based upon these statements. (Fryar Dep. 186:17-21).

212. To further increase sales, Fryar used stickers on his products. (Fryar Dep. 184:6-18). Stickers gave "the customer a better view of what you have" and made it more likely the customer would buy the product. (*Id.*).

**Plaintiffs' Response:** Defendants' policy was to have stickers, a policy they enforced via store audits. This policy applies to employees as well. (██████).

213. Fryar also analyzed sales reports on a weekly basis and used them to decide which products to cut in his orders to reduce the amount of stale product he had to remove from the shelves. (Fryar Dep. 90:14-95:6, 172:25-173:14). The less stale product he had, the more money he could make. (Fryar Dep. 95:4-6).

**Plaintiffs' Response:** Disputed. Distributors attempted to reduce their stale product because Defendants unilaterally set stale product levels and penalized distributors if they

exceeded their percentage. (Fryar Dep. 94:25–95:6, Linthicum Dep. 62:5–18, 67:12–17, 68:7–
12, █████).

214.    "Equity-wise," Fryar increased his territory by around $10,000 as of September

2015. (Fryar Dep. 162:12-163:25, 203:20-204:14). He attributes this increase in the value of

his territory to "enhanced customer service" and "client relationships." (Fryar Dep. 203:20-

204:8).

    **Plaintiffs' Response:** Disputed. Admitted that Fryar would attribute any increase in
sales to his service and relationships. Deny that Fryar had any personal knowledge that his
territory increased in equity. (Fryar Dep. 163:6-25, 203:20-25).

215.    To the extent Fryar filed tax returns individually and on behalf of Ryan F. Baby,

Inc., he deducted business expenses from his income. (Stipulation ¶ 2).

    **Plaintiffs' Response:** Admitted due to Defendants' misclassification.

### 5.    Termination Of Fryar's Distributorship

216.    Fryar's Distributor Agreement was terminated in late January 2017. (Fryar Dep.

340:6-342:4, 348:22-349:7, 352:5-21, 356:3-11, 387:3-18, 388:18-389:19).

    **Plaintiffs' Response:** Admitted.

## II.   FACTS RELATED TO THE MOTOR CARRIER EXEMPTION

### A.   LEPAGE IS A MOTOR CARRIER AND THE PRODUCTS TRANSPORTED BY PLAINTIFFS ARE IN INTERSTATE COMMERCE

217.    Lepage is a motor carrier registered with the Department of Transportation

("DOT"). (Linthicum 7/21/17 Dec. ¶ 4).

    **Plaintiffs' Response:** Deny as to information and belief and to the extent this calls for a
legal conclusion.

218.    Distributors, including Plaintiffs, must register their businesses with the DOT and

receive a DOT number that they post on the side of their delivery vehicles in order to comply

with DOT regulations. (Linthicum 7/21/17 Dec. ¶ 5, Valdez Dep. 264:7-17, Schucker Dep.

322:23-323:17, Bower Dep. 330:23-331:6, SB000006, Shafer Dep. 14:24-16:3, 138:9-14).

**Plaintiffs' Response:** Defendants dictated this requirement in the Distributor

Agreements. (Distributor Agreement, ¶¶ 9.1–9.2).

219.    From March 2014 to the present, all of the product ordered by distributors in New

York has been made by out of state bakeries, including Lepage's bakeries in Brattleboro,

Vermont and Lewiston, Maine, as well as certain other out of state bakeries affiliated with

Flowers.    (Linthicum 7/21/17 Dec. ¶ 6).  Approximately 75% of the products ordered by

distributors in New York from March 2014 to the present has come from Lepage's bakeries in

Vermont and Maine, with the rest coming from other out of state bakeries.  (Linthicum 7/21/17

Dec. ¶ 6).

**Plaintiffs' Response:**  Plaintiffs deny personal knowledge of these statements other than

admitting that the products are baked outside of New York.

220.    Lepage's bakeries in Vermont and Maine decide how much product to make

based on the orders they receive from distributors.  (Linthicum 7/21/17 Dec. ¶ 7).  The bakeries

bake products only to fulfill specific orders placed by distributors.  (*Id.*).

**Plaintiffs' Response:**  Plaintiffs deny personal knowledge of these statements.

221.    Lepage then transports these products from the bakeries in Vermont and Maine

across state lines to warehouses in New York.  (Linthicum 7/21/17 Dec. ¶ 8).

**Plaintiffs' Response:**  Admitted.

222.    Lepage owns the bread products during the transport process.  (Linthicum 7/21/17

Dec. ¶ 8).

**Plaintiffs' Response:**  Deny personal information as to this statement.

223.    All of the products baked by Lepage and ultimately delivered to the warehouses are intended to be sold to specific customers by the distributors that ordered them.  (Linthicum 7/21/17 Dec. ¶ 8).

**Plaintiffs' Response:**  Deny as to the veracity of this statement.

224.    Other bakeries outside the State of New York also bake products to fulfill orders distributors have placed for specific customers.  (Linthicum 7/21/17 Dec. ¶ 9).  To the extent those bakeries make product for distributors in New York, they transport them to Lepage's bakery in Lewiston, Maine, and then Lepage transports them to its warehouses in New York.  (Linthicum 7/21/17 Dec. ¶ 9).

**Plaintiffs' Response:**  Plaintiffs deny having any personal knowledge of these statements.

225.    Since at least March 2014, when products from Lepage and the other bakeries arrive at warehouses in New York, including the Newburgh warehouse, a Lepage employee or contractor divides them into stacks for each distributor based on the product each distributor ordered.  (Linthicum 7/21/17 Dec. ¶ 10).  The products themselves are not altered or modified in any way while at the warehouse, and no product is stored or inventoried at the warehouse.  (Linthicum 7/21/17 Dec. ¶ 10).

**Plaintiffs' Response:**  Denied as to knowledge and information.

226.    Once the distributors pick up their products at the warehouse, they take title to them and deliver them to customers to fulfill the orders they placed.  (Linthicum 7/21/17 Dec. ¶ 11).

**Plaintiffs' Response:**  Admitted.

### B.    BOWER'S DELIVERIES TO CONNECTICUT

227.    Bower ordered product for customers in Connecticut, and he received such

product in New York and then transported the product to the customers in Connecticut.  (Bower

Dep. 150:6-9, 206:18-208:9).

**Plaintiffs' Response:**  Disputed but admit that for a period of time, he delivered product
there.

### C.    DELIVERY VEHICLES USED BY PLAINTIFFS

228.    The vehicles that Plaintiffs used to make deliveries weighed over 10,000 pounds.

(Linthicum 7/21/17 Dec. ¶ 13, Valdez Dep. 183:10-17, 266:24-267:25, 269:19-270:16, Valdez

Exs. 23, 24, Schucker Dep. 186:18-187:3, Heinrich Dep. 103:14-104:9, 358:14-25, Heinrich Ex.

21, Bower Dep. 250:13-251:7, SB000006, Shafer Dep. 193:11-16, Fryar Dep. 254:24-255:10).

**Plaintiffs' Response:**  Disputed.  For example, Heinrich, Schucker and Valdez also
utilized their personal cars to service customers to deliver products.  (Schucker Dep. 318:21-
320:8, Heinrich Dep. 104:10-17, 230:14-24, 231:17-25, 232:9-25, 234:16-24, Valdez Dep.
147:3-148:2 (Valdez delivered product this way "about once a month").

229.    During some workweeks, Valdez uses his personal vehicle, a Toyota Prius, on

Wednesdays and Sundays.  (Valdez Dep. 145:24-146:9).  However, when the DuBose brothers

worked for him, Valdez did not always work on Wednesdays and Sundays.  (Valdez Dep. 155:3-

11, 159:2-7).  Even now, Valdez occasionally will have a workers service customers

Wednesdays and/or Sundays.  (Valdez Dep. 80:6-16).

**Plaintiffs' Response:**  Denied Valdez stopped working on Wednesdays and Sundays.
(Valdez Dep. 156:18-157:23).

230.    On Wednesdays and Sundays when Valdez does work, he does not go into the

warehouse and instead moves product that he previously delivered from the customer's

stockroom to the shelves, and merchandises the product on the shelves to increase the likelihood

that shoppers will purchase his products.  (Valdez Dep. 145:5-23).  He only works about four

and a half hours on those days.  (Valdez Dep. 148:10-23).

**Plaintiffs' Response:**  Disputed.  Valdez also utilized his personal vehicle to service

customers and deliver product.  (Valdez Dep. 146:5-148:2).  This was the same practice

Plaintiffs had as employees.

231.   In total, during weeks when Valdez worked on Wednesdays and Sundays, he only

spent 10 hours a week working on days he drove his personal vehicle, while he spent

approximately 50 hours working on days he drove his truck.  (Valdez Dep. 121:24-122:13,

131:7-18, 130:23-131:3, 132:2-4; 148:10-23).

**Plaintiffs' Response:**  Denied.

232.   Schucker used his family vehicle, a Cavalier Jetta, on Wednesdays and Sundays

instead of his truck.  (Schucker Dep. 318:7-18).

**Plaintiffs' Response:**  Admitted that he also delivered product on those days.  (Schucker

Dep. 318:21–320:8).

233.   In total, on days in which he used his delivery vehicle, Schucker worked

approximately sixty to seventy hours a week.  (Schucker Dep. 207:25-208:6, 381:17-382:5).  On

days he used his personal car, Schucker worked approximately sixteen hours a week.  (Schucker

Dep. 310:20-311:12).

**Plaintiffs' Response:**  Admitted.

234.   Heinrich uses his personal car, a Honda Accord, only on Wednesdays and

Sundays.  (Heinrich Dep. 104:10-17, 234:15-24).

**Plaintiffs' Response:**  Admitted.

235.   In total, Heinrich works between seven and ten hours a day on his five delivery

days, when he uses his delivery truck, whereas he only works three to four hours per day on

Wednesdays and Sundays.  (Heinrich Dep. 83:2-6, 150:14-19, 226:12-227:8, 228:18-229:8, 231:11-25, 234:4-13).

**Plaintiffs' Response:**  Admitted.

236.    Bower used his personal vehicle, a Dodge Caravan, on Wednesdays and Sundays. (Bower Dep. 251:18-21).

**Plaintiffs' Response:**  Admitted.

237.    In total, Bower worked approximately fifty hours a week on his five delivery days, whereas he only worked eight hours per week on days he used his personal vehicle. (Bower Dep. 203:19-22, 215:22-216:6, 251:18-252:19, 252:25-253:9).

**Plaintiffs' Response:**  Admitted.

238.    Shafer used his personal car, a Honda CRV, on Wednesdays and Sundays. (Shafer Dep. 193:17-24).

**Plaintiffs' Response:**  Admitted.

239.    In total, Shafer worked about 40 hours a week on delivery days and 8 hours a week on Wednesdays and Sundays.  (Shafer Dep. 168:4-15, 191:11-19).

**Plaintiffs' Response:**  Admitted.

240.    Fryar used his personal car on Wednesdays and Sundays.  (Fryar Dep. 256:12-257:19).

**Plaintiffs' Response:**  Admitted.

241.    In total, Fryar used his truck around seventy hours a week, whereas he only used his personal car around eight hours a week.  (Fryar Dep. 257:4-19, 267:2-5, 277:11-278:24).

**Plaintiffs' Response:**  Admitted.

## III.   FACTS RELATED TO OUTSIDE SALES EXEMPTION

242.   Valdez characterized himself as a "salesman" for the period from June 2015 to

January 2016. (Valdez Dep. 87:24-88:16).  During this period of time, he did not personally

service either of his territories, and instead had two workers who serviced them for him.  (*Id.*).

**Plaintiffs' Response:**   Denied. Defendants' references to the record are disputed and
there is no remote reference to him viewing himself as a "salesman." From the time he purchased
a second route, he was unable to obtain any new customers. (Valdez Dep. 74:6-94:6-9).
Building up sales was not practicable in existing stores because the manager wanted to interface
with the Defendants directly and then the Defendants would call Valdez due to Defendants'
controls over chain stores which Defendants admit. (Linthicum Dep. 36:7-21, 37:7-8, 140:5-25).
Therefore, he had no real ability to gain sales which had been a key component of Defendants'
sales pitch. (Id. 251:14-21, 253:2- 8). During this time period, Valdez went store to store with
his helper and he performed all of the core duties except actually carrying the bread. ( Id. 90:16-
24). He especially had to give "tlc" to Hannafords and Walmarts so he was in those stores
regularly to make sure they were being serviced properly so this was the same as if he was
operating a route as an employee. (Id. 158:19-25). At the time, he was losing "a lot" of money
and was not earning enough money to pay for the driver who was operating the route and he was
using his personal money to make up for the expenses he was being charged. (Id. 78:17-79:4).
He eventually sold the route at a loss. (Id. 97:5-9).

243.   Valdez went to various stores to try to talk to "grocery manager[s]" and others

there to convince them to buy product. (Valdez Dep. 87:24-88:16, 256:5-24).

**Plaintiffs' Response:**   Disputed. Defendants had personal knowledge that this strategy
would not be feasible, given the Defendants' control over processes.  (Linthicum Dep. 36:7-21,
37:7-9, 140:5-25). Valdez tried to make sales but since he was at the stores so early, there was
never a manager or person in charge that he could connect with. (Valdez Dep. 89:3-16).
Distributors are at the mercy of their chain stores such as Walmart, ShopRite, Stop and Shop,
Price Chopper, Hannaford, Dollar General and Family Dollar, all of whom have planograms for
products distributors were selling and who comprise virtually all of Plaintiffs' sales volume. (Id.
253:14-254:24, 253:2-8, ▮▮▮▮▮▮▮). Valdez bought business cards with the expectation that he
could build relationships with his stores as he was directed to during the sales pitch. (Id. 251:6-
21). It turned out to be a useless investment because the store owners would bypass the
distributor and communicate directly with the Defendants' company. (Id. 251:22-256:18).

244.   Valdez independently solicited new business. *See* Valdez Dep. 225:8-226:6

(describing account he obtained during this period of time based on his solicitation efforts).

**Plaintiffs' Response:**   Defendants required this policy for employees and distributors.
Denied that it had any significant impact on Valdez' ability to gain sales and his primary duties
never changed. (Valdez Dep. 90:16-24, 158:19-25). Valdez tried to make sales but since he was

at the stores so early, there was never a manager or person in charge that he could connect with. (Valdez Dep. 89:3-16). The service requirements of even the small stores that paid him $20 per week made it impossible for him to find new customers, if any were to be found. (Valdez Dep. 91:11-21). His hands were tied in many aspects including Defendants charging such a high price for bread at small locations that the store owner could buy it cheaper directly from Shop Rite. (Id. 91:17-18, 92:18-93:3). Defendants refused in at least one instance to adjust the price of the bread so that Valdez could get a new customer. (Id. 93:1-4, 141:6-18).

245.    At existing clients, Valdez also tried to persuade managers to give him additional

shelf space and displays in order to increase his sales.   (Valdez Dep. 87:24-88:10, 256:5-257:4).

**Plaintiffs' Response:** Disputed. Due to Defendants' broken promise of providing sales support, Valdez took it upon himself to try to obtain more space in stores. However, this was impossible since managers only wanted to deal with Defendants. (Linthicum Dep. 140:5-141:25, Valdez Dep. 89:3-16).

246.    During this time period, Valdez spent no more than one hour a day at the

warehouse and spent the rest of the time outside of the warehouse attempting to solicit sales from

new and existing customers.  (Valdez Dep. 102:24-103:5, 103:23-104:10).

**Plaintiffs' Response:** Denied that this is what the transcript states or that Valdez' duties changed. Also, during this time period, Valdez went store to store with his helper and he performed all of the core duties except actually carrying the bread. ( Id. 90:16-24). He especially had to give "tlc" to Hannafords and Walmarts so he was in those stores regularly to make sure they were being serviced properly so it was the same as if he was operating a route. (Id. 158:19-25).

247.    All the earnings Valdez received from CK Sales were based on how much

product he sold. (Valdez 177:21-178:11 (his earnings consisted of the profit on the difference

between the price Valdez was able to resell products to customers and the suggested wholesale

price he paid for them).

**Plaintiffs' Response:** Disputed. Valdez was paid on the product he sold, subject to Defendants' unilateral controls previously described. Denied as to any legal conclusion to be drawn from Defendants' reference to CK Sales alone. Denied that his profit was calculated as stated since Defendants made deductions for various expenses and stale product charges.

## IV.  FACTS RELATED TO NYLL UNLAWFUL DEDUCTION CLAIMS

248.    Plaintiffs "authorize[d] the Company to collect from [them], via the weekly

settlement statement, business expenses," such as truck expenses, administrative fees and

warehouse fees. (Valdez Dep. 335:14-24, Valdez Ex. 35, Schucker Dep. 347:20-348:20,

Schucker Ex. 10, Heinrich Dep. 299:17-300:2, Heinrich Ex. 15, Bower Dep. 320:7-19, Bower

Ex. 17, Shafer Dep. 216:19-22, Shafer Ex. 5, Fryar Dep. 320:12-16, Fryar Ex. 12).

**Plaintiffs' Response:** Defendants required this arrangement as part of their overall
scheme to retain control and security over Plaintiffs and the routes they sold to them. (███████,
Agreements).

## V.    FACTS RELATED TO ERISA CLAIMS

249.    Independent contractors are ineligible to participate in any of Flowers' benefits

plans even if a court subsequently determines that they are common law employees and not

independent contractors.   (Dkt. 52, Hickey Dec. ¶ 5, Ex. A, Sect. 1.31; ¶ 6, Ex. B, Sect. 1.31; ¶

7, Ex. C, Sect. 2.8; ¶ 8, Ex. D, Sect. 1.07).

**Plaintiffs' Response:**  Denied as this calls for a legal conclusion.

250.    Plaintiffs did not make any claims to Flowers, Lepage, CK Sales or any related

entity for unpaid benefits prior to the filing of this lawsuit. (Valdez Dep. 343:9-13, Schucker

Dep. 395:15-396:8, Heinrich Dep. 324:18-24, Bower Dep. 319:3-20, Shafer Dep. 215:11-21,

Fryar Dep. 319:15-21).

**Plaintiffs' Response:**  Disputed.  Defendants never provided Plaintiffs with documents
related to benefits or informed them of their ERISA rights or benefits thus under the statute,
Plaintiffs were not required to make any claims. (see Plaintiffs' brief).

251.    Plaintiffs' Distributor Agreements provide that Plaintiffs are not eligible for

benefits and waive any right to such benefits. (Distributor Agreement at § 16.1) ("In the event

Distributor…hereafter become[s] eligible to participate in any…benefits, Distributor…hereby

waives any right to participate in such benefits."); (Valdez Exs. 1, 2, Schucker Ex. 7, Heinrich

Ex. 2, Bower Ex. 3, Shafer Ex. 3, Fryar Ex. 4).

    **Plaintiffs' Response:**  Defendants illegally deprived Plaintiffs of benefits.

## VI.    FACTS RELATED TO RELEASES

### A.    PLAINTIFFS VALDEZ, SCHUCKER, HEINRICH, SHAFER AND FRYAR RELEASED NYLL, ERISA AND UNJUST ENRICHMENT CLAIMS

252.    Upon any transfer or sale of Distribution Rights, Plaintiffs' Distributor

Agreements require that each Plaintiff sign "a release of all [] interests and claims to and in such

Distribution Rights and all [] interests under or arising out of th[e] Agreement, together with a

general release of claims against Company and its affiliates." (Distributor Agreement at § 15.1);

(Valdez Exs. 1,2, Schucker Ex. 7, Heinrich Ex. 2, Shafer Ex. 3, Fryar Ex. 4).

    **Plaintiffs' Response:**  Defendants required Releases to be signed upon return of their
territories without any consideration. Deny that the Releases are binding upon the individual
Plaintiffs or that they are legally enforceable.  (███████).

253.    Similarly, the Franchise Disclosure Document that Plaintiffs' received requires

any Plaintiff "[u]pon any sale or transfer of the Territory and Distribution Rights, including any

sales of transfer to [Company] . . . to deliver to Company a release of all [Plaintiff's] interests

and claims to and in the Distribution Rights and [Plaintiff's] interests under the Distributor

Agreement, together with a general release of claims." (Linthicum 7/21/17 Dec. ¶ 2, Linthicum

Ex. A).

    **Plaintiffs' Response:**  Defendants require Releases to be signed. Deny that the Releases
are binding upon the individual Plaintiffs or that they are legally enforceable.

254.    When Plaintiffs Schucker, Heinrich, Shafer and Fryar sold their distribution

rights, either in whole or in part, they signed general releases waiving "any and all claims,

actions, cause of actions, rights, demands or remedies, whether known or unknown, which

[Plaintiffs] ever had, or may claim to have had, from the beginning of time until as of the

moment he/she/it signs this Agreement arising out of, or relating to" the Distributor Agreement,

including "any and all tort and contract claims." (Schucker Dep. 389:4-25, Schucker Ex. 17,

Heinrich Dep. 141:24-143:23, Heinrich Ex. 8, Shafer Dep. 241:24-242:21, 250:23-251:13,

Shafer Exs. 9, 11, Fryar Dep. 149:24-150:24, Fryar Ex. 6).

    **Plaintiffs' Response:** Denied that these releases are binding upon the individual
Plaintiffs or are legally enforceable.

Dated: September 1, 2017                    Respectfully submitted,

                                        *s/ Randy J. Perlmutter*
                                        Randy J. Perlmutter, Esq.
                                        KANTROWITZ, GOLDHAMER
                                        & GRAIFMAN, P.C.
                                        747 Chestnut Ridge Road, Suite 200
                                        Chestnut Ridge, New York 10977
                                        Tel: 845.356.2570
                                        Fax: 845.356.4335
                                        rperlmutter@kgglaw.com

                                        *Attorneys for Plaintiffs*